UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

WASHBURN LAW, PLLC,

DEBTOR

James B. Angell, Chapter 7 Trustee for

Washburn Law, PLLC,

        Plaintiff,

vs.


All American A, LLC dba "All American Abstract" et al.,

        Defendants.
-----------------------------------------

)  CASE NO:
)
)  23-00222-5-DMW
)
)  CHAPTER 7
)
)
)
)
)
)
)  Adv. Pro. No.
)  23-00082-5-DMW
)
)
)
)
)
)
)

The Honorable Judge David M. Warren, Presiding


TRANSCRIPT OF THE PROCEEDINGS

In Re: Washburn Law, PLLC

2

E X A M I N A T I O N   I N D E X

| Witness | Examination/By Whom | Page No. |
|---|---|---|
| Derek Ellington | Direct/Angell | 13 |
| | Cross/Behr | 36 |
| Robert Nordlander | Direct/Angell | 40 |
| | Cross/Behr | 77 |
| | Redirect/Angell | 78 |
| Jonathan Washburn | Direct/Angell | 79 |
| | Redirect/Angell | 112 |
| | Cross/Behr | 113 |
| Garland Lee Zuber, Jr. | Direct/Angell | 117 |
| | Cross/Behr | 124 |
| | Recross/Behr | 127 |
| | Redirect/Angell | 128 |

In Re: Washburn Law, PLLC

3

1         THE CLERK:  Plaintiff's motion for preliminary

2    injunction and motion to dismiss complaint filed by Defendant

3    Jackson Munsey, Jr. in Adversary Proceeding Angell vs. All

4    American A, LLC, et al., 23-00082.  James Angell, Chapter 7

5    Trustee.  Brian Behr, Attorney for the Bankruptcy

6    Administrator.  There are no attorneys present on behalf of

7    the Defendants.

8         THE COURT:  Good morning.

9         MR. ANGELL:  Good morning, Your Honor.  How are you

10   doing this morning?

11        THE COURT:  I'm well.  How are you?

12        MR. ANGELL:  Good, good.

13        THE COURT:  Good.

14        MR. ANGELL:  Let's see.  I spoke this -- I spoke

15   with Jeff Foster.  He does not plan to attend today.  He was

16   counting on a continuance because of the weather, but he

17   doesn't think he can get here until --

18        THE COURT:  The weather.  Good lord.

19        MR. ANGELL:  -- 12:00.  And then I spoke with

20   Rusty McLean's office, and he has jury duty today, so he's

21   not planning on attending, either.

22        THE COURT:  So am I wrong?  With jury duty, aren't

23   -- don't you get the summons from the sheriff about four

24   weeks in advance?

25        MR. ANGELL:  Your Honor, it's been a long time since

In Re: Washburn Law, PLLC

4

1   I've gone for --

2          THE COURT:  I think that's the way it normally

3   operates.

4          MR. ANGELL:  -- jury duty.  But I think it's

5   incumbent on Mr. McLean to inform the court and seek a

6   continuance if --

7          THE COURT:  Obviously, I'm very disappointed in all

8   that.  I'm going to hear your case.  And you know, again, I

9   was going to give the opportunity provided that the fees for

10  -- your fees and the witnesses' fees were being paid by Mr.

11  Foster, allow him to appear, you know, when he got here.  So

12  he's not planning to come at all?

13         MR. ANGELL:  He says he's not planning on coming.

14  He says he wouldn't get here till 12.

15         THE COURT:  Well, you know -- he's not even on the

16  road?

17         MR. ANGELL:  No.  That's what he said.

18         THE COURT:  And I -- you know, I'm just really

19  incredulous about the whole deal.  I mean, it would never --

20  you wouldn't do that in a million years.  Mr. Behr wouldn't

21  do that in a million years.  And I know I wouldn't do it in a

22  million years.  Well, what do you want to do?  I mean, I'm

23  ready.  And we're dressed up and ready to go.  And I'm glad

24  to hear it.  And if --

25         MR. ANGELL:  Well, I'd like --

In Re: Washburn Law, PLLC

5

1         THE COURT:  We'll let the chips fall where they can.

2         MR. ANGELL:  I'd like judgement on the motion to

3    dismiss.  We'll start there.  I don't think it's being

4    prosecuted.  I think it's abandoned at this point.

5         THE COURT:  Okay.  So there was a deal where -- we

6    had a little bit of a snafu as far as getting the -- I think

7    the entry of default.  Let's see.  What do my note -- well,

8    let me look him up.  But we didn't get the -- what was that?

9         THE CLERK:  Okay.  That's a different --

10        THE COURT:  A different defendant.  Okay.

11        MR. ANGELL:  Mr. Zuber, I think, because there was

12   an entry of default but there was a -- the court --

13        THE COURT:  I gave him ten days to set that aside.

14        MR. ANGELL:  And he did get an answer filed.  So I

15   think the court would probably rescind that entry of default

16   as to his --

17        THE COURT:  Okay.

18        MR. ANGELL:  But he didn't -- he may have made a

19   motion to dismiss, too.  I --

20        THE COURT:  He did.  I think that's on for today.

21   So I'm going to essentially deny that for failure to

22   prosecute.

23        MR. ANGELL:  Okay.

24        THE COURT:  And I'm going to set aside the entry of

25   default and just allow it to go on as to him because he --

In Re: Washburn Law, PLLC

6

1    he's cooperating with you a little bit, isn't he?

2              MR. ANGELL:  He has been cooperating.  Yes.

3              THE COURT:  Okay.  All right.

4              MR. ANGELL:  Okay.  Your Honor --

5              THE COURT:  So the other one is the one you want me

6    to --

7              MR. ANGELL:  I would like to make an evidentiary

8    record on the motion for preliminary junction.

9              THE COURT:  But you're -- let's go to the motion to

10   dismiss complaint filed by Jackson Munsey.

11             MR. ANGELL:  Right.

12             THE COURT:  Okay.  I'm going to deny that motion

13   because that one is -- has not been prosecuted.

14             MR. ANGELL:  Okay.  Thank you, Your Honor.

15             THE COURT:  Okay.  All right.

16             MR. ANGELL:  Your Honor, I have handed up exhibit

17   books and there's also an index to exhibits.  We'll go

18   through those as we need to.  I have handed up bank

19   statements, but I do not plan to go through those bank

20   statements.  Those are simply the foundation for my expert

21   witnesses' testimony, who I expect to be here any time soon.

22             THE COURT:  Okay.

23             MR. ANGELL:  Any -- what I'd like to start off with

24   is a video of Jackson Munsey.

25             THE COURT:  Okay.

In Re: Washburn Law, PLLC

```
                                                               7
 1          MR. ANGELL:  And I think it has admissions against
 2     interest, Your Honor.
 3          THE COURT:  Okay.  Well, Mr. Behr, did you want to
 4     be heard to begin with?
 5          MR. BEHR:  No, Your Honor.  I'm here to support the
 6     Trustee and also to support him in a technological fashion by
 7     [INDISCERNIBLE].
 8          THE COURT:  Okay.
 9          MR. BEHR:  I'll note that we -- are we going to stop
10     the video early or --
11          MR. ANGELL:  Yes.
12          MR. BEHR:  There is a relevant portion of this video
13     and then there's also a portion that is relevant but not
14     relevant to the matter today and is of a very personal
15     nature.  We'll -- it's our intention to stop the video before
16     that portion is played.
17          THE COURT:  Okay.
18          MR. BEHR:  If that's okay, Your Honor.
19          THE COURT:  It's up to your discretion, so.  While
20     you're doing that, Mr. Behr, if you can multitask, what is
21     your position on how the court's proceeding today?
22          MR. BEHR:  I think it's within the court's
23     discretion to grant a continuance if one is requested.  I
24     don't believe there has been one requested.  I don't -- it's
25     not how I practice and I can't -- I understand that there is
```

In Re: Washburn Law, PLLC

8

1    a -- you know, we're having a bit of a -- if you watch the

2    news, it's a WRAL weather emergency, right, or something like

3    that.  But so right now --

4              THE COURT:  It's the [INDISCERNIBLE] of the day, you

5    know.

6              MR. BEHR:  If it's later in the day -- and I don't

7    think that there's actually anything before Your Honor to

8    consider.  There was no motion filed.  There is no -- so I

9    think that we proceed.

10             THE COURT:  I'll also just state for the record that

11   we received at 3:45, 3:30 yesterday another -- a memorandum

12   from Mr. Foster.  And again, this morning we reviewed that,

13   spent time on a 106-page document that I reviewed this

14   morning in preparation for this hearing.  So, again, we are -

15   - we're ready to go.  I'm not asking for an endorsement of

16   what I'm doing.  I just want to know what the BA's position

17   was.

18             MR. BEHR:  Again, you know, Your Honor, I think Your

19   Honor had -- as Your Honor has noted, you've read the

20   submissions and I think perhaps considering those when also

21   weighing the Trustee's evidence would -- and a reflection on

22   the record of that might -- to make -- if there is an appeal,

23   show that at least their side was considered in Your Honor

24   making a decision.

25             (UNRELATED MATTERS WERE DISCUSSED FOR ONE MINUTE)

In Re: Washburn Law, PLLC

9

1          THE COURT:  How many witnesses do you expect, Mr.
2    Angell?  You got two?

3          MR. ANGELL:  Your Honor, I have at least two.  Maybe
4    three.

5          THE COURT:  Okay.

6          MR. ANGELL:  Depending on how Mr. -- I've asked Mr.
7    Washburn to come from Wilmington.  He's on his way.

8          THE COURT:  Okay.

9          MR. ANGELL:  He expects to be here about 10:30, so I
10   anticipate he will be available to testify.

11         THE COURT:  Okay.

12         MR. M. WASHBURN:  Your Honor, my name's Michael
13   Washburn.  I'm with the Wake County Bar.  I'm here to support
14   my brother, Jonathan Washburn.

15         THE COURT:  Okay.  Thank you.

16         MR. M. WASHBURN:  And he is on his way.

17         THE COURT:  Okay.  Thank you.

18         MR. ANGELL:  Just to be clear, are you making an
19   appearance for Jonathan Washburn?

20         MR. M. WASHBURN:  I just -- I would like to have my
21   participation in this case as limited as possible.  It's not
22   my area of expertise.  I happen to be a lawyer.  I'm his
23   brother.  I don't anticipate that I am going to represent him
24   in these proceedings, but I am a trial lawyer and he just
25   asked me could I please be [INDISCERNIBLE].

In Re: Washburn Law, PLLC

10

1          THE COURT:  Okay.  So are you admitted in the US

2     District Court?

3          MR. M. WASHBURN:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. M. WASHBURN:  These -- all districts in North

6     Carolina.

7          THE COURT:  Okay.  So --

8          MR. M. WASHBURN:  I don't know about bankruptcy.  I

9     don't [INDISCERNIBLE].

10         THE COURT:  Well, if you're admitted to the US

11    District Court --

12         MR. M. WASHBURN:  Yes, Your Honor.

13         THE COURT:  -- then you're admitted here.  So do you

14    want -- you don't have to make an appearance.  And if you

15    want to just, you know, sit and take notes, that's fine.  I

16    mean, but --

17         MR. M. WASHBURN:  [INDISCERNIBLE] cooperation.  I

18    know where he is.  I'm in touch with him.  I can kind of --

19         THE COURT:  Okay.

20         MR. M. WASHBURN:  I can show him where to go and get

21    him up here.

22         THE COURT:  Okay.  Very good.  Thank you for your

23    assistance on that.  If you want to let Mr. Foster know that

24    he still has a window of opportunity to get here today.  He

25    can certainly -- it's three hours from Charlotte.

Pace Reporting Service, Inc.  919-859-0000     www.pacereporting.com

In Re: Washburn Law, PLLC

11

1          THE COURT REPORTER:  A memorandum.  I printed
2    [INDISCERNIBLE].
3          MR. ANGELL:  Your Honor, does that mean -- just so I
4    tell him correctly -- does that mean that Your Honor is going
5    to hold the hearing open to allow him --
6          THE COURT:  I'm not going to hold it open but I'll
7    allow him to address the court and present any evidence he
8    wants at that particular time.  I know it's out -- I'm going
9    to say it -- maybe I will, maybe I won't.  I'm going to give
10   him an opportunity to be here if he'll go ahead and get on
11   the road.
12         MR. ANGELL:  If he gets here before the conclusion
13   of the hearing?
14         THE COURT:  Yeah.  If he does.
15         MR. ANGELL:  Okay, good.  Thanks.  I just wanted to
16   properly --
17       (UNRELATED MATTERS WERE DISCUSSED FOR ONE MINUTE)
18         MR. BEHR:  Your Honor, I'm sorry to interrupt.  Mr.
19   Angell has suggested [INDISCERNIBLE] give Mr. Foster a call.
20   That way we can confirm that he's received the message.  If
21   Your Honor --
22         THE COURT:  Okay.
23         MR. BEHR:  -- will just give Mr. Angell a moment to
24   step out.
25         THE COURT:  That'll be fine.  Go ahead.

In Re: Washburn Law, PLLC

12

1          MR. ANGELL:  Thank you, Your Honor.

2      (UNRELATED MATTERS WERE DISCUSSED FOR FOUR MINUTES)

3          MR. ANGELL:  He said he doesn't think he can get

4    here till 2:00.  And he asked me how long my evidence would

5    take.  [INDISCERNIBLE] probably a couple hours.

6    [INDISCERNIBLE] doesn't see any point in coming.

7          THE COURT:  Yes, sir?

8          MR. ANGELL:  Thank you, Your Honor.  I spoke with

9    Mr. Foster.  I informed him that the court had invited him to

10   attend if he would like to attend but that the court was not

11   going to hold the matter open for him to get here.  He said

12   he does not think he could get here before 2:00.  He

13   asked me for a forecast as to how long my evidence would take

14   or argument would take.  I said maybe two hours.  And he said

15   that he doesn't see any point in coming.  He did ask if he

16   could listen in to the hearing on -- over the telephone, even

17   if he can't --

18         THE COURT:  We put these things on the CourtSpeak,

19   so he can hear it.

20         MR. ANGELL:  He can hear it after the --

21         THE COURT:  I mean, I think, you know, we put it on

22   there about 30 minutes after the hearing, don't we?  And the

23   clerk is telling me yes.  So, yeah.  No.  He -- we're ready

24   to go, so.

25         MR. ANGELL:  Okay.  Thank you, Your Honor.

In Re: Washburn Law, PLLC

13

1      THE COURT:  Thank you for doing that.  You know, I'm

2  trying to give the guy -- you know, this morning when he knew

3  that I wasn't going to grant, I guess, the verbal request --

4  at least the request you had made to Ms. Donacott [phonetic].

5  If he would have left then, then he would have been here by

6  now.

7      MR. ANGELL:  Right.

8      THE COURT:  And so I can't stress, on the record,

9  how important it is for lawyers to be where lawyers ought to

10  be if they're going to represent a client.  You know, this is

11  a -- I may end up having a show cause hearing.  I don't know.

12  But I'm just -- and I've got another lawyer who's in jury

13  duty.  You know, it's just -- this is no way to conduct

14  judicial business.  So I'm not ranting at you.  I'm ranting.

15  Okay?

16      MR. ANGELL:  That's all right, Your Honor.  As long

17  as you're not ranting at me, I'm happy to --

18      THE COURT:  No, you're fine.  You're here.  You're

19  ready to go.  So let's do it.

20      MR. ANGELL:  We're going to proceed with the video,

21  Your Honor.

22      THE COURT:  Thank you.  Do you want to lay any

23  foundation about this at all so I know what I'm looking at?

24      MR. ANGELL:  Your Honor, I filed a 2004 request of

25  Stephanie Munsey to produce any -- and I think of Jack

In Re: Washburn Law, PLLC

14

1   Munsey, too -- to produce any videos that they had.  I had

2   learned previous that Mr. Munsey had submitted a -- had

3   prepared a video and submitted it to the North Carolina --

4   the State Bar.  And this is a video that he submitted.  But

5   it was received pursuant to a 2004 --

6          THE COURT:  And when was this prepared, and when did

7   you get it?

8          MR. ANGELL:  It was prepared -- I believe it was

9   prepared in -- on December 15th --

10         UNIDENTIFIED SPEAKER:  2022.

11         MR. ANGELL:  -- 2022.  I knew that before he told

12   me.  No, that's the date that's on the video file date.

13         THE COURT:  Okay.

14         MR. ANGELL:  So I believe that's the date of it.  I

15   don't have any other evidence to show that.

16         THE COURT:  Okay.  All right.  Very good.

17         MR. ANGELL:  While Mr. Behr is off fooling around

18   there, the State Bar closed down Washburn Law.  I think it

19   was the first week of December.  And this was done after

20   that.  So just to put a time --

21         THE COURT:  2022.

22         MR. ANGELL:  '22, yes.

23         MR. BEHR:  Your Honor, this was working before we

24   started the hearing.

25         THE CLERK:  Is that plugged into the cord?  That

Pace Reporting Service, Inc.  919-859-0000      www.pacereporting.com

In Re: Washburn Law, PLLC

15

1  cord?

2          MR. BEHR:  I believe it is.

3          [VIDEO PLAYS FOR ELEVEN MINUTES]

4          THE COURT:  Yes?

5          MR. BEHR:  There is the short portion after that,

6  Your Honor, that relates to the a very personal matter

7  involving Mr. Munsey that -- probably keep off the public

8  record if it's all right with the court.  If Your Honor would

9  like a copy of this video, I can submit it to chambers.

10  Obviously, Mr. Angell's likely to move to enter it into

11  evidence.  And Your Honor, listening to it, I'm not certain

12  how well it's recorded by the system, but I can submit a copy

13  of the video to the court if that's what Your Honor would

14  like.

15          THE COURT:  Probably so.  Let's do that.

16          MR. BEHR:  Yeah.

17          MR. ANGELL:  Your Honor, I would ask that it be

18  admitted.  I left a number for it as Exhibit 6.

19          THE COURT:  Okay.

20          MR. ANGELL:  And I did not know how to submit it to

21  the court.

22          THE COURT:  We'll take that in and then just have it

23  submitted to the clerk after the hearing.

24          MR. ANGELL:  Okay.  Also, note that at Exhibit 7, it

25  -- there's a transcript of this video, so --

In Re: Washburn Law, PLLC

16

1        THE COURT:  Oh, is there a transcript?  Okay.  If we
2   have the transcript, I'm probably pretty satisfied that that
3   would work as well as the video.
4        MR. ANGELL:  It's not a formal transcript.  It's
5   simply the --
6        THE COURT:  It's the Trustee's paralegal typing it
7   out?
8        MR. ANGELL:  My -- yeah.  That's right.  That's
9   right, Your Honor.
10       THE COURT:  Yeah.  I've got those transcripts.
11       MR. ANGELL:  So I'd prefer to have them both
12   entered.
13       THE COURT:  Okay.  That works fine.  Yeah.  So 7 and
14   6 are admitted.
15       MR. ANGELL:  And 7, I guess, is not technically
16   evidence.  It's exemplary evidence.  Yeah.  That's just the
17   --
18       THE COURT:  Admitted as such.
19       MR. ANGELL:  Your Honor, I think at this point I
20   would like to call Derek Ellington to the stand.  May I
21   approach, Your Honor?
22       THE COURT:  You may.
23                    DEREK ELLINGTON,
24                    having been first duly sworn,
25                    was examined and testified

In Re: Washburn Law, PLLC

17

1       as follows:

2   DIRECT EXAMINATION BY MR. ANGELL:

3       Q.    Mr. Ellington, do you need a copy of your CV for

4   this?

5       A.    No, sir.

6       Q.    Thank you.  Would you state your name?

7       A.    Derek Ellington, D-E-R-E-K, E-L-L-I-N-G-T-O-N.

8       Q.    And Mr. Ellington, are you employed by the estate in

9   this case?

10      A.    Yes, sir.  By yourself, the Trustee.  Yes, sir.

11      Q.    Okay.  That's right.  I -- okay.  And do you have a

12  company that you work for?

13      A.    Yes.  I worked with Ellington Digital Forensics in

14  Wake Forest, North Carolina.  I am a North Carolina licensed

15  digital forensics investigator, a certified fraud examiner,

16  and a licensed private investigator.

17      Q.    And did your company undertake an investigation of

18  some of the files in this case?

19      A.    Yes, sir.

20      Q.    Okay.  Would you state what your education is?

21      A.    Over 30 years of IT and digital forensics

22  experience.

23      Q.    Okay.

24      A.    As outlined in my CV, I guess.

25      Q.    And do you have any formal training?

In Re: Washburn Law, PLLC

18

1    A.    Yes, sir.  Again, numerous on-the-job conferences,

2  CLEs, things like that.  My CV is actually an outline of

3  trainings and stuff that I've given because people are

4  usually more interested in what I say as opposed to what I've

5  heard.

6    Q.    Okay.

7    A.    But, yes, sir.  Twenty years of digital forensic

8  experience.  Thirty years of IT experience.

9    Q.    Do you have designations or license -- licenses or

10  designations or --

11    A.    Yes, sir.

12    Q.    -- achievements or recognitions?

13    A.    Yes, sir.  I'm an ACFE fraud examiner.  I am a ACEDS

14  certified e-discovery specialist.  I am a certified forensic

15  examiner through Exterro.  I'm also a new designation that

16  has just come up in North Carolina, but it's a digital

17  forensics investigator license that's only been around for a

18  year, and I think there's only four of us that have it right

19  now.  I'm also a licensed private investigator in the states

20  of North Carolina, South Carolina, and Texas.

21        MR. ANGELL:  Okay.  Your Honor, I tender the witness

22  as an expert in digital forensics.

23        THE COURT:  Okay.  So admitted.

24    Q.    Mr. Ellington, did you have an opportunity to look

25  at that -- the video that we just saw?

In Re: Washburn Law, PLLC

19

1      A.   Yes, sir.  I've seen the video before.  Yes, sir.

2      Q.   Did you review the properties of the video?

3      A.   Yes, sir.

4      Q.   Do you have an opinion as to when it was made?

5      A.   And I should know off the top of my head, but I know

6   that the date stamp was accurate.  And again, I don't -- if

7   you'll tell me the date, I can tell you if that's accurate.

8   I know I hate to do that to you but --

9      Q.   Was it made on December 15th --

10     A.   Yes.

11     Q.   -- 2022?

12     A.   Yes, sir.  In the evening.  Yes, sir.

13     Q.   And how did you determine that?

14     A.   The metadata in the original copies of the video.

15  As the video, I think, got saved, some of the date stamps

16  updated but that was the original metadata in the video.

17  Yes, sir.  Sorry.

18     Q.   Okay.  Did you undertake an examination of the

19  Google accounts for Washburn Law?

20     A.   Yes, sir.  After, I guess, the interview that took

21  place with Mr. Munsey, finally subsequent to that I was able

22  to assist in regaining access to the Google for Business

23  account that Washburn Law was using.  And along with

24  preserving any of the remaining information, I preserved the

25  access and administrator logs from that account.

In Re: Washburn Law, PLLC

20

1    Q.   So that interview, would that be the March 1st, 2004

2    examination of Mr. Washburn?

3    A.   In Asheville.  Yes, sir.

4    Q.   Munsey.

5    A.   Mr. Munsey.  Yes, sir.

6    Q.   And how did you access the Google accounts?

7    A.   Well, basically, what had to happen is I had to --

8    well, I guess, let me take a step back.  Prior to that, I had

9    been tasked with preserving any electronic evidence that Mr.

10   Washburn had.  So I had met with Mr. Washburn -- excuse me --

11   in Wilmington in order to preserve his computer and things

12   like that.  At the time, I realized while he had an email

13   account for Washburn Law that was still active and he was

14   still able to receive email, we were not able to actually log

15   in to the account and that he lacked administrator

16   privileges.

17       I determined that at the time that Mr. Munsey was

18   the only administrator on the account.  And in fact, anybody

19   that uses Google or Gmail knows that there's, a lot of times,

20   a two-step authentication that has to take place, where a

21   code will go to your phone in order for you to log in.  And

22   Mr. Munsey was actually set -- his phone number was the one

23   that was set as the two-step authentication and recovery

24   number for Mr. Washburn's email account.

25       So I guess what I'm saying -- so I knew all that by

In Re: Washburn Law, PLLC

21

1    the time we got to attempting to access the account post that

2    March interview.  And at the time, Mr. Munsey claimed that he

3    was not able to access the account; that he'd gotten locked

4    out of it.  Finally, with his help, we were able to -- it

5    took a little nudging, I guess, but finally we were able to

6    get his assistance with having the code sent to his phone.  I

7    was able to go into his account, change the credentials, and

8    lock him out of the account at that point.  And then preserve

9    what email accounts were still there.

10         There had previously been a considerable number of

11   email accounts active and storing data.  I believe by the

12   time I accessed the account, it may have been -- it was

13   Stephanie Munsey, Jonathan Washburn, Jack Munsey's account,

14   and I believe it was a -- the Garreth [sic] account.  I think

15   those were the only ones that were still active and still had

16   data in them.  The rest of the accounts had been deleted.

17   Q.   And when you say they had data in them, how old was

18   that data?

19   A.   Well, the -- so, I guess, basically, you've got four

20   accounts that are still active, so they're still receiving

21   email at that point.  So I guess you could say they were

22   current.  And all of them did have a -- those had a decent

23   amount of email stored.  Like off the top of my head, I

24   think, you know, Stephanie's was 52 gigabytes.  So that's a

25   reasonable and normal amount of email you would expect in

In Re: Washburn Law, PLLC

22

1   that situation.  As well as Jonathan.  Jonathan had about 50

2   gigabytes of email.

3       Q.   Okay.  I'm going to turn your attention to what I

4   marked as Exhibit 35.  This -- that's in the second binder.

5   It's the white one, I guess.  We had like [INDISCERNIBLE].

6       A.   I'm with you.  And I'm sorry.  Which tab?

7       Q.   Thirty-five.

8       A.   Thirty-five.  Yes, sir.  You know what, sir?  If it

9   --I have to go grab my glasses from my bag.  I had to empty

10  my pockets at security.  I'm sorry.  Sorry.  All those years

11  of squinting at computer screens.  Yes, sir.  I'm on Exhibit

12  35.

13      Q.   Okay.  Can you tell the court what that is?

14      A.   What this is, is the administrator log for the

15  Google account.  Once I was able to access the account as an

16  administrator, I was able to export what's called the

17  administrator log, which keeps track of, you know,

18  administrator-level events.  Now, unfortunately, it was April

19  before I could access it and the records usually only have,

20  you know, 90 days or so retention.  So while I was able to

21  access them, you know, they only went back to about, what,

22  December -- late November.  So they -- or early November.  So

23  I had logs from early November through April.  Of course,

24  there was a lag in activity, you know, between December and

25  April.

In Re: Washburn Law, PLLC

23

1       Q.   Okay.  Can you describe to the court what sort of

2   data Washburn Law had in its Google account?

3       A.   So --

4       Q.   The types of things.

5       A.   Yeah.  Well, the way they had it set up, obviously,

6   everybody was using it for email.  Everybody had email

7   accounts.  And then each one of the users had an associated

8   Google Drive account where they would store their work

9   documents.  They didn't appear to use a central server or

10  anything like that, so everything's pretty much stored in the

11  cloud.  So, for example, Heather, who did a lot of the

12  administrative stuff, she had a Google Drive that contained

13  that kind of information.

14           So, basically, a person's data store would have been

15  all of their email.  It would have been their Google Drive

16  stuff.  And also associated with that would have also been

17  all the other information that Google collects about you.

18  Search histories, web histories, location data, pictures,

19  things like that.  So I guess we'd say there's three

20  categories of data.  The third being stuff that'd be

21  interesting to me as an investigator.  But again, that was a

22  combination of email, documents, and then all the other

23  auxiliary data that Google keeps.

24      Q.   So when you talk about the documents on the Google

25  Drive, what sort of doc -- what type of documents would those

In Re: Washburn Law, PLLC

24

1  be?

2      A.   Those would be all kinds of documents.  Financial

3  documents, Word, Excel, a lot of PDFs.  Things like that.

4  Pictures.  The usual day-to-day office type -- office-type

5  information and office-type documents that you would expect.

6      Q.   Okay.  And let me set some foundation.  Prior to

7  being employed by my estate, did -- were you employed by

8  somebody else in connection with this case?

9      A.   Yes.  I was initially engaged by Attorney Bo

10  Thompson and assisting him with data collection in the early

11  stages, I guess.  That was where -- that was also where my

12  initial collection of Mr. Washburn's information was

13  coordinated.  And I also, I guess, sort of logistically

14  assisted Mr. Thompson.  I guess an example would be, at one

15  point, he was at the office in Tryon looking for computers.

16  And at the time he was there, there were no computers left

17  but there was a copier.  And over the phone, on like a Sunday

18  evening, I think it was, I was talking him through how to

19  remove the hard drive from the copier in case there was

20  responsive information on it, so.  But he was the one I was

21  initially engaged with.  Yes, sir.

22      Q.   So did you actually take computers out of the

23  offices of Washburn Law?

24      A.   I didn't.  No, sir.  My understanding was that when

25  Mr. Thompson went there, there was nothing there.  And I

In Re: Washburn Law, PLLC

25

1   guess what I'm saying is I know that because I was talking to

2   him on the phone at the time as he was trying to see if there

3   was anything that could be collected.  I did though -- was

4   able to make a forensic image of the computer that Mr.

5   Washburn was using, that he had at his residence in

6   Wilmington, along with making sure that I had -- I think it

7   was a copy of his phone and his computer.

8            And at the time, I had -- as I previously testified,

9   he wasn't able to log in to his Google account, but his

10  Outlook on his computer was connected.  So I was able to make

11  sure that at least his copy of Outlook -- because he was

12  using Outlook to access his Gmail -- there was a full copy

13  there.  So I was able to get Mr. Washburn's email without

14  actually being able to access the Google account, if that

15  makes sense.  And I verified that.  So that was -- but that

16  was part of the collection that I was doing for Mr. Thompson

17  initially.

18     Q.   All right.  Did you determine whether or not any of

19  the data of the files or emails or whatnot were kept locally

20  and not on the Google Drive?

21     A.   For -- and the answer is yes.  The way that Google

22  Drive works, you can have a local store that synchronizes

23  with the cloud or it can all be stored in the cloud.  Mr.

24  Washburn had local documents.  It's -- it's usually a fairly

25  accurate sync but you can't be a hundred percent sure.  So,

In Re: Washburn Law, PLLC

26

1    you know -- so I guess what I'm saying is if you're asking

2    the question for other custodians, I know that other

3    custodians were using Google Drive.  And I guess I can

4    explain ultimately how I knew that.

5          Also, again, I guess taking a step back, while I was

6    trying to get access to the Google account, I communicated --

7    I'm going to guess Heather Turner is what we're calling her.

8    I communicated with Heather over the phone several times to

9    get her assistance in trying to regain access.  Some of the

10   information I was looking for was, well, if I could have a

11   copy of a bill, maybe I can convince Google [INDISCERNIBLE],

12   you know, their billing statements or the things like that.

13         And at the time, she represented that she didn't

14   have access to any of that because she had been locked out of

15   her email.  That just arbitrarily her email stopped working.

16   She couldn't get in.  Showed her account as being deleted.

17   So I knew that she had had -- at that point, I knew she had

18   access, that she no longer had access.  But at that point, I

19   didn't know why.  So it wasn't until I had gained access to

20   the account that I saw that her account had specifically been

21   deleted December 30th.  Okay.

22         In conjunction with that, when I gained access to

23   Mr. Wash -- excuse me -- Mr. Munsey's account, what I was saw

24   was that in his Google Drive store there was some Google data

25   that had been transferred from other accounts to Mr. Munsey's

In Re: Washburn Law, PLLC

27

1   account when those counts -- when those accounts were

2   deleted.  And then, of course, using the administrator log, I

3   was able to reconcile the fact that specifically December

4   15th and December 30th of last year accounts were

5   specifically deleted.

6           THE COURT:  When you say last year, you mean 2022?

7   A.    No, 20 -- 2022.  Yes, sir.  I'm sorry.  It was the

8   end of the year, 2022.

9           THE COURT:  Right.  Okay.  I'm with you.

10   A.    But you're right.  That accounts had been deleted

11   but that for a lot of the accounts, the Google Drive

12   information had been copied over to Mr. Munsey's.  So let me

13   explain it a different way.  If you're an administrator and

14   you have somebody that has a Gmail account -- like Heather,

15   for example -- when you as the administrator go to delete

16   that account, you say, hey, I want to get rid of this

17   account.  Google kind of says, hey, slow down a second.  Do

18   you want to keep their email?  Do you want to keep their

19   documents?  You're given those choices because, obviously,

20   this is a very serious thing.  You know, you don't just click

21   by accident.

22           So one of the options is to transfer their Google

23   Drive information over to yours and store it.  So you'll end

24   up with a subfolder that has that person's name and it's got

25   their information in it.  You also have the option of

In Re: Washburn Law, PLLC

28

1   transferring email to your email.  What I was seeing when I

2   looked at the Munsey Google Drive is while documents had been

3   transferred over, the -- I couldn't find the email.  The

4   email was gone, which corresponded with, of course, like what

5   Heather was saying.  She didn't have access to her email.

6   And it wasn't that she was locked out of it.  Her account was

7   gone.  There's a difference between changing somebody's

8   password so that they can't get in and the whole account just

9   being blown off.  And that's what I was seeing for pretty

10  much all the email accounts.

11        Again, the only accounts that I was able to recover

12  email for were, I guess, those four I mentioned earlier.

13      Q.   Okay.  Let me turn your attention to Exhibit 36.

14      A.   Yes, sir.  Yes, sir.

15      Q.   Can you tell the court what that is?

16      A.   Yes, sir.  This is a -- simply a screenshot that I

17  actually produced and sent to you in conjunction with

18  explaining how this works.  And this is a -- this is kind of

19  a zoomed in -- but as an administrator of the Google account,

20  this is what you see when you actually tell it you want to

21  delete somebody's email account.

22      Q.   So what would be the decision that you would make

23  that would affect the ability to recover information from the

24  email account?

25      A.   The decision would be not to keep the email account

In Re: Washburn Law, PLLC

29

1    and to delete the email account.  And unfortunately -- you

2    know, Google does have a little bit of a window of

3    protection, where you've got 25 days from the time either an

4    email is deleted or an entire account is deleted that Google

5    can recover it.  Just kind of a cooling-off period.  Once the

6    25 days are gone, even Google can't get it back.  I mean,

7    it's a situation unless there was some type of, you know,

8    litigation hold or something like that where Google's

9    specifically holding an account, once you tell it to make it

10   go away, it's gone forever unless you get lucky and can

11   access it during that small window.

12       Q.   So in Exhibit 36, it -- do any of those choices

13   appearing on Exhibit 36 -- like choices to whether or not to

14   keep the email information?

15       A.   No, sir.  They do reflect what we were talking

16   about.  When you're an administrator and you're accessing

17   users' accounts, you have certain options.  You can change a

18   user's password.  You can suspend an account, which means the

19   account is still there, the person just can't get to it.  You

20   know, they can't -- they can't reset the password them self.

21   You have the option to delete the account.  When you delete

22   the account, then that's when you get the option of what

23   information to keep or not.  Do you want to keep the

24   documents?  Yes or no.  Do you want to keep the email?  No.

25   And then it's gone.

In Re: Washburn Law, PLLC

30

1      And those choices are reflected in the administrator

2  log.  It also reflects which administrator was logged in.

3  So, for example, when you review these logs, you'll see that

4  -- you'll see a date.  You'll see what the administrator

5  account was.  In this case, you see listings for Jack Munsey

6  at Washburn Law.  And then you'll see the activity that took

7  place.  And of course, as you go through this, you'll see --

8  and I used an admin account once I got in, but you'll see

9  that there's a lot of activity under the Jack Munsey account

10  from November to December as far as administrative stuff.

11  And then you can contrast that with my later activity in

12  April when I'm trying to see if there's any data that can be

13  recovered.

14      One of the other things that I did when I finally

15  regained access to the account -- so I regained access as

16  administrator, which meant -- you know, and then at that

17  point, I didn't want anybody messing with anything, so, of

18  course, I downloaded all the email.  But I actually went

19  through myself and said, hey, is there any email that's been

20  deleted in the last 25 days.  Even though it was April, you

21  know, just so that it would be put back there as a part of my

22  trying to collect all the information.  Unfortunately, that

23  would have only got me stuff that had been deleted in March,

24  which was kind of well past the window of concern.  I didn't

25  have the ability to go back to, say, even October, November

In Re: Washburn Law, PLLC

31

1   when the real interesting, I think, information would have

2   probably been there.

3       Q.   Let me get back to Exhibit --

4       A.   Yeah.  Sorry.

5       Q.   -- 36.  That's all right.

6       A.   Yes, sir.

7       Q.   But so the choices to whether or not to retain all

8   the emails -- or email accounts is not on 36, but is that on

9   that screen that 36 -- in other words, is that one of the

10  choices that comes up on that screen?

11      A.   Yes, sir.

12      Q.   Okay.

13      A.   Whether to preserve the email or whether to destroy

14  it.

15      Q.   And that choice comes up when the administrator

16  chooses to do what?

17      A.   To delete the user's account.

18      Q.   Okay.

19      A.   Exactly.

20      Q.   Now, let me take you back to Exhibit T35.  Did you

21  see evidence of anyone other than Jack Munsey acting as

22  administrator of the Google account?

23      A.   No, sir.  Other than myself, of course.

24      Q.   Other than yourself.

25      A.   Yes.

In Re: Washburn Law, PLLC

32

1      Q.   Okay.  And I have highlighted some of the tasks

2   here.  I used your -- your spreadsheet.  And this data was

3   downloaded from Google.  Is that correct?

4      A.   Yes, sir.  This was -- this was downloaded directly

5   from Google.  There are, like I said, administrative logs,

6   and this is actually referred to as the admin log because it

7   keeps track of specifically administrative actions.

8      Q.   Okay.  Can you start on -- I'm sorry.  I did not

9   number these pages.

10             THE COURT:  If you go and use the left --

11             MR. ANGELL:  Yes, that' right

12             THE COURT:  -- side, I can identify those.

13             MR. ANGELL:  Start on 168, if you would.

14             THE COURT:  168?

15      Q.   Yes.  And start -- tell the court about the

16   highlighted ones and if there are other ones that are

17   significant.  Can you tell the court what Mr. Munsey did?

18      A.   All right.  And you said line 68?

19      Q.   Yes.

20      A.   All right.  And this would be -- this would be a

21   situation where the account for Jack Munsey, there was an

22   attempt to delete the account but -- and then another account

23   was created.  But then the Jack Munsey account was restored.

24   Let me see where.  Let me go back.

25             So, yeah.  So it says account wipe was requested by

Pace Reporting Service, Inc.  919-859-0000      www.pacereporting.com

In Re: Washburn Law, PLLC

33

1   -- yeah.  So, actually -- I'm sorry -- this is where you see

2   the account wipe with ID on device Android.  This is just

3   basically saying that these accounts were deleted and it was

4   done by the Jack Munsey administrative account.  Sorry.  And

5   it was done with his phone.  So it says on device type

6   Android was requested by user.

7       Q.   So that was done but on what date?

8       A.   Those were done on the -- well, the one on item 68

9   was done on January 1st of this year.  As you work backwards,

10  you'll see --

11      Q.   Last year, last year?

12      A.   I'm sorry.  Yes.  I'm way over -- January 1st, 2023.

13  So the evening of New Years Eve 2022 to 2023.  Sorry.

14      Q.   Okay.  And those are account wipes that would --

15  what was the effect of an account wipe?

16      A.   Those would be deleting user accounts.

17      Q.   And whose user accounts?

18      A.   Well -- and unfortunately, I didn't reconcile with

19  you the user IDs.  The accounts had like specific user IDs.

20  If you --

21      Q.   Okay.

22      A.   -- I think, go backwards, we can see the list.

23  Let's see.  Yeah.  I actually -- these were the accounts.  I

24  had a list somewhere else -- I'm sorry -- that we could use

25  to reconcile this.

In Re: Washburn Law, PLLC

34

1      Q.   Okay.

2      A.   One of the things that I did when I was actually

3  working with Mr. Washburn, when I was collecting his stuff,

4  and I realized that he was not an administrator on the

5  account, which I had expected he would be, I actually used

6  his contact list to generate my own list of who all the

7  current Washburn people was.  And I believe I have that

8  somewhere else.

9      Q.   Okay.

10      A.   And then that kind of reconciles with this report,

11  where you actually see all of the accounts being deleted.

12  I'm trying to see if I can see where -- yeah.  In fact, if

13  you go back -- it's actually easier to see if you go back to

14  -- if you're around line, say, 209.

15      Q.   Okay.

16      A.   That actually gives you a -- an example of -- this

17  was removing the license from this user, which effectively

18  suspended their account.  But then actually confirming to

19  remove all the data was what you'd see like on line 68.  So

20  it was a several-step process, I guess is [INDISCERNIBLE].

21      Q.   Okay.  So this is -- this is in reverse

22  chronological order?

23      A.   Yes, sir.

24      Q.   I see.

25      A.   It is in reverse order.  Yes.

In Re: Washburn Law, PLLC

35

1    Q.   Okay.  And each time that you see, for instance, 73

2    through 88, just looking at that page -- each time you see

3    the account wipe, is that an attempt to delete a different

4    email account?

5    A.   Yes, sir.  That would be the -- I guess, the

6    confirmation and the purging of the accounts.  And if you go

7    back -- and I guess as we'll walk through -- as we go back in

8    reverse chronological order, you'll actually see the accounts

9    are named in detail, what some of the accounts were that were

10   removed at that time.

11   Q.   Okay.  And it says Android here.  What does it --

12   what is the significance of that?

13   A.   The significance of that was just that the activity

14   -- Google recognized the activity was being done on an

15   Android device, which just means an Android phone.  And the

16   account logged in at the time was Jack Munsey's.  So an

17   Android phone logged in to the Jack Munsey account with

18   administrator privileges was the account responsible for

19   this.

20   Q.   Okay.  And the lines 89 to 105, that's the same

21   thing, deletion of email accounts by Mr. Munsey.  Is that

22   right?

23   A.   Yes, sir.  Yes.

24   Q.   And then the -- and that's on -- that's all on the

25   31st, 106 to 122 is the deletion of email accounts.  Is that

In Re: Washburn Law, PLLC

36

1    correct?

2        A.   Yes, sir.

3        Q.   By Mr. Munsey?

4        A.   Yes, sir.  By the account -- yes, sir.

5        Q.   Okay.  [INDISCERNIBLE]

6        A.   By the account assigned to Mr. Munsey that he was

7    the administrator of it.

8        Q.   123 to 139, that's also deletion of email accounts?

9        A.   Yes, sir.

10       Q.   All 30-- 123.  Is that correct?

11       A.   Yes, sir.

12       Q.   And 140 to 156?

13       A.   Yes, sir.

14       Q.   Then I've got 157 to 166.  That is all efforts to

15   delete email accounts made by Mr. Munsey.  Is that correct?

16       A.    Yes, sir.  And then, I guess just for the sake of

17   clarification, when you get down to 167, what's also

18   happening is -- one of the ways that Google and even iPhones

19   work is if you have corporate or business email attached to

20   that device and you delete that account, it can -- by

21   default, it will go and remove that account from the person's

22   device, as well.  It's kind of the same way where if you work

23   in a corporate setting and they terminate you and you've got

24   a company-issued phone, they can remotely wipe the phone.

25   And then, of course, all your kid's soccer picture are gone

In Re: Washburn Law, PLLC

37

1    or whatever.

2          So this is part of the process of removing the user

3    in a corporate setting, is also that all their email, you

4    know, get -- a signal gets sent to delete the Gmail account

5    off their phone or device.

6          Q.    Okay.  And then --

7          A.    You can't -- just one, quickly.

8          Q.    Go ahead.

9          A.    It doesn't really work that way for a computer.  So

10   like if you have a computer and you're using Outlook or

11   whatever, and they delete your account, you can't log in, but

12   all the email that you got stored on your computer, you know,

13   would still be there.  A phone, the account would get blown

14   off.  One interesting thing though is if you are using Gmail,

15   and let's say you have Outlook, so you have a local store, if

16   I delete your account, all your email will stay there.  If I

17   go into your account and delete all your email, and then your

18   Outlook tries to sync with Gmail, it will think you wanted

19   that gone and then it will delete it that way.

20         I mean, I just want to make sure people kind of

21   understand that if I delete your account, it doesn't remove

22   your email from your computer.  But if I delete your emails

23   individually, it will delete them from your computer.

24         Q.    So are you saying that if one purposefully wanted to

25   destroy past emails, they would go in using -- they would --

In Re: Washburn Law, PLLC

38

1  and they knew what they were doing, they would go in using a

2  phone rather than a computer?

3      A.   Well, just saying that if we looked at -- if we

4  actually got our hands on the phones of people involved in

5  this whose accounts were deleted, we probably would not find

6  emails on their phones.  If we looked at their computers, we

7  might find emails, but we don't know whether that's the sum

8  total of all the emails or not.  There's going to be that

9  gray area.  I guess that was a really complicated way of me

10 saying that some of this information may still exist but

11 there's no guarantee, and there's no guarantee that we would

12 have the sum total of information from other sources.

13     Q.   Okay.  Tell me -- turn your attention to line 191 to

14 192.  Can you tell the court what happened?  That would be on

15 the 30th of December.

16     A.   Yes, sir.  That was the -- what we call license

17 revoked and user deletion of the Heather Washburn account.

18 And again, just -- because I'm here because I'm the nerd.

19 So, basically, the way that Google for Business works is you

20 buy the licenses.  So maybe you buy -- you got a hundred

21 employees, you buy a hundred licenses.  Okay?  So you're

22 paying for licenses.  You can terminate an employee, so

23 you're using 99 of your hundred licenses.  Hire somebody

24 else; you're using a hundred licenses.  It sounds kind of

25 weird but, you know -- so what happens is, if you -- you can

In Re: Washburn Law, PLLC

39

1    get rid of an employee.  You're still paying for that spot

2    unless you also delete the license.  So it's also a two-step

3    process.  It's a multistep process.  You would delete the

4    employee and you would also delete the license if you're not

5    going to replace that person.

6         So what you're seeing here is -- I guess, we'd say

7    in fell swoop, the license for Heather was revoked and her

8    account was deleted.  And again, let me just reiterate.  When

9    I communicated with Heather starting, I guess, in January,

10   she represented to me that she had no clue why anything

11   happened.  She was using her computer, using her email, and

12   then all of the sudden, all her access was gone.  Because I

13   was actually requesting information to her and she was like,

14   I can't.  I don't have any of that.  I can't get any of that

15   for you.

16   Q.   So the effect of that was not only could Heather not

17   get in, but those emails were also deleted.

18   A.   That's correct.  And again, to be clear, when I was

19   trying to figure out the problem, before I had the benefit of

20   seeing the administrator log, and I'm talking to Heather, I

21   actually tried to log in to her account to just see if it was

22   a -- maybe we can reset the password or something like that.

23   And it told me then that the account is deleted.  Because

24   when you go to log in, Google will tell you whether you're

25   locked out of an account, whether your account is suspended,

In Re: Washburn Law, PLLC

40

1   or whether the account is gone.  And at that point, Heather's

2   account was gone, which I also knew meant that there was no

3   recovery of her information that I was trying to capture.

4       Q.   Okay.  And looking at 209 and 211, is that the same

5   thing in effect with Usha Thomas?

6       A.   Yes, sir.

7       Q.   And then --

8       A.   And it's my understanding that Ms. Thomas was an

9   assistant to Mr. Munsey.

10      Q.   Okay.  And this was done on the 30th of December,

11  2022.  Is that right?

12      A.   Yes, sir.

13      Q.   And then looking at the next page, there are simply

14  another -- a lot of other accounts that are deleted.  Is that

15  right?

16      A.   Yes, sir.  Accounting, accounts payable.  Just

17  Nathan Jones, scheduling, title purchase closing.  A lot of

18  those.  New orders, client.  Things like that.

19      Q.   Okay.  And same thing on the next page and the page

20  after that?

21      A.   Yes, sir.

22      Q.   Let's go to -- let's go to what happened on December

23  15th.  Can you tell the court what happened on December 15th?

24      A.   I guess -- yeah.  And the December 15th activity

25  starts, I guess, at line 299 -- 298.  And that's where -- and

In Re: Washburn Law, PLLC

41

1   that's really where there were a lot of deletions and license

2   removed.  I guess on December 15th, the first one would have

3   been the R. Richards account.  And then you see DeeDee Pack

4   and Lee Zuber.  His account was also deleted on the 15th.

5   SAI and John Croft.  And then, I guess, again, as you work

6   down in the numbers, you -- you're working forward in time,

7   so you can see, as you've got highlighted here, that all

8   these accounts were deleted.

9        Q.   And that's the same day he made that video as far as

10  you can tell [INDISCERNIBLE]?

11       A.   Yes, sir.

12       Q.   Can you tell what time they were done?

13       A.   In the evening.  So it was in conjunction with the

14  timestamp.

15       Q.   What time?  For instance, look at --

16       A.   Well, so some of them were actually in the

17  afternoon, but then they go forward all the way to -- let's

18  see -- well, 1:30 in the afternoon because this has been

19  adjusted for UTC.  So, yeah.  So this was actually earlier in

20  the day.  Forgive me.  I misspoke.  The December 30th

21  activity was in the evening.  This was in the afternoon.

22  This would have been 1:30 approximately in the afternoon on

23  the 15th.

24       Q.   Okay.  And look at December 1st.  Were there email

25  accounts deleted then, too?

In Re: Washburn Law, PLLC

42

1    A.    Yes, sir.  There were a significant number deleted

2    on that day, as well.

3    Q.    Is there a -- and with the deletion of these

4    accounts and the emails, you're potentially -- you're losing

5    communications between some of the principal players in this

6    company.  Is that right?

7    A.    Yes, sir.  And again, it was -- it would make sense

8    if you were talking strictly from a financial standpoint.  If

9    you have users or accounts that aren't being used, it would

10   make sense to delete those from a financial standpoint.  But

11   my understanding at the time is that some of these accounts

12   were actually in use.  Especially the account of Heather,

13   because, again, the representations that she made was that,

14   you know, she was using it and then, all of the sudden, it

15   just stopped.  So it wasn't like, you know -- I guess the

16   thing is, when I reached out to her, she seemed very

17   surprised that she no longer had access.  So it wasn't like,

18   oh, yeah, they terminated me, or something.  You know, she

19   was just working and then it stopped.  And then all of her --

20   she represented that all of her documents -- because they

21   were locked up in Google Drive, there was pretty much nothing

22   she could do.  So --

23   Q.    Is there a distinction between inactivating an

24   account and deleting an account?

25   A.    Inactivating it or suspending it would keep the user

In Re: Washburn Law, PLLC

43

1   from being able to access the account.  Why suspending is

2   also important, in a lot of situations, because you don't

3   want to micromanage your users, they have the ability to

4   change their passwords or reset their passwords if they

5   forget.  You know, their own cell phone -- typically, their

6   own cell phone is how the two-step authentication goes.  So

7   if I were to change your password, you would still have tools

8   at your disposal to reset your password and get back into the

9   account.  Suspending the account means you're locked out,

10  period.  There's nothing you can do to get back in.  And then

11  ultimately, of course, deleting the account means that the

12  data's gone unless you've done what Google asks you to do and

13  take steps to preserve that data.

14      Q.   So suspending, the old emails are still there.

15  Deleting it, they go away.

16      A.   And emails will still come in.  So the -- a

17  suspended account would still receive incoming emails, just

18  the user is powerless to do anything with that account.

19      Q.   What are the finances involved in maintaining the

20  accounts?  Is this expensive to add an account on your Google

21  account?

22      A.   Well, it can be.  It sort of depends upon the

23  package.  But just for context, a typical Google user could

24  be anywhere from six dollars a month up to 14 or 15 dollars a

25  month depending upon the level of the package and stuff, and

In Re: Washburn Law, PLLC

44

1    what you're doing there.  But let's say I've got a whole

2    bunch of people and I'm paying the premium package for a lot

3    of extra stuff or whatever.  You can always reduce that.  So

4    from a financial standpoint, it would make sense to get rid

5    of users that you didn't need anymore, making sure, of

6    course, you migrated their data.  But for your existing

7    users, there are ways you can economize it by making sure

8    you're on the lowest package.

9         So let's say they're -- at the end of the day, maybe

10   there were ten people who were critical to the operations or

11   had important data.  You're talking about 60, 70 bucks a

12   month for that.  And Google does give you a grace period, you

13   know.

14        Q.   How about keeping the suspended accounts on it?

15        A.   A suspended account you would still pay for.  But

16   you could -- if you were paying more than, say, the six,

17   seven bucks a month, you could downgrade the account.

18        Q.   Okay.  When were you employed by Mr. Thompson?

19        A.   I believe it was early January, I believe, of 2023.

20   So it was, I guess, after all this happened.  Because my

21   initial -- the initial scope was just to assist in preserving

22   Mr. Washburn's electronic evidence.  And then also, of

23   course, just sort of helping Mr. Thompson understand where

24   other evidence may be.

25        Q.   Okay.  You heard on the video that was played today

In Re: Washburn Law, PLLC

45

1    that Mr. Zuber -- Mr. Munsey identified Mr. Zuber as someone

2    who was potentially involved in the account issue, the trust

3    fund divergence, as well as Heather.  We call her Heather.

4    She goes by Turner or [INDISCERNIBLE].  Is that right?

5         A.   Yes, sir.  That's why I was trying to figure out

6    what we called her.  Yes, sir.  Heather Turner.

7         Q.   Okay.  So you heard that.  Is that right?

8         A.   Yes, sir.

9         Q.   So do you have an opinion as to whether Mr. Munsey

10   deleted potential evidence of criminality relating to the

11   diversion of funds to the trust account after December 1st

12   and before you took control of the account?

13        A.   Yes, sir.  And to add context to that, one of the

14   other roles that I undertook to assist Mr. Thompson was --

15   there was a Qualia account.  There was some other accounts

16   where Washburn Law information was stored.  You know, Qualia

17   being the title and all that software.  And part of my job

18   was to go into that, make sure that it was locked down,

19   preserve any data that I could.  And there were, I guess, a

20   core group of people who were obviously empowered.  I guess,

21   accounts that were important.  Like, for example, Mr. Zuber's

22   account was obviously something that was important.  Heather

23   Turner's account was obviously something that was important.

24   The Garreth account.  Things like that.

25             Those were obviously important because those were

In Re: Washburn Law, PLLC

46

1    tied to -- like, for example, Heather's was the account for

2    their voicemail, their RingCentral voicemail system.  The

3    Qualia accounts.  Those were important accounts.  So I guess

4    what I'm trying to say is, is before I knew much else about

5    Washburn Law or even had seen these logs, I knew that there

6    was a handful of people whose accounts were important because

7    those were the ones that the other stuff was associated with.

8        Q.   And Mr. Thompson, was he employed by the

9    professional malpractice insurance company?

10       A.   I believe he said yes, he was working for the

11   insurance company.

12       Q.   Okay.  And was he willing to spend money to preserve

13   evidence?  Or the insurance company was willing to spend

14   money?

15       A.   Yeah.  That was what they brought in initially for,

16   is just to collect whatever could be collected.

17           MR. ANGELL:  Okay.  I've got no further questions of

18   the witness, Your Honor.  I tender Exhibits 35 and 36 as --

19   into evidence.

20           THE COURT:  Okay.  Exhibits 35 and 36 are admitted.

21   One question for you.  Mr. Thompson's first name is what?

22           THE WITNESS:  Bo is what everybody calls him.  Bo

23   Thompson.

24           THE COURT:  Is he a lawyer?

25           THE WITNESS:  Yes, sir.  He's an attorney.

In Re: Washburn Law, PLLC

47

1          THE COURT:  Okay.

2          THE WITNESS:  And he's [INDISCERNIBLE].

3          THE COURT:  And he's located where?

4          THE WITNESS:  He's located here, sir.  In Raleigh.

5          THE COURT:  Okay.

6          MR. ANGELL:  Give me a second, Your Honor.

7          THE WITNESS:  Yeah.

8          MR. ANGELL:  I can find him.

9          THE WITNESS:  And I was familiar with him because I

10   had assisted him on other non [INDISCERNIBLE] type cases.

11          MR. ANGELL:  He's with Gordon & Rees.  And his real

12   name is Samuel G. Bo -- sorry -- Samuel G. Thompson, Jr.

13          THE COURT:  Okay.

14          MR. ANGELL:  Gordon & Rees.

15          MR. BEHR:  I have a few questions if Your Honor is

16   through.

17          THE COURT:  Yes, sir.  Go ahead.

18   CROSS EXAMINATION BY MR. BEHR:

19     Q.   Thank you.  Mr. Ellington, how did you gain access

20   to the Google administrator account?

21     A.   What I had to do was to approach it from a password

22   reset.  And so I basically tried to log in.  Didn't know the

23   password.  Went through the password reset.  And one of the

24   options for resetting the password was to have a code sent to

25   Mr. Munsey's phone.  So I coordinated with Mr. Munsey,

In Re: Washburn Law, PLLC

48

1    texting back and forth, and then he provided me that code.  I

2    was able to change the password and then get into the

3    account.

4        Q.   And during your examination of the access to the

5    Google account and -- was it determined that only Mr. Munsey

6    had access to that two-factor authentication?

7        A.   Yes.  His phone number was the only one that was the

8    two-factor phone number for his account.  Because that was my

9    only option.  I was looking for all the other options.  And

10   Mr. Washburn's account, instead of it being Mr. Washburn's

11   phone number, the two-step authentication for Mr. Washburn

12   was Mr. Munsey's number.  And also, let me clarify, too.

13   When I was trying to regain access to the account, I was

14   looking for any account with administrator privileges that I

15   could use to get back in, and Mr. Munsey was the only account

16   with administrator privileges.

17       Q.   Okay.  And at any time did you become aware of any

18   information that would suggest that anyone other than Jack

19   Munsey had accessed the administrator rights to the Google

20   account?

21       A.   No, sir.

22       Q.   All right.  And if you'll turn with me to number 47.

23   And is this --

24       A.   I'm sorry.  Number?

25       Q.   Line item number 47.

In Re: Washburn Law, PLLC

49

1    A.   Oh, I'm sorry.  I didn't know if you mean exhibit.

2    Q.   It's -- I'm still on 35.

3    A.   Okay.

4    Q.   So if you'll look at line 47, it's the April 7th,

5    2023.

6    A.   Yes.

7    Q.   Is that when you first accessed the system?

8    A.   Yes, sir.  The April -- all the April activity is

9    me.

10   Q.   And on the far right there is an IP address, right?

11   That 174.109.138.131?

12   A.   Yes, sir.

13   Q.   Do you recognize that IP address?

14   A.   I recognize that as probably being consistent with

15   my own having accessed it through Spectrum.  That looks like

16   a Spectrum IP address.  I could --

17   Q.   And did every access from that point to the most

18   recent one, which is April 27th, 2023, is at that IP address?

19   A.   Yes, sir.

20   Q.   So that's likely your IP address?

21   A.   Yes, sir.

22   Q.   All right.  And the -- number two.  What event was

23   that that's listed as -- let's say, start with number three

24   and then go to number two.

25   A.   Oh, yes, sir.  That was -- that was me exporting

In Re: Washburn Law, PLLC

50

1  this log that we're looking at right now.

2      Q.   And this log, this -- you queried the system.  They

3  -- the Google system generated this log.  It was provided in

4  essentially this format?

5      A.   Yes, sir.

6      Q.   All right.  And this is a true and correct version,

7  other than Mr. Angell's highlights, of the log that was --

8  that you were able to receive from Google?

9      A.   Yes, sir.

10     Q.   Okay.

11         MR. ANGELL:  I will mention that the numbers to the

12 left are numbers that I put in there to -- that corresponded

13 to Mr. Ellinger's [sic] Excel spreadsheet, row numbers.

14     Q.   Okay.  And were you able to determine the IP address

15 of Mr. Munsey's devices?

16     A.   You know what, sir?  I did not do that examination.

17 That is -- reconciling those IP addresses is something that

18 could possibly be done with subpoenas to the service

19 providers.  Some of that -- I would say, unfortunately, the

20 stuff that's over a year old might -- Google actually does a

21 pretty good job of keeping IP addresses for a long time.  So

22 if it pleases the court, that is something that could be done

23 to reconcile those, but it might be a couple-step process.

24     Q.   Okay.  And do you recognize that this log reflects

25 that the majority of the events that have been identified

In Re: Washburn Law, PLLC

51

1   reflect that the same IP address initiated those actions?

2   24.158.57.17.

3        A.   Yes, sir.

4        Q.   Okay.  No further questions, Your Honor.  Thank you.

5            THE COURT:  Okay.  I think -- Mr. Ellington, didn't

6   you testify in Wilmington for another case we had with Ms.

7   Gillis down there?

8            THE WITNESS:  Yes, sir.  If it pleases the court, I

9   was going to tell you that your order in that matter -- I

10  really appreciate the language of the order and I really

11  appreciate your conclusions there.

12           THE COURT:  Okay.  Very good.  Thank you.

13           THE WITNESS:  Thank you.

14           THE COURT:  Please step down.  Yes, sir?

15           MR. ANGELL:  The next witness I'd like to call is

16  Robert Nordlander.

17           THE COURT:  Okay.  Do you want to take a break or

18  are you good to go?  Let's take about a five-minute break.

19           MR. ANGELL:  That'd be good.  Thank you, Your Honor.

20           THE CLERK:  All right.  United States Bankruptcy

21  Court will be recessed for five minutes.

22                         (RECESS)

23           MR. ANGELL:  In light of the fact that there are no

24  other attorneys here other than Mr. Behr and me, I would ask

25  that Mr. Ellington be released.

Pace Reporting Service, Inc.  919-859-0000    www.pacereporting.com

In Re: Washburn Law, PLLC

52

1    THE COURT:  Okay.  That's fine.  Thank you for your
2  service.  I appreciate your appearing today.
3                    (WITNESS DISMISSED)
4    MR. ANGELL:  And I call Robert Nordlander to the
5  stand.
6                    ROBERT NORDLANDER,
7                    having been first duly sworn,
8                    was examined and testified
9                    as follows:
10  DIRECT EXAMINTION BY MR. ANGELL:
11    MR. ANGELL:  Your Honor, I just would like the
12  record to reflect that Mr. Nordlander has brought his
13  computer with him to the court --
14    THE COURT:  Right.
15    MR. ANGELL:  -- in order to assist him in his
16  testimony.
17    THE COURT:  Okay.
18    Q.   Would you state your name for the record?
19    A.   Robert Nordlander, N-O-R-D-L-A-N-D-E-R.
20    Q.   Thank you.  And Mr. Nordlander, can you tell us what
21  your education is?
22    A.   I have a bachelor's degree in accounting.  I have a
23  MBA and I also have CPA license and a certified fraud
24  examiner credential.
25    Q.   Okay.  Do you have any other designations?

In Re: Washburn Law, PLLC

53

1    A.   Not for that, no.  That's about it.

2    Q.   [INDISCERNIBLE]

3    A.   I did graduate from the academy -- six months

4    academy for the IRS as an IRS special agent, but that's not

5    technically a --

6    Q.   Okay.  Can you tell the court --

7    A.   -- [INDISCERNIBLE].

8    Q.   -- what your work experience has been?

9    A.   Sure.  For the first eight years, I was working with

10   a CPA firm.  And then I actually taught at a university for

11   two years, tax, accounting.  Those types of -- those types of

12   courses.  And then for 20 years, approximately, I worked with

13   the IRS as a special agent for the IRS criminal

14   investigations.

15   Q.   And can you tell the court what sort of work you did

16   as a special agent in your work for the IRS?

17   A.   Yes.  In short, I chased tax evaders and money

18   launderers around the world in a sense.  I looked at books

19   and records, compared the tax returns, as well as trace

20   money.  Where'd the money come from?  Where'd the money go

21   to?  And testify in federal court about my findings.

22   Q.   And did you assist in criminal investigations or

23   civil matters?

24   A.   I assisted in criminal investigations during that

25   whole time.

In Re: Washburn Law, PLLC

                                                                    54

1        Q.    Okay.  Your Honor, I would tender -- and you are

2    employed in this case.  Is that correct?

3        A.    I am.  Yes, sir.

4        Q.    Okay.

5              MR. ANGELL:  I would tender Mr. Nordlander as an

6    expert in forensic accounting.

7              THE COURT:  And so admitted.

8        Q.    Mr. Nordlander, I asked you to do a number of

9    things.  Can you tell the court briefly what you did in order

10   to look at the financial transactions involving Washburn Law,

11   its trust account, and All American A, LLC?

12       A.    I was hired by the trustee to review the documents

13   concerning the -- where the funds went to from the trust fund

14   account, and where -- who got the benefit of that, if there

15   was anything of that.  So I looked at the trust fund account

16   for multiple years and downloaded the data from the bank

17   statements, and reviewed them to find out where was a lot of

18   this money going to.  And I discovered that much of the funds

19   were going to AAA, which is a certain type of business that's

20   been operating I think headed by the Munseys', I believe.

21              So transferred the money to AAA.  And then I went to

22   AAA's account and then looked at that, as well, to find out

23   who actually got the money; where'd the money come from;

24   where'd the money go to; who got the benefit; and then

25   reported my findings back to the trustee.

In Re: Washburn Law, PLLC

                                                              55

1        Q.   Okay.  Can you give the court an idea about the
2   approximate time ranges that you did that work?
3        A.   The years for the -- the years for the trust account
4   was from December of 2019 all the way to 2023.  The first
5   quarter of 2023.  I believe the trust account closed -- had
6   almost no activity at the end of 2022.  So the first quarter
7   of 2023 is really just a few dollars here and there.  Not
8   material in nature.  And from that, I looked from -- I looked
9   at those transactions for that time period to see where the
10  money was going to in particular since it was supposedly it
11  was -- allegedly to be missing.  And then found that it went
12  to AAA.  A lot of it went to AAA, as well as other -- other
13  financial institutions that the pay -- that you would see
14  typically in a closing account from a trust fund.  So --
15       Q.   Okay.
16       A.   -- there's approximately 30,000 transactions I had
17  to go through, to give you an idea of how many transactions
18  there were.
19       Q.   Okay.  And by AAA, you mean All American A, LLC?  Is
20  that correct?
21       A.   Yes, sir.  I apologize.  Yes, sir.
22       Q.   Sometimes referred to as All American Abstract, LLC.
23       A.   Yes.
24       Q.   Okay.  And did you look at other transactions
25  regarding accounts at Washburn Law?

In Re: Washburn Law, PLLC

56

1      A.    I looked at few of them, yeah.  So the operating

2  account I believe was also done.  That was -- I know them by

3  account numbers.  Give me one second.  I can tell you what

4  account [INDISCERNIBLE].

5      Q.    And I've got bank statements sitting up there.

6      A.    I see that.  Account number 282 -- ending in 2827,

7  Washburn Law; AAA account number 1830; and then Washburn Law

8  account number 3302 -- ending in 3302; and the trust account

9  ending in 7948 are the ones that analyzed.

10      Q.    So 7948 is the Washburn Law trust account?

11      A.    Correct.

12      Q.    And that's where the money left.  Is that right?

13      A.    That's where -- yes.  The trust fund is where -- it

14  went from there to AAA.

15      Q.    Okay.  You mentioned 30,000 transactions.  Did you

16  in -- review transaction individually or how -- what

17  methodology did you use to investigate?

18      A.    The situation is, is because the trust fund account

19  was alleged to be misused, I could not really trust the bank

20  -- the books and records of the law firm because I heard

21  allegations that they couldn't be reconciled.  So I went back

22  to the bank -- original sources of bank data.  And from there

23  I downloaded the bank statements.  In some of the bank -- and

24  in the bank statements, they'll just say wire in, wire out.

25  But you really don't know by looking at that wire in, wire

In Re: Washburn Law, PLLC

57

1   out where the money went to, so you had to get additional

2   data from the bank, saying, okay, these wires are coming in,

3   leaving this account.  What are these wires?  So that gives

4   you another data dump of the wires itself.  And so I put all

5   those wires in.  That kind of gave me more information about

6   who was receiving the wires, who is sending the wires.

7          That being said, because there's so many

8   transactions in the bank statement, I did not scrutinize

9   every single one of them because it would be virtually

10  impossible to do so.  And so we looked at particularly the

11  wires because that's where the bulk of the money was coming

12  in for -- going out.  So not every check is in my spreadsheet

13  because 20 dollars going there or 250 dollars going there was

14  just not material in this investigation in my opinion.

15      Q.   So how -- was the information as to where wires went

16  -- let's talk about the trust account.

17      A.   Uh-huh.

18      Q.   Was information as to where the wires went, was that

19  made available to you?

20      A.   Yes.  In -- from the bank, I downloaded it into a

21  spreadsheet to determine where did this money go to.  And

22  from there, I made my analysis.

23      Q.   Okay.  I've got in front of you, in that pile of

24  things, I have bank statements from Wells Fargo account 3302,

25  which is the Washburn Law account, that you testified from

Pace Reporting Service, Inc.  919-859-0000      www.pacereporting.com

In Re: Washburn Law, PLLC

58

1    January 1, 2020 to January 31, 2023, marked as Exhibit 40.

2        A.    Yes, I see that.

3        Q.    Okay.  And are those the bank statements that you

4    used to form your opinion?

5        A.    Yes.

6        Q.    Okay.  And are they consistent with what you

7    downloaded from the bank [INDISCERNIBLE]?

8        A.    Yes, they are.

9        Q.    Okay.  And Exhibit 41 is Wells Fargo account 2827,

10   which is also a Washburn Law account, I believe.

11       A.    41 is 7948.

12       Q.    Okay.

13       A.    I have 71 -- 7948 --

14       Q.    Okay.

15       A.    -- as being the Washburn Law account.

16       Q.    My numbering's off then.  And that is the IOLTA

17   trust fund account for Washburn Law.  Is that correct?

18       A.    Correct.

19       Q.    Okay.  And that's from January 1, 2019 to January

20   28, 2023.

21       A.    Yes.

22       Q.    And is that consistent with the data that you

23   downloaded from the bank?

24       A.    Correct.

25       Q.    Okay.  And if you look at 42.  Maybe you better tell

In Re: Washburn Law, PLLC

59

1   me which account that one is.

2        A.   This is account number -- give me one second.  It's

3   not showing me automatically.

4        THE COURT:  Look at the right-hand side, down about

5   three-quarters of the way down.

6        A.   Oh, yeah.  28 -- 2827.

7        Q.   Okay.  And is that a Washburn Law account?

8        A.   Yes, it is.

9        Q.   Okay.  And that is from January 1, 2020 to January

10  31, 2023.  Is that consistent with the information that you

11  downloaded from the bank?

12       A.   Yes.

13       Q.   And Number 43.  Could you identify that?

14       A.   T43 is All American A.  We call it AAA, LLC.  And

15  that account number is 1830.

16       Q.   And that's a Wells Fargo account?  Is that right?

17       A.   Yes.

18       Q.   And is that consistent with the information that you

19  downloaded directly from the bank?

20       A.   Yes.

21       Q.   Okay.

22       MR. ANGELL:  Your Honor, I want to tender Exhibits

23  40, 41, 42, and 43 into evidence.

24       THE COURT:  Okay.  Each of those is admitted.

25       Q.   And you base your opinion on the data that's in

In Re: Washburn Law, PLLC

60

1   those statements.  Is that correct?

2        A.   That is correct.

3        Q.   Okay.  Let me turn your attention to Exhibit 32.

4        A.   Of which book?

5        Q.   It is in the second volume.  The white book.

6             THE COURT:  32?

7        Q.   32, yes.  Can you tell the court what that is?

8        A.   Yes.  This is a printout that I created based on the

9   deposits that were into -- I call it AAA's account, 1830.

10       Q.   Okay.  And so that first line, can you tell the

11  court what that is?

12       A.   That is transfers from Washburn law.  IOLTA account

13  number 7948.  And it's five, almost -- a little over 5.6

14  million dollars.

15       Q.   Okay.  And that says 75.43 percent.  Can you tell

16  the court what that means?

17       A.   That is out of all the deposits that were made into

18  this account, 75 percent of it came from that same source.

19       Q.   Okay.  And the next item is from Washburn Law.  Is

20  that correct?

21       A.   That is correct.

22       Q.   3302.  Do you know what they used account 3302 for?

23       A.   That is the operating account.

24       Q.   Okay.  And that money came -- that money came into

25  All American Abstract or All American A?

In Re: Washburn Law, PLLC

61

1    A.   That's correct.  And that'll be a little less than

2    ten percent.

3    Q.   And what period of time are we talking about?

4    A.   This is -- let me go back to my spreadsheet again.

5    2022, 2021, and 20 -- first -- December of 2019 all the way

6    to the end of 2022.  Let me rephrase that.  Hang on a second.

7    Make sure I got this right.  No.  This was 2020.  All of

8    2020.  I apologize.  All of 2020, 2021, and 2022.  Yes.

9    Q.   So 2020 through 2022?

10   A.   Yes, sir.

11   Q.   Okay.  And there's money coming in from Mr. Munsey,

12   as well.  Is that correct?

13   A.   Yes.  Line three would be Munsey's -- their bank

14   account ending in 4568, approximately 142,000 dollars.

15   Q.   Do you know if that was his account or a joint

16   account?  That's -- if you know, you know.

17   A.   I do not know what that account was about.  Sorry.

18   Q.   Okay.  That's fine.  Okay.  And the US Treasury,

19   136,900 dollars.  Do you know what that money was?

20   A.   I don't but I looks like potentially it's going to

21   be one of those SBA or CARES Act type of loans.

22   Q.   Was that a single deposit?

23   A.   I don't -- check real quick.

24   Q.   Are you able to look at your data and inform the

25   court when that money was received?

In Re: Washburn Law, PLLC

62

1    A.   Yes.  Give me one second.  That was one deposit on
2    07-31-2020, 136,900 dollars.  And that is -- it looks like a
3    SBA.  It says SBA D Treasury payment.  So it's from the --
4    more than likely, it's from like the CARES Act or the COVID
5    type of thing.
6    Q.   All right.  And then two lines down it says PPP
7    loan, 94,202 dollars.
8    A.   I will look at -- that also was on July 24th, 2020
9    and was one amount.  And the bank has it down.  Its
10   description is PPP load disbursement.  That's how it's
11   reflected in the bank statement.
12   Q.   Okay.  Disbursement.  It was a deposit.  Is that
13   right?
14   A.   Yes.  But it's a disbursement into the --
15   Q.   [INDISCERNIBLE]
16   A.   -- bank account.  Right.
17   Q.   Okay.  Good.  Okay.  I'm going to turn your -- and
18   I'm going to turn your attention to the next exhibit, T33.
19   Can you tell the court what that is?
20   A.   Using the same data as a -- from the deposits, from
21   the bank's -- from the bank documents, this is the
22   expenditures that went out of that same account of 1830.
23   Q.   Okay.
24   A.   For the same time period as the deposits and from
25   T30.

In Re: Washburn Law, PLLC

                                                            63

1      Q.   So there were transfers to Washburn Law operating

2    account.  Is that correct?

3      A.   There were.  Yes, sir.  There were transfers.  A

4    little over 2.3 million dollars that were transferred to

5    Washburn Law account number ending in 3302.

6      Q.   Okay.  And the next highest is to Mr. Munsey's

7    account.

8      A.   That would be correct.  It'd be transferred to J.

9    Munsey ending in -- account ending in 4568 for a little over

10   479,000 dollars.

11     Q.   And are we talking about the period of 2020 through

12   2022?

13     A.   Correct.

14     Q.   Let me ask you a question about that PPP money.  Did

15   you see expenditures for employees of All American A that

16   would seem to indicate that there was -- there should -- or

17   there were sufficient employees to generate that PPP?

18     A.   I didn't see any evidence in the AAA that was

19   payroll.  And by evidence, I mean you would have typically

20   weekly, bi-weekly, monthly, odd numbers, checks made payable

21   to the federal government, state government, unemployment.

22   All that type of thing.  I did not see that in that account.

23     Q.   Okay.  Do you -- the next is A Better Bid.  Do you

24   know who A Better Bid is?

25     A.   I do not in particular.  I believe it's some type of

In Re: Washburn Law, PLLC

64

1    -- it's almost like eBay type of thing where someone buys

2    things on like an auction type of thing.  That's all I know

3    about it.

4        Q.   Okay.  And were all these done by wires or were

5    there other forms of payment?

6        A.   Some of these were -- I'll have to look.  Some of

7    these were wires.  It's easy because it was -- or you could -

8    - it's ACH type of thing whereas A Better Bid -- some things

9    were like a debit card.  Later on down there, you'll see the

10   debit card.  Some of them were Zelle payments.  It's a

11   mixture of a lot of one to another.

12       Q.   Okay.  And was there also cash paid to Mr. Munsey?

13       A.   There was payments made to Mr. Munsey.  In

14   particular which line are you talking about ?

15       Q.   I'm talking about where it says cash/checks, Munsey

16   at 82,914.56.

17       A.   Oh, yes.  This would be checks made out to Mr.

18   Munsey.

19       Q.   Okay.  And that's in addition to the transfers to

20   the account?

21       A.   That's correct.

22       Q.   There's --

23       A.   Yes.

24       Q.   -- cash.  How did the cash come out?

25       A.   Let me look at the transactions, what the bank says.

In Re: Washburn Law, PLLC

65

1   Let me go there.  Mr. Munsey.  These were amounts in even

2   numbers and it was just -- it's just cash going to Mr.

3   Munsey.  Four thousand, 5,000, 6,000, 3,200, 9,000, 3,000.

4   These are the type of transaction that were done through the

5   bank account.

6       Q.   How do you know -- do you know where that money went

7   when it says cash?

8       A.   No, I do not.

9       Q.   It's simply unaccounted for?

10      A.   Yes.

11      Q.   There's how many?  It says Southeast Auto Group.

12  You've got it listed on here.  Mark Fisher Ford with a

13  question mark.  Perry O. [sic] Motor Cars.  My Body Shop with

14  -- there's again My Body Shop.  Were those -- I see BIJ

15  Motors TX.  Were those -- Prestige Motorwork.  I could keep

16  going.  [INDISCERNIBLE] look at and might find.  Are those

17  transfers to companies that are consistent with the abstract

18  work or broker price opinions?

19      A.    No.  This is -- this looks like, in my opinion,

20  being an investigator for over 20 years, money's going into

21  AAA, which is -- I believe it's a title company or abstract

22  title company.  And a lot of the money goes out to various

23  car-related expenditures, whether it's buying a car or parts

24  or that type of thing.  Including other personal living

25  expenses.

In Re: Washburn Law, PLLC

66

1    Q.    That would be unrelated?

2    A.    That would be unrelated, yes, to the business at

3    hand.

4    Q.    There's transfers to a PayPal account, 164,271 and

5    11 cents.

6    A.    Sometimes when you go to -- it just goes to PayPal.

7    Whose PayPal account that is, I do not know at this time.

8    Q.    You don't know?

9    A.    No.

10   Q.    Okay.  Stephanie Munsey, 41,100 dollars.

11   A.    Yes.  There was -- money went to Stephanie Munsey.

12   Q.    Can you tell -- can you tell how that money went

13   out?

14   A.    Yes.  Give me one second.  In this situation, it's

15   money was transferred to Stephanie Munsey's bank account

16   ending in 9733, in a lot of them.  But this would be 5,500

17   dollars, 200 dollars, 900 dollars, 500 dollars, a thousand

18   dollars.  It just -- you know, in even amounts going to

19   Stephanie Munsey's account.

20   Q.    Were there regular amounts or regular payments?

21   A.    No.  These were just -- it seems to be haphazardly,

22   as needed.  There was not a rhyme or reason, like every month

23   or every week or every bi-week type of thing.

24   Q.    Okay.  There's another Jackson Munsey down here,

25   25,899.  Is that right?

In Re: Washburn Law, PLLC

67

1     A.  Yes.

2     Q.   Okay.

3     A.   Do you want me to talk about that one?

4     Q.   Sure.

5     A.  Same way as with -- this is Venmo payments,

6   actually, to Jackson Munsey.  And that would be 250 dollars,

7   600 dollars, a thousand dollars at various times throughout

8   the time period that totaled that amount of money up.

9     Q.   Okay.  And eBay right under it but you don't know

10  whose eBay account that might have been for.  Is that right?

11    A.    Let me check if I can get some more clarification

12  for you on that one.  This is just purchases straight off of

13  eBay.  What it is for, who it went to, I don't have like -- I

14  don't have any knowledge.  But it's just your purchases going

15  to eBay that are at odd amounts that would be consistent with

16  just various purchases [INDISCERNIBLE] on eBay.

17    Q.   Apple Cash, 47,220 dollars.

18    A.  Apple Cash.  This is labeled from the bank statement

19  as purchases using Apple Cash.  What was purchased during

20  this period of time, I don't know.  It's just money coming

21  out of -- on behalf of Apple Cash.  And that is even amounts.

22  Two hundred dollars, 500 dollars, 800 dollars, 400 dollars.

23  That type of thing.

24    Q.   Okay.  It says transfer to Washburn Law IOLTA

25  account 7498, 31,856 dollars and 91 cents.

In Re: Washburn Law, PLLC

68

1    A.   That's correct.  That is money that was -- can be

2  traced directly from this account back into the Washburn

3  IOLTA -- you know, the trust fund account.

4    Q.   And did you find any other money that went back into

5  the trust fund account?

6    A.   No.

7    Q.   And 3302, is that the operating account?

8    A.   It is.

9    Q.   Okay.

10   A.   And just for clarity, that money coming from AAA

11 back into the Washburn trust account was verified on both

12 sides of the equation.  So it's not just AAA saying they sent

13 the money, but it's also Washburn, the trust account

14 acknowledging receiving the money.  So I could do a trace on

15 both sides.

16   Q.   You said you found the same amount --

17   A.   Yes.

18   Q.   Okay.  Let's look on the next page.  There's William

19 Van Antwerp.  And how much did he receive?

20   A.   17,191 dollars and 50 cents.  And that would be --

21 that is in four separate transactions.

22   Q.   Okay.  And what is the approximate amount of those

23 transactions?

24   A.   It's 4,300, 4,300, 4,300, and then 4291 and 50

25 cents.

In Re: Washburn Law, PLLC

69

1   Q.   Okay.  And in your spreadsheet did you set it up so

2   you can click on that number and then find out what the

3   source [INDISCERNIBLE]?

4   A.   Correct.  What's happening is I took all the bank

5   transactions and classified them to the best of my ability

6   based upon the descriptions and had made -- created a pivot

7   table.  So this is a [INDISCERNIBLE].  This is the pivot

8   table of a summary of what I see.  And so on the pivot table,

9   I just -- I can double click on it and see what makes up that

10  number, all the individual transactions.

11  Q.   Okay.  And I'm going to turn your attention to

12  Exhibit 34.  And can you tell me what you did there?

13  A.   What I was looking for is how much did Washburn Law

14  -- or AAA -- how much did they receive from Washburn Law, the

15  organization itself, and then how much did they transfer back

16  into Washburn Law.  So because Washburn -- because AAA was

17  receiving a lot of money from the trust fund account, what

18  flowed back into Washburn Law.  And there's a net effect.  So

19  when I look at all the transfers from Washburn Law going into

20  AAA, and all the money from AAA going back into Washburn Law,

21  whether it's an operating account or trust account, the net

22  effect is 3,570,346 dollars and 50 cents -- is the net amount

23  that AAA received from Washburn during that period of time.

24  Q.   And what period of time are we talking about?

25  A.   20 -- I'll remember this one day.

In Re: Washburn Law, PLLC

70

1          THE COURT:  I think it's December '19 to December

2      '22.

3      A.    Yes, sir.  That'd be it.

4      Q.    That's right?

5      A.    That'd be correct.  Yes, sir.

6      Q.    Okay.  So that's roughly one, two, three years.  Is

7      that right?

8      A.    Yes.  It'd be three years.

9      Q.    So I'm going to ask you this.  It says transfer from

10     Washburn Law, IOLTA, 7498, 5, 664,000-something.  And at the

11     bottom it says transferred to Washburn Law, IOLTA, 31 8 56

12     91.  Are those -- is the net of that the net of what was

13     taken out of the trust account?

14     A.    That would be correct.  Yes.

15     Q.    Okay.  Which is not to say that they can do that,

16     but just that's what it was?

17     A.    Right.  But the -- some of the money went to other

18     accounts associated with Washburn Law, as well.

19     Q.    Okay.  Did you take a look at the --

20          MR. ANGELL:  Your Honor, I want to -- I'd ask that

21     Exhibits 32, 33, and 34 be put in evidence as explanatory,

22     illustrative evidence.

23          THE COURT:  Exhibits 32, 33, and 34.  Is that

24     correct?

25          MR. ANGELL:  Yes.

In Re: Washburn Law, PLLC

71

1          THE COURT:  Okay.  Each of those is admitted.

2     Q.   Did you look at the tax returns for Washburn Law?

3     A.   I have.

4     Q.   Did you look at them?

5     A.   I think I did.

6     Q.   Did you review those?

7     A.   Do you have a copy of those?

8     Q.   Yes.  Let me turn your attention to Exhibits 13,

9  which is the first volume, the black book.  We'll start with

10 that.  And the other ones are in the white volume, also.

11    A.   And 13 is 2018 tax return?

12    Q.   Yes.  Did you review that?

13    A.   Yes, I have.

14    Q.   Okay.  So can you tell the court, was there a gain

15 or a loss in 2018?

16    A.   There was a loss of 10,577 dollars --

17    Q.   Okay.

18    A.   -- on the tax return.

19    Q.   And on page three of the return it says designation

20 of partnership representatives.  It's --

21         MR. ANGELL:  Your Honor, I did not delete the Social

22 Security Number there.

23         THE COURT:  That's okay.

24    Q.   Okay.  But you see that?

25    A.   I do.

Pace Reporting Service, Inc.  919-859-0000      www.pacereporting.com

In Re: Washburn Law, PLLC

72

1    Q.   Is that Ms. Munsey, Stephanie Munsey?

2    A.   That is Stephanie Munsey's Social Security Number.

3  Yes.

4    Q.   That's her name.  Is that right?

5    A.   Yes.

6    Q.   Okay.  Tell the court what the partnership

7  represented in debts.

8    A.   When it comes to matters with the IRS, when there is

9  a partnership in general, the IRS wants to know, who do I

10  talk to if we have questions.  That's what it comes down.

11  And so this would be the person that the IRS would want to

12  contact for any questions regarding the tax returns.

13    Q.   Okay.

14    A.   And so if there's any issue regarding adjusting the

15  tax returns or an audit, that this would be the person that

16  they talk to.

17    Q.   Does that person have the right to make

18  representations on behalf of the company?

19    A.   Yes.

20    Q.   And they have the authority to sign tax returns --

21    A.   Yes.

22    Q.   -- and amend tax returns?

23    A.   They would be.  Yes.

24    Q.   Okay.  Let me turn your attention to what's been

25  marked as page -- what is page five of the return.  And I'm

In Re: Washburn Law, PLLC

73

1   going to refer you to -- actually, let's start back on the

2   first page.  See under G, it is marked --

3       A.   On page one?

4       Q.   Yes.

5       A.   Okay.

6       Q.   It's marked initial return.

7       A.   Correct.

8       Q.   Does that mean that there were no pre -- tax returns

9   previously filed for this entity?

10      A.   That would be correct because it's consistent with

11  the date the business started on this tax return.  It was

12  January 1st, 2018.  So this would be the first tax return for

13  that entity.

14      Q.   Okay.  And that is also reflected on page five where

15  the balance at the beginning of the year is zeroed out, and

16  then at the end of the year, there's assets and liabilities

17  there.  Is that correct?

18      A.   Correct.

19      Q.   Okay.  I'm going to turn your attention to -- toward

20  Schedule B-1, which is about three page back from there.

21      A.   What page?

22      Q.   B-1.  Two pages back from there.  It's information

23  on partners owning 50 percent or more of the partnership.

24      A.   I apologize.  I'm trying to figure out what page

25  you're on, actually.

In Re: Washburn Law, PLLC

74

1    Q.   It is B -- Schedule B-1.

2    A.   Oh, Schedule B-1.  I see Schedule M-1.

3    Q.   Two pages after the balance sheet.

4    A.   Oh, okay.  I got it.  Thank you.

5    Q.   Okay.  And who does it list as having more than 50

6    percent?

7    A.   Stephanie Munsey.

8    Q.   And what percentage does it list her as having?

9    A.   Sixty percent.

10    Q.   And I'm going to show you a -- next is Schedule K-1.

11    And who does that show as having -- what does that show Ms.

12    Munsey as having in terms of a percentage?

13    A.   It shows Stephanie Munsey having 60 percent

14    ownership of this --

15    Q.   Okay.

16    A.   -- of this partnership.

17    Q.   And then three pages back, Mr. Washburn's K-1.

18    A.   He's reflected showing 40 percent.

19    Q.   And let me turn your attention to the next exhibit.

20    And I will submit to the court, these are copies of returns

21    provided to me by Boston Financial -- excuse me, Your Honor -

22    - pursuant to 2004, an order that I obtained from them.  And

23    they prepared the tax returns for the entities there.  That

24    one's signed but that's the circumstances under which I

25    received.  So Mr. Nordlander, let's go to Exhibit 14.  And

In Re: Washburn Law, PLLC

75

1   have you seen that before?  It's in the white book.  The very

2   first exhibit.

3       A.   Okay.

4       Q.   Okay.  And can you tell the court whether or not

5   there -- Washburn Law made money that year or lost money?

6       A.   According to the tax return, they lost 730,100 and -

7   - 730,172.

8       Q.   Okay.  And can you tell the reason for that loss?

9   Can -- is there --

10      A.   Well, looking at it, number one, is they have a cost

11  of goods sold on here for 408,000 dollars, which means they

12  have 1.1 million dollars in sales, but after the cost of

13  goods sold, they have 700,000 in gross profit approximately.

14  And after that, they pay wages of 877,906, which means

15  automatically you're in the hole just by paying wages by

16  itself.  And then you'll have your rent and your other

17  business-related activities, which would cause a -- which

18  causes loss.

19      Q.   Okay.  And two pages after that, Stephanie Munsey is

20  still the partnership representative.  Is that right?

21      A.   That is correct.

22      Q.   How can a company lose 700,000 dollars and continue

23  to operate?

24      A.   The only logical way to do this is to have someone

25  either infuse the money into the business out of their own

In Re: Washburn Law, PLLC

76

1    deep pockets, or to borrow money from a source to put it into

2    the business.

3        Q.    In other words, it takes cash to be able to do that?

4        A.    But you have to have some type of cash or liability

5    associated with -- you owe somebody something for that amount

6    of loss.

7        Q.    Okay.

8        A.    Because it's not a -- they're not in the real estate

9    business, which would be depreciation, so depreciation's a

10   non-factor in this type of sit -- in this type of business.

11       Q.    Okay.  So look at page five, if you would.  Can you

12   tell the court whether or not there were any capital

13   contributions made as reported on the return?

14       A.    Yes.  On Schedule M-1, or particularly in Schedule

15   M-2, you will see that that -- according to the tax return,

16   there was influx of 560,930 dollars of capital into this

17   business to keep it afloat.

18       Q.    Okay.  And then let's go to the K-1s here.  And

19   we've got Stephanie Munsey showing at 60 percent.  Is that

20   correct?

21       A.    That is correct.  According to the 2019 tax return,

22   K-1, Stephanie Munsey owned 60 percent.

23       Q.    And how much -- did she contribute money to the firm

24   according to this K-1?

25       A.    According to this K-1, yes, 336,558 dollars.

In Re: Washburn Law, PLLC

77

1    Q.   Okay.  And then going on to Mr. Washburn's K-1.

2  He's at 40 percent.  Is that correct?

3    A.   Correct.  He's at 40 percent.

4    Q.   And does that show him contributing capital to the

5  company?

6    A.  Yes, 224,372 dollars.

7    Q.   Okay.  Turn your attention to year 2020, the next

8  one, Exhibit 15.

9    A.   I'm there.

10   Q.   Okay.  And did the company make money or lose money

11  in 2020?

12   A.   The tax return shows on line 22 a loss of 133,345

13  dollars.

14   Q.   Okay.  And is there a depreciation or other non-cash

15  items that might explain that loss?

16   A.   Not material, no.

17   Q.   So, again, would there have to be loans or capital

18  contributed to the company?

19   A.  Yes, sir.

20   Q.   Okay.  Page three, Stephanie Munsey is still the

21  partnership representative.  Is that correct?

22   A.   That is correct.

23   Q.   Okay.  And then it -- page five.  Was there a --

24  does the return reflect that there was cash that was

25  contributed to the company?

In Re: Washburn Law, PLLC

78

1    A.   No.  According to Schedule M-2, there's no capital

2    contribution by the partners.

3    Q.   Does it reflect a profit on the books?

4    A.   It does reflect a profit on the books.  Now, the

5    question would be is why is that.  And there is a -- there's

6    an explanation.  If you look on Schedule M-1, there's an

7    explanation with a net income of 72,000 dollars.  That at the

8    end of the day, they're saying there's a 133,000-dollar loss,

9    which is quite substantial.  But statement 17 would be the --

10   statement 7 -- I apologize -- on this tax return would be the

11   explanation for it.  And I guess we'll go to -- let me find

12   statement 7.  From this standpoint, and it's consistent with

13   you have to borrow money, and this --

14   Q.   Right.

15   A.   But what's happening is, is that there was a non-

16   taxable advance as well as the paycheck protection loan

17   forgiveness of 212,000 dollars as stated in statement 7 on

18   the tax return.

19   Q.   Okay.  So that is the explanation for that.  Is that

20   correct?

21   A.   That's correct.

22   Q.   Okay.  And that's not going to show up as a taxable

23   item?

24   A.   Right.

25   Q.   And again, do we have Ms. Munsey at 60 percent?

In Re: Washburn Law, PLLC

79

1    A.   Let me go back to her K-1, but I believe that's
2    true.  Yes.  She stays at 60 percent.
3    Q.   And Mr. Washburn at 40 percent.  Is that right?
4    A.  And Mr. Washburn stays at 40 percent.
5    Q.   Okay.  And can I get you to look at what I marked as
6    Exhibit 16?
7    A.   Yes.  This is the 2021 Form 1065 with the --
8    Q.   Okay.  And did the company make money or lose money
9    that year?
10   A.   This year, they have a loss of 357,242 dollars.
11   Q.   Okay.  So are you -- I don't know if you know this
12   or not.  Do you know whether or not the numbers on these
13   returns reflect monies that came into All American A in
14   addition to those reported on Washburn Law?
15   A.   I have not compared the money going to AAA in -- to
16   compare it to the Washburn Law tax return.  No, I have not.
17   Q.   That's fair.  And again, 2021, do we have Ms. Munsey
18   as the tax representative?
19   A.  Yes.
20   Q.   Okay.  And then page five.  What -- what do they
21   account for that kept the company going despite a 357,000-
22   dollar loss in that year?
23   A.   They also have another statement 8.  It shows
24   199,600 dollars that would have -- that would help at least
25   explain some things.  And we can look at statement 8.

In Re: Washburn Law, PLLC

80

1   Statement 8 is the Paycheck Protection Program loan

2   forgiveness.

3       Q.   Okay.  So we have PPP loans in Washburn Law firm

4   that were forgiven in 2020 and 2021.  Is that right?

5       A.   That's correct.

6       Q.   And why would -- do you have any idea All American A

7   would receive a PPP loan?

8       A.   I have no idea.

9       Q.   Let me turn your attention to the K-1 for Ms.

10  Munsey.  She still has 60 percent.  Is that correct?

11      A.   That is correct.

12      Q.   And Mr. Washburn's still at 40 percent.  Is that

13  right?

14          THE COURT:  Mr. Angell, let me clarify one thing.

15  You had asked the question about why AAA would have received

16  a PPP loan.

17          MR. ANGELL:  Yes.  PPP money.

18          THE COURT:  How is that -- how is that showing on

19  the statement 8?

20      Q.   Do you know whether or not there was 90,000 dollars

21  that was received by AAA?  Is that reflected on the Washburn

22  Law tax returns?  Do you know?  Or is that separate money?

23      A.   Are we talking about money that AAA received from

24  the PPP loan?  Are we asking if it's on the tax return, same

25  numbers?

In Re: Washburn Law, PLLC

81

1    Q.   Yes.  Do you know?

2    A.   Let me look at the PPP loan real quick.

3         THE COURT:  I guess my question is, would it reflect

4    a loan forgiven of 190 -- am I looking at the right thing --

5    199,600 dollars?

6         MR. ANGELL:  Right.

7         THE COURT:  I'm just trying to correlate that

8    between Washburn Law and AAA.

9         MR. ANGELL:  That's the question.  I'm not sure that

10   the witness knows the answer.

11        THE COURT:  Okay.

12        MR. ANGELL:  If he does, I would --

13        THE COURT:  It's just reflected on the Schedule 8,

14   is what -- the testimony I have so far.

15        MR. ANGELL:  I think the testimony was there's --

16   what -- about 90,000 that went into AAA and then --

17   A.   Ninety -- yeah, 94,902 dollars went into AAA for PPP

18   loan.

19   Q.   Did that come directly from the government

20   [INDISCERNIBLE]?

21   A.   Yes.  That went straight --

22        THE COURT:  And that was reflected in the earlier

23   exhibit with the printout that Mr. Nordlander had done.

24        MR. ANGELL:  Right.

25        THE COURT:  Okay.  All right.  So that's a restating

In Re: Washburn Law, PLLC

82

1    of what he's already testified to.

2        Q.   So this was a wire or an ACH transfer.  Is that

3    right?

4        A.   That went from the government to AAA.

5        Q.   Does it -- so that's a loan to AAA.  Is that right?

6        A.   Yes.

7        Q.   So based on that, is it your opinion that AAA

8    requested a PPP loan and it was funded?

9        A.   I am not going to be -- consider myself an expert in

10   the administrative wiring, okay, of where -- how the money

11   gets placed.

12       Q.   Understood.

13       A.   So I don't want to overstep -- get over my skis on

14   this one.  What internal controls the government has when

15   someone requests money and then where the money goes to, I

16   have a general idea.  But I'm not comfortable testifying to

17   that in court regarding what's being -- being a hundred

18   percent certain.

19            THE COURT:  Let me just narrow you down.  For my

20   question, I may have brought you outside what you're looking

21   for.  So all I'm seeing is that with this 199,600, that was a

22   forgiven loan and that would be added to the M-2 to show some

23   mitigation of loss.  Is that correct?

24            MR. ANGELL:  It would be -- so that mean-- if I

25   understand it, Your Honor -- and I don't mean to testify --

In Re: Washburn Law, PLLC

83

1    but if I understand, when they got the PPP money and it was

2    forgiven, it was not taxable.  And therefore, they did get

3    cash -- or they got released from liability in that year.

4              THE COURT:  Okay.

5              THE WITNESS:  Yeah.  You have to show -- in order to

6    qualify for these loans, you have to show a need for it,

7    number one.  But --

8              THE COURT:  I got all that.  I know that.

9              THE WITNESS:  Yeah.  [INDISCERNIBLE] the employees -

10   -

11             THE COURT:  But I just wondered because the

12   accounting aspect as to how we -- how that affects the

13   numbers I'm seeing on this 20 -- 2021 tax return.

14        Q.   That's a good question.  Would you record the

15   forgiveness of the loan as income in the year that it's

16   forgiven, whether or not it's taxable income [INDISCERNIBLE]

17   income?  Or would you record it in the year that the loan is

18   made?

19        A.   No.  You would record the year that -- when it's

20   forgiven is when you record the forgiveness of it.

21        Q.   Okay.

22        A.   Not when the loan is made.

23        Q.   So those amounts that are included in the Schedule

24   M-2s weren't necessarily money coming in in those years.

25   They may have been money that was for loans --

In Re: Washburn Law, PLLC

84

1    A.   More than --

2    Q.   -- that were forgiven in those years?

3    A.   More than likely, it's the time of forgiveness.  And

4    usually, the date of the loan and the time for forgiveness

5    would be two separate years.

6    Q.   Okay.  And again, we're assuming that it was

7    reported in accordance with your understanding?

8    A.   Yes.

9    Q.   Okay.  Mr. Nordlander, let's see.

10        MR. ANGELL:  I will tender into evidence -- Your

11   Honor, I'd like to tender into evidence Exhibits 13, 14, 15,

12   and 16.

13        THE COURT:  Okay.  Exhibits 13, 14, 15, and 16 are

14   hereby admitted.

15   Q.   Thank you.  Okay.  Now, Mr. Nordlander, did you

16   review the tax returns of the Munsey's?

17   A.   I have.

18   Q.   Okay.  And I'm going to -- we're going to go back to

19   the black book again.  And I'm going to turn your attention

20   to Exhibit 9.

21   A.   Your Honor, if you're going to have forensic

22   accountants up here, you need bigger tables.  We like to

23   have, you know, at least [INDISCERNIBLE].

24        THE COURT:  Well, talk to your representative about

25   that.  I don't have any jurisdiction over that.

In Re: Washburn Law, PLLC

85

1          MR. ANGELL:  Your Honor, we have the same complaint,

2    so.

3          THE COURT:  I understand.

4     Q.   Okay.  Mr. Nordlander, did you review Exhibit 9?

5     A.   Let me get in Exhibit 9 real quick.  Yes.

6     Q.   Okay.  And can you tell the court what it appears to

7    be?

8     A.   The 2018 Form 1040 for Stephanie Munsey and Jackson

9    Munsey.

10         MR. ANGELL:  And Your Honor, this is a document that

11   I received pursuant to 2004, as you may recall.

12         THE COURT:  Okay.  Thank you.

13    Q.   And how much did Mr. and Ms. Munsey report as

14   income?

15    A.   Give me one second.  Make sure I -- there is various

16   numbers here.  Total income would be 17,000 dollars and --

17   17,065 dollars.

18    Q.   Okay.

19    A.   And that would be on line six of the Form 1040, page

20   two.

21    Q.   Okay.  That's total income that they reported for --

22    A.   From all sources.

23    Q.   -- 2018.  Is that right?

24    A.   Yeah, for 2018.  Yes, from all sources.

25    Q.   Okay.  And 4,000 of that is wages?  Is right -- is

In Re: Washburn Law, PLLC

86

1    that right?

2        A.    That's correct.  It'd be line one, 4,000 as wages,

3    and then line six is some other type of income.

4        Q.    And what is that other income?  Do you know?  Can

5    you [INDISCERNIBLE]?

6        A.    That would be on Schedule 1.  Let me find Schedule 1

7    real quick.  That's the next page.  The next page over.  It's

8    about 19,411 dollars for business income and a loss of 6,346

9    dollars from other sources, which gives you a -- 13,065.

10       Q.    Okay.  Turn your attention to Schedule C of the

11   return, if you would.

12       A.    Okay.  I see that.

13       Q.    And what does that purport to be?

14       A.    This is a Schedule C for Jackson Munsey for

15   marketing and sales title abstracts.  And he has income.  He

16   has expenses.  And his profit is 19,411 dollars.

17       Q.    Okay.  Do you know whether or not that -- where that

18   income was earned by Mr. Munsey?

19       A.    I do not.

20       Q.    Did you look at -- and I don't know if you know or

21   not -- was this income that might have been earned through

22   AAA?

23       A.    I have no idea.

24       Q.    Okay.  Do you -- can you tell the court what sort of

25   distributions or funds were taken out of AAA by Mr. Munsey?

In Re: Washburn Law, PLLC

87

1    A.  Well, this is a 2018.

2    Q.  That pre-dates your --

3    A.  That pre-dates my analysis.

4    Q.  Okay.  [INDISCERNIBLE]

5    A.  So I don't have anything to say about that.

6    Q.  Okay.  Based on this, do you have an opinion as to

7    how much positive cash the Munsey's may have had?  How much

8    it -- cash after the business expenses of Mr. Munsey that the

9    Munseys' may have earned during 2018?

10   A.  It would be real close to the 19,411 because there's

11   only 108 dollars of depreciation, which is a non-cash event.

12   So it's about 19,000 dollars in income.

13   Q.  And he reports on a cash basis.  Is that correct?

14   A.  That would be correct.

15   Q.  Okay.  Let's look at 2009 in Exhibit T10 -- '19,

16   2019.  Exhibit T10.

17   A.  Okay.

18   Q.  And can you tell the court was sort of income they

19   had in that year?

20   A.  According to the tax return, they had a loss of

21   726,738.

22   Q.  And what is that attributable to?

23   A.  That is various businesses that they operated.  The

24   majority of it would come from a loss from Washburn Law.  And

25   that would be -- I'm looking for that number.  Maybe it was -

In Re: Washburn Law, PLLC

88

1  - that would be on page two of the Schedule E, which shows
2  Washburn Law with a 731,072 loss.
3      Q.   Okay.  And this is -- excuse me.  This is a year and
4  -- sorry.  And there's no wages reported.  Is that correct?
5      A.   That's correct.
6      Q.   Okay.  And look on Schedule A.  And it says that
7  37,770 dollars paid for home mortgage interest.  Is that
8  right?
9      A.   That would be correct.
10     Q.   And again, we've got on Schedule C, we've got Mr.
11 Munsey with his business, a cash business, with a net of
12 3,434 dollars.  Is that right?
13     A.  Yes.
14     Q.   Now, this was the year, I believe -- look back at --
15 I'm not going to make you do it, but I'm going to do it.
16     A.   For clarification, that mortgage interest is
17 reported by them paying Mr. William Antwerp that same amount
18 of money.  That was their lender according to the tax return.
19     Q.   Okay.  And this is the year that we saw on the
20 Washburn tax return that there was a con -- capital
21 contribution made by Ms. Munsey of 336,558 dollars.  Does
22 that sound right?
23     A.  Yes.
24     Q.   Okay.  And I'm going to refer back to -- I'm reading
25 from Exhibit 14.  Do you see anywhere that money could have

In Re: Washburn Law, PLLC

89

1    come from?

2         A.   Come from as in from -- what do you mean by --

3         Q.   Any source of funds that the Munseys' might have had

4    that year to make that contribution.

5         A.   Not personally.  I have a guess of where the source

6    of the money came from regarding AAA.  But when it comes to

7    the Munseys' lifestyles, the answer is no.

8         Q.   Was AAA supposedly a subsidiary of Washburn Law?

9         A.   That's what I was told.

10        Q.   How will they -- how would you have a contribution

11   from a wholly owned subsidiary to a --

12        A.  You don't.

13        Q.   Okay.

14        A.   If it's going to be wholly owned, there's -- we're

15   getting to tax law and everything else.  But for the most

16   part, no.

17        Q.   It's consolidated, isn't it?

18        A.  It's consolidated.  You can do a consolidation.

19   Yeah.

20        Q.   Okay.  Let me turn your attention to Exhibit T11.

21   This is the 2020 return.

22        A.   This is a 2020 Form 1040 for Stephanie Munsey and

23   Jackson Munsey.

24        Q.   Okay.  And what do you see in terms of wages?

25        A.   71,096 dollars.

In Re: Washburn Law, PLLC

90

1    Q.   And then you got a little interest there.  And then

2  there's other income.  Can you tell me what the other income

3  is?

4    A.   The other income is a hodgepodge of other businesses

5  that flow into their tax returns.

6    Q.   Okay.

7    A.   Some of it's going to be their -- Jackson Munsey's

8  Schedule C, which he reports an income of 64,711 dollars.

9  And the bulk of it will be on page two of the Schedule E,

10 which will show Bokeman Well [sic], Washburn Law, and Terra

11 Novus [sic] from those sources.

12   Q.   Okay.  And can you tell how much mortgage interest

13 was reported for 2020?

14   A.   Yes.  Let me get that page.  Mortgage interest on

15 the Schedule A was reported at 45,107 dollars.

16   Q.   Okay.  And I'm going to -- we're going to turn your

17 -- I'm going to turn your attention to Exhibit 12.  Sorry.

18 Let me back up to Exhibit 11.  Do -- examining that return,

19 do you see how the Munseys' might have been able to pay

20 45,000 dollars' worth of mortgage interest after payment of

21 their expenses?

22   A.   No, not in -- are we talking about -- well, for

23 2020, for sure no.  You're talking about 2021 now?

24   Q.   Yes.

25   A.   2021, that's Exhibit T12?

In Re: Washburn Law, PLLC

91

1    Q.   Yes.

2    A.   And that's a 2021 Form 1040 for Stephanie Munsey and

3    Jackson Munsey.  And for that year, they report 78,000

4    dollars in wages and approximately 160,588 loss.  So they

5    have a loss of the year, as well.  So for a couple years,

6    they had a -- heavy losses.

7    Q.   Okay.  And what do they report as -- did they report

8    mortgage interest?

9    A.   They did.  For that year, it's 54,002 dollars.  For

10   2021 for the mortgage interest.

11   Q.   Maybe 54,002 dollars?

12   A.   Yeah.  I thought -- did I say 40 -- 54,002 dollars.

13   Q.   Okay.  And from the return, do you see any source of

14   income that would be sufficient to pay that mortgage

15   interest?

16   A.   No.

17          MR. ANGELL:  I ask that Exhibits 9, 10, 11, and 12

18   be admitted into evidence, Your Honor.

19          THE COURT:  Okay.  Exhibits 9, 10, 11, and 12 are

20   admitted.

21   Q.   Mr. Nordlander, let me refer your attention to

22   Exhibit 22, which is in the white book.  And I will tell you

23   I pulled that from the records of [INDISCERNIBLE].

24          THE COURT:  And your exhibit number is which one?

25          MR. ANGELL:  Exhibit Number 22.

In Re: Washburn Law, PLLC

92

1        THE COURT:  Got it.  Okay.

2    Q.   Are you with us?

3    A.   Oh, yes, sir.  I'm here.

4    Q.   Okay.

5    A.   I apologize.  I was just reviewing it.  Go ahead.

6    Q.   Okay.  I'm going to represent to you that I pulled

7    this from the county records of Cherokee County, South

8    Carolina.  And it purports to be a mortgage made by Stephanie

9    Munsey filed on -- in 2018, 08-31-2018, for 799,000 dollar

10   and some odd cents.  Do you have any estimate as to what you

11   think a payment might be on a mortgage like that?  Of course,

12   we don't know whether or not it balloons, but assuming equal

13   payments, what sort of mortgage --

14   A.   Well, with a mortgage like this, if you have --the

15   interest rates were pretty low in 2018.  Even if it was, you

16   know, one percent, one percent is eight grand.  Two percent

17   is 16,000.  Three percent's -- you know, so with a 54,000-

18   dollar mortgage -- or 54,000-dollar interest, based upon

19   this, it had like an eight percent interest rate.

20   Q.   Okay.  And --

21   A.   So that -- I don't have my financial calculator, but

22   an eight percent interest rate's, you know, a little high,

23   but that's just my opinion on the matter.  But I'm not an

24   expert in interest rates.

25   Q.   Okay.  But do you have any estimate as to what the

In Re: Washburn Law, PLLC

93

1   payments would be on a 30-year loan?

2       A.   Not with -- not unless you give me a few minutes.  I

3   can figure that out.  Or you can -- maybe after a break or

4   something, I can do it.

5           THE COURT:  I'm going to guess it's around eight

6   grand a month.

7           MR. ANGELL:  I don't know, Your Honor.

8           THE COURT:  I mean -- okay.  It's high.  I know

9   that.

10          MR. ANGELL:  Your Honor, I think we're speculating,

11  so we'll move on.

12          THE COURT:  Yeah, yeah.  Yeah.

13      Q.   Mr. Nordlander, I'm going to turn your attention to

14  Exhibit 23.  And I will represent to the court that is

15  another record of Cherokee County with a mortgage -- and the

16  mortgage is -- well, 22 and 23 are to Mr. Van Antwerp and his

17  wife.  Is that [INDISCERNIBLE]?

18      A.   That's correct.

19      Q.   Those were payees.  They're -- the Antwerps received

20  four payments from AAA.  Is that correct based on your

21  analysis?

22      A.   Give me one second.  It references a promissory note

23  but I don't see the terms of the promissory note unless I'm

24  missing it in here.

25      Q.   Yeah.  I don't think it's in here.

In Re: Washburn Law, PLLC

94

1    A.   So it references a promissory note but I don't know

2    what the promissory note says.

3    Q.   Okay.  But the Van Antwerps did receive funds from

4    AAA.

5    A.   Oh, that's correct.  For --

6    Q.   Okay.

7    A.   There's like four transactions to them.

8    Q.   Well, we've got two mortgages that Ms. Munsey's on

9    that total about 1.2 million dollars.  Is that right?

10    A.   That would be correct.

11    MR. ANGELL:  Okay.  I ask that Exhibits 22 and 23 be

12    admitted into evidence.

13    THE COURT:  Okay.  Exhibits 22 and 23 are hereby

14    admitted.

15    Q.   Mr. Nordlander, did you review the bank statements

16    of Ms. Munsey?

17    A.   I did.

18    Q.   And I will represent to the Court that Ms. Munsey

19    provided her bank statements pursuant to the 2004 entered by

20    this court and they were sent to Mr. Nordlander.

21    THE COURT:  Okay.

22    Q.   Did you see any evidence of payments to the Van

23    Antwerps in those bank statements?

24    A.   No.

25    Q.   Did you see any evidence in anything that you

In Re: Washburn Law, PLLC

95

1  reviewed that Ms. Munsey had a 25 percent interest in

2  Washburn Law?

3      A.    Twenty-five percent --

4      Q.    Right.

5      A.    -- versus the 40 on the tax return -- or 60 on the

6  tax return?

7      Q.    Right.

8      A.    No.  I don't see anything like that.  When I

9  reviewed Ms. Munsey's personal bank statement, I mean, I --

10  if you need me to explain what I found in there, I can, but -

11  -

12      Q.    Go ahead.

13      A.    The bottom line is, is the money came from -- it

14  appears to be like payroll type of deposits but they're like

15  2,000, 2,500 dollars each time.  Something like -- something

16  of that nature, which is consistent with the payroll.  But

17  the outgo was really for college education.  Belmont

18  University.  It also went to a lot of credit cards; into

19  transfers to another account, which paid some type of loan to

20  First Citizens.  And you know, your typical personal expenses

21  like oral surgeons and medical things, and gas, and

22  groceries, and those type of vendors.  That's where it all

23  went to.

24      Q.    Okay.

25      A.    And it's -- the Belmont is consistent with tax

In Re: Washburn Law, PLLC

96

1   return.  It shows that her son -- I think her son is -- what

2   is it?  Rex?  I think something like that -- was going to

3   Belmont, so it's consistent with that.

4       Q.   Okay.  Let me turn to your attention to what I've

5   marked as Exhibit 20.

6       A.   Okay.

7       Q.   Okay.  And this is an email -- it purports to be an

8   email from Ms. Munsey to Usha Thomas, I believe is her name.

9   Okay.  It said will you please provide me the account

10  information for All American A, LLC.  I've received my

11  business check card but I also need the routing number and

12  account number.  Did you see any evidence of -- do you know

13  whether or not Ms. Munsey had a check card -- a business

14  check card for All American, for AAA?

15      A.   I do not know.  I didn't see any evidence of that.

16      Q.   Okay.  And that doesn't mean that it might not be

17  there, I guess.  It's --

18      A.   No.  But in my analysis of AAA, there's quite a few,

19  based upon my experience, personal living expenses.

20      Q.   Okay.

21      A.   Gasoline, gas -- gas stations, restaurants.  You're

22  typical personal -- you know, grocery stores.  That type of

23  thing.

24      Q.   And where were those personal expenses incurred?

25      A.   Most of it was in the Tryon area, Gaffney.  That

In Re: Washburn Law, PLLC

                                                              97

1    type of area of the United States.  It wasn't outside of

2    that.  There's a couple of times where there was like maybe

3    like Vegas or something -- like out of state.  But the

4    majority of it was in a certain locale.

5        Q.    Tryon or Gaffney, South Carolina?

6        A.    Correct.

7              MR. ANGELL:  Give me just a second, Your Honor.

8              THE COURT:  Okay.

9              MR. ANGELL:  I've got no further questions, Your

10   Honor.

11             THE COURT:  Okay.  Mr. Behr?

12             MR. BEHR:  No questions, Your Honor.

13             MR. ANGELL:  Just does Your Honor have any

14   questions?

15             THE COURT:  Oh, I'm going back to my notes.  And I

16   don't think I do.  Did the -- you asked about 25 percent

17   ownership.  I'm remembering that may have been in some

18   pleadings.  Why is that relevant?

19             MR. ANGELL:  If you read Ms. Munsey's answer, she

20   doesn't directly say she only owned 25 percent at the time of

21   the transfer.  She said at one point she owned 25 percent.

22   Then she kind of moves on to other things.  But --

23             THE COURT:  Okay.

24             MR. ANGELL:  -- she intimates that she owned 25

25   percent.

In Re: Washburn Law, PLLC

98

1          THE COURT:  Okay.  All right.

2          MR. ANGELL:  And there's an operating agreement I'll

3     bring forward later on, too.

4          THE COURT:  Okay.  Would you examine Mr. Norlander

5     on the -- I know one of the businesses -- the other two

6     businesses from which there were losses?  And that would have

7     been on the Munsey's individual tax returns from 2021 or

8     2022.  There were three businesses that were done but there

9     were -- one was Washburn Law and there were two other things,

10    like Terra Nova or Terra Ferma or something like that in one

11    of them.

12         MR. ANGELL:  Terra Ferma, I believe, was owned by

13    Ms. Munsey.  And the other one, I believe, was owned by Ms.

14    Munsey, as well.

15         THE COURT:  Okay.  Is there any relevance on that or

16    is that just for informational purposes?

17         MR. ANGELL:  It's just part of the return.

18         THE COURT:  Okay.  All right.

19         THE WITNESS:  Well, if I could clarify for you, Your

20    Honor.  When there's -- there appears to be a small mistake

21    on the tax return.  Because you'll see Terra Nova and one big

22    number.  Okay.  But when you look at the Schedule later, a

23    couple pages back, it lists like five or six other

24    corporations that had their losses that equals that number.

25    So it's not -- so like Contract to Close, Contract Solutions,

In Re: Washburn Law, PLLC

99

1   those types of things, are on her tax returns but it's on a

2   separate page that somehow when you add all those numbers up,

3   it equals Terra Nova's numbers.

4           THE COURT:  Okay.

5           THE WITNESS:  If that makes sense.

6           THE COURT:  Okay.

7           THE WITNESS:  So, I mean -- so to sit there and say

8   that Terra Nova has a X loss or X profit, I think is not

9   correct because when we look at the -- what makes up that

10  number, it's multiple corporations --

11          THE COURT:  Okay.

12          THE WITNESS:  -- is my point.  That's all.

13          THE COURT:  I gotcha.  Okay.

14          MR. BEHR:  Yeah.  I do have one question based on

15  that, Your Honor.

16          THE COURT:  Mr. Behr.

17  CROSS EXAMINATION BY MR. BEHR:

18      Q.   Mr. Nordlander, if you could turn to Exhibit Number

19  33 real quick.  That's in the white book.  Based on your

20  review of the AAA bank account, which is summarized here on

21  Exhibit Number 33, and based on your review of all the tax

22  returns that you just testified about, are you able to draw a

23  conclusion as to whether there is unreported income on behalf

24  of Mr. Munsey within his personal tax returns for this time

25  period?

In Re: Washburn Law, PLLC

100

1    A.   Based upon my 20 years' experience in doing this,

2    and seeing what's reported on their tax returns, seeing the

3    corporate bank accounts that they control, and seeing the

4    personal living expenses that appear to be the Munseys', I

5    would definitely say that the tax return is not correct.

6    Q.   In that there is [INDISCERNIBLE].

7    A.   Their personal tax return is not correct.

8    Q.   In the area of income received?

9    A.   Correct.  Because there's too many living expenses

10   out there.  I can go through Ms. Munsey's personal bank

11   account and see that this is not a 70,000-dollar lifestyle

12   with living in a -- what -- 1.3-million-dollar house, having

13   that 1 million dollar -- or you know, 700,000-dollar

14   mortgage, whatever.  It's -- no.  The math does not work out.

15   Q.   And Exhibit Number 33 suggests that at least a half

16   a million dollars went to Mr. Munsey during the relevant time

17   period, which is 2020, 2021, 2022, just from the AAA bank

18   account.  Correct?

19   A.   Oh, that's correct.  Yeah.  The -- it went to J.

20   Munsey account number 4568 for a little less than 480,000

21   dollars for that time period.  Yes.

22   Q.   And then there's also the cash transactions that at

23   82,000, right?  And that's irrespective of any other personal

24   benefit he may have received as a result of some of these

25   transactions.

In Re: Washburn Law, PLLC

101

1    A.   Right.  And you got the BMW cars, and you know,

2   there's other stuff that I haven't investigated per se, or

3   the trustee, I don't think, ever has.  But there's a lot of

4   money out there that has the flavor of personal living

5   expenses.

6    Q.   Did you have an opportunity to review the payroll

7   account for Washburn Law?

8    A.   No.

9    Q.   So you don't know whether or not Mr. Munsey was also

10  receiving a paycheck from Washburn Law?

11   A.   I didn't see any evidence of that.  And I didn't see

12  any evidence on their tax returns or anything -- any other

13  documents that I had.

14        MR. BEHR:  Okay.  No further questions, Your Honor.

15  Thank you.

16        THE COURT:  Anything else?

17        MR. ANGELL:  Let me follow up on one thing --

18        THE COURT:  Okay.

19        MR. ANGELL:  -- Mr. Behr said.

20  REDIRECT EXAMINATION BY MR. ANGELL:

21   Q.   Given Ms. Munsey's mortgages and the mortgage

22  interest paid on those mortgages, if there were -- if there

23  was unreported income on the tax return, would Ms. Munsey

24  have been -- or should have been aware of that?

25   A.   Based upon the lifestyle, yes, and her education.

In Re: Washburn Law, PLLC

1    If you're asking me as an investigator, put my little

2    investigator hat on, there would definitely be -- have to be

3    some level of knowledge that you can't have a 78,000-dollar

4    wage and live this type of lifestyle, and then turn right

5    around and sign a tax return and say this is correct.  With

6    her level of education and being an attorney, that's just --

7    it doesn't compute very well.

8            And in addition, when you look at -- when you look

9    at where the sources of the money came from, okay, based upon

10   my analysis, I think it comes from the trust fund, goes in

11   AAA, AAA pays for a lot of that -- a lot stuff.  At the end

12   of the day, AAA nets out, what, 3 million dollars over a

13   period of time.  And where did that money go to?  It looks

14   like it went to the Munseys.

15           MR. ANGELL:  I have no further questions, Your

16   Honor.

17           THE COURT:  Okay.  You can step down.  Thank you.

18           MR. ANGELL:  I ask that the witness be released.

19           THE COURT:  Okay.  You can be released, Mr.

20   Nordlander.  Thank you.

21           MR. NORDLANDER:  Thank you.

22                   (WITNESS DISMISSED)

23           THE COURT:  Okay.  At this point, we're going to

24   take a break till 1:45 and we'll pick up then.

25           THE CLERK:  All right.  The United States Bankruptcy

In Re: Washburn Law, PLLC

103

1   Court will be in recess until 1:45.

2                        (RECESS)

3           THE COURT:  Okay.  Your next witness or next

4   evidence.

5           MR. ANGELL:  I call Jonathan Washburn to the stand.

6                   JONATHAN WASHBURN,

7                   having been first duly sworn,

8                   was examined and testified

9                   as follows:

10  DIRECT EXAMINATION BY MR. ANGELL:

11      Q.   Good afternoon.  State your name for the record.

12      A.   My name is Jonathan Worth Washburn.

13      Q.   And Mr. Washburn, can you explain what your position

14  was with Washburn Law?

15      A.   Washburn Law as a North Carolina LLC, I was the

16  managing partner and initially just an employee and a

17  managing partner.  Later I became a 40 percent owner and

18  remained as the managing partner and 40 percent owner.

19      Q.   Okay.  We're going to have to break this down a

20  little bit.  When did you first become involved with Washburn

21  Law?

22      A.   2014 was the initial date of Washburn Law, which

23  commenced as Washburn and Ray, PLLC.  And another attorney,

24  David Ray, shortly thereafter, decided not to leave his

25  present position at that time, so we changed it to Washburn

In Re: Washburn Law, PLLC

                                                                104

1    Law, PLLC.

2        Q.    And was it just the two of you?

3        A.    Well, the firm was the three of us because the firm

4    was owned by Stephanie Munsey.  But David Ray and I were the

5    two named associates with the firm, with the North Carolina

6    LLC.

7        Q.    So did -- what percentage of the firm did Ms. Munsey

8    own at that time?

9        A.    One hundred percent.

10       Q.    And how long did she own a hundred percent of the

11   firm?

12       A.    I believe around 2016 or '17, discussion was had

13   about whether the firm would be sold and it came about that

14   we agreed if it were sold, I'd get 40 percent and Stephanie

15   would get 60 percent.  So around 2016 or '17, we prepared

16   revised -- changing that ownership.

17       Q.    Okay.  Let me turn your attention to what I'll mark

18   as Exhibit 37.  It is in the white book.

19       A.    All right.

20       Q.    Have you seen that document before?

21       A.    I don't recall seeing this document except for

22   earlier today when I glanced at this.

23       Q.    Okay.

24       A.    This operating agreement.

25       Q.    So you don't know whether or not it was ever signed

Pace Reporting Service, Inc.  919-859-0000       www.pacereporting.com

In Re: Washburn Law, PLLC

105

1   by Ms. Munsey?

2       A.   I don't know if it was ever signed by Ms. Munsey.

3       Q.   But it does indicate she's a hundred percent owner.

4   Is that right?

5       A.   Yes, it does.

6       Q.   And that's consistent with your recollection?

7       A.   That is correct.

8       Q.   And let me turn your attention to Exhibit 38.

9       A.   Yes.  I'm at that.

10      Q.   That again is unsigned.

11      A.   That is unsigned.

12      Q.   And have you have -- ever seen that document before?

13      A.   I've seen it.  I know my peculiarities.  I know that

14  this was prepared by me on my computer because of various

15  things.  So, yes, I've seen it.

16      Q.   Is that the format of the document that makes you

17  think that?

18      A.   That -- the format, the -- yes, that's correct.  For

19  -- one key example is never put a dot after my middle

20  initial, W, and I do that for a number of reasons.  But that

21  is a clue that very few other people would adhere to, so.

22  And many other things.

23      Q.   Okay.  How did the firm come to be called Washburn

24  Law if she wasn't -- if you weren't a partner in it?  How did

25  --

In Re: Washburn Law, PLLC

106

1    A.  There was discussion with people at the Secretary of

2    State and the State Bar about how to appropriately name a

3    firm depending on the ownership and the managing partner.

4    And we did determine with discussion with the State Bar that

5    that was an appropriate name, but I can't recall the details

6    of how that came about.

7    Q.  Because Ms. Munsey's not licensed in North Carolina.

8    Is that correct?

9    A.  That is correct.

10   Q.  And you are licensed in North Carolina.

11   A.  That is correct.

12   Q.  And it's organized as a professional limited

13   liability company.  Is that right?

14   A.  That is correct.

15   Q.  Okay.  Let's get back to 38.  Did you ever see a

16   signed version of that document that you can recall?

17   A.  I recall seeing a signed copy of this.  Yes.

18   Q.  Do you know where that might be?

19   A.  I may even have a copy in stored files, and I

20   thought there was a copy of the signed one circulated around

21   in various documentation in connection with this action.

22   Q.  Okay.  Well, we'll follow up but I'd like you to

23   look for that.

24   A.  I would be glad to.

25   Q.  If you can turn your attention to Exhibit 39?

In Re: Washburn Law, PLLC

107

1    A.   I'm there.

2    Q.   And did you prepare this document?

3    A.   I did.  Well, it appears exactly like a document

4  that I would have prepared.  I'm confident that I prepared

5  this document.

6    Q.   Okay.  And have you seen a signed version of this

7  document?

8    A.   The answer is yes, but if there were some small

9  clerical changes that were made from what you're showing here

10  and the final one, I'm -- I haven't scrutinized it but I've

11  seen a signed copy of the original minutes that this

12  represents.

13    Q.   And do you think you might have that, as well?

14    A.   I think the same storage facility and my computer,

15  we'd locate both of those if I have them.

16    Q.   Okay.  Would you take a look at this document and

17  see if it accurately reflects a meeting held on May 23rd,

18  2018, to the best of your recollection?

19    A.   Yes.  I recall after reading this the main purpose

20  that this was generated for.  So, yes, I recall that meeting.

21    Q.   Okay.  So your testimony is regardless of whether or

22  not this document was signed, it accurately reflects a -- the

23  meeting that took place.  Is that --

24    A.   That is correct.

25    Q.   And same thing -- is the same thing true of Exhibit

In Re: Washburn Law, PLLC

108

1    38?

2        A.    That is correct.

3        Q.    Okay.  Now, let me turn your attention to -- give me

4    a second -- Exhibit 24.

5        A.    I'm at Exhibit 24.  A PLLC operating agreement.

6        Q.    Okay.  And was that operating agreement signed by

7    you and Stephanie Munsey on or about September 23rd, 2017?

8        A.    It was signed but that is not my -- that is not my

9    signature.

10       Q.    You don't believe that's your signature?

11       A.    I don't believe that's my signature and I don't

12   believe those are my initials.  But the signature is entirely

13   unusual to the way I would sign.  The initials are hard to

14   tell because there's not a lot of writing there but --

15       Q.    Do you recall signing an operating agreement on or

16   about September 23rd, 2017?

17       A.    I can't recall if I did or did not.  I don't recall

18   it.

19       Q.    But you don't think -- these are not your initials

20   on here and not your signature.

21       A.    Well, a couple of these initials look close, but one

22   or two of them are just clearly not the way I would have

23   initialed.  The one on the fourth and the fifth page are --

24   do not appear to be and the signature is not the way I sign.

25       Q.    Is that Ms. Munsey's signature, to the best of your

Pace Reporting Service, Inc.  919-859-0000      www.pacereporting.com

In Re: Washburn Law, PLLC

109

1   knowledge?

2       A.   I can't -- I can't provide any accurate assessment

3   on that.

4       Q.   There's a -- have you seen her signature before?

5       A.   I've seen it.  I've seen it many times, but I just

6   can't picture it in my head.  If I saw another example of it

7   that I knew was hers, maybe I could compare it.  But I'm

8   certainly not a handwriting expert, so I don't want to

9   portray that I am.

10      Q.   Did you make a contribution of 375 dollars to

11  Washburn Law on or about September 23rd, 2017?

12      A.   I don't recall being asked to make a contribution

13  and I don't recall making a contribution.

14      Q.   Let me turn your attention to Exhibit 17, which is

15  actually North Carolina law.

16      A.   I'm there.

17      Q.   And have you reviewed these statutes before?

18      A.   I may have at various times, but I don't remember

19  them with any particular acuity.

20      Q.   I want you to look at the second page, A2.  That's

21  right.  A1 subparagraph one -- or subparagraph -- yeah, A1.

22  Would you read that, A1, and subparagraph one?

23      A.   Any person may own up to 49 percent of the stock of

24  a professional corporation rendering services under Chapter

25  93 of the General Statutes as long as licensees continue to

In Re: Washburn Law, PLLC

110

1    own and control voting stock that represents at least 51

2    percent of the votes entitled to be cast in the election of

3    directors of the professional corporation.

4         Q.   So were you -- did Washburn Law have a North

5    Carolina licensee who owned at least 50 percent of the stock?

6         A.   No, it did not.

7         Q.   Do you -- you don't know.  In 2019, did you make a

8    capital contribution of 220 -- 74,000 -- sorry -- 224,000

9    approximately to Washburn Law?

10        A.   No, I did not.

11        Q.   So that if that -- said that in the tax return,

12   that's not correct.  Is that right?

13        A.   I didn't participate in the creation of those tax

14   returns and I don't know what those tax returns say.  But I

15   did not make a capital contribution.

16        Q.   Have you ever made a capital contribution?

17        A.   I have not.  And I will state that when this started

18   in 2014, I specifically stated that I was not expecting to

19   contribute to the cost or expenses of Stephanie's operation,

20   and I was only going to work as a salaried employee.

21        Q.   Did Stephanie Munsey make any capital contributions

22   to Washburn Law?

23        A.   I'm not aware of what contributions Stephanie made.

24        Q.   Would you be aware, do you think?

25        A.   I don't think I would -- I do not know what capital

In Re: Washburn Law, PLLC

111

1   contributions she made.

2       Q.    So what was your compensation scheme with respect to

3   not -- I don't mean scheme pejoratively -- but what was your

4   compensation --

5       A.    I understand.

6       Q.    -- arrangement with Washburn Law?

7       A.    When I started this venture with her, she already

8   had some entity called Land and Law, or something like that.

9   She wanted to do one or two closings just over the South

10  Carolina border in North Carolina.  She asked me if I would

11  serve as the North Carolina counsel and she agreed through

12  Jack, who I knew from Chapel Hill, to pay me 300 dollars per

13  week to be responsible for overseeing and handling the North

14  Carolina transactions, which would be limited.  We didn't

15  even have a separate Washburn Law firm at that time.

16      Q.    So that was Land and Law?  Is that right?

17      A.    That was Land and Law.

18      Q.    Was Ms. Munsey working with Jack Munsey at that

19  time?

20      A.    She -- that is correct.

21      Q.    And did you understand them to be married?

22      A.    Yes, I did know.  Well, I've never seen the marriage

23  license but I do believe that they were married.

24      Q.    Okay.  Good.  And did that arrangement change at any

25  time?

In Re: Washburn Law, PLLC

112

1    A.   Within six months to a year, there was a significant

2    increase in the number of closings.  I think I was doing one

3    a month or two a month, where I was originally just going to

4    do one every three or four months.  So we decided after

5    discussion to create a North Carolina firm and have that firm

6    be responsible for the North Carolina transactions.

7    Q.   Why did you create a North Carolina firm?

8    A.   Because it was going to be doing the North Carolina

9    closings.

10   Q.   And was Land and Law -- were they a law firm?

11   A.   Whatever Stephanie's business was at that time in

12   South Carolina was handled by Stephanie.  I believe she

13   continued to operate as Land and Law.  I also understand that

14   she had a possibly salaried, some employment that she did

15   with a title agency is South Carolina.  So she was not full

16   time in her law practice and neither was I.  I continued to

17   work as a commercial real estate broker, which I had been

18   doing successfully for ten years at that point.

19   Q.   Okay.  And I think I asked.  You said that it

20   changed and you created the North Carolina firm.  And that

21   was Washburn and Ray.  Is that right?

22   A.   That's correct.  And I think within a month it

23   became Washburn Law.

24   Q.   Okay.  And that was owned by Stephanie Munsey, is

25   your testimony?

In Re: Washburn Law, PLLC

113

1      A.   That's correct.

2      Q.   And did that -- did that ever change or did your

3  compensation change after that?

4      A.   It did.   It steadily increased because the amount of

5  work that I was asked to do continued to increase.   And it

6  went -- just rough approximation -- 300 dollars a week to 500

7  dollars a week to a thousand dollars a week.   And then it

8  became 2,000 at the end.   Two thousand dollars every two

9  weeks, which is a thousand dollars a week.   But I also got

10 asked to get a nicer car to meet the clients on their site,

11 so they paid a 1,300-dollar car payment and a 200-dollar life

12 insurance policy.   So those were all part of the compensation

13 package.

14     Q.   Okay.   And that was not a group policy.   That was an

15 individual policy.   Is that right?

16     A.   That was an individual life insurance policy.

17 That's correct.

18     Q.   And at what time did you discuss getting the 40

19 percent on liquidation?

20     A.   At the time that the first minutes that represented

21 the change from a hundred percent Stephanie to 60 percent

22 Stephanie, there was discussion about, well, we could just

23 sell this business.   And I said, well, what do I get if you

24 sell the business, and so we came up with this 60-40 deal.

25 And it was at the time that those minutes were prepared.

In Re: Washburn Law, PLLC

114

1    Q.   Okay.  You heard testimony regarding the tax returns

2    and the 60-40 split --

3    A.   I did.

4    Q.   -- on the account.  Did you ever receive 60 -- or 40

5    percent of the income, or were you ever given K-1s that

6    indicated you were to be reporting 40 percent of the income?

7    A.   The first answer is no.  I did not ever get copies

8    of the tax returns with the exception of one year for some

9    reason, either 2019 or 2002.  I got one year's tax return and

10   a K-1.  I had continuously insisted that I'm not taking these

11   losses shown on the K-1.  I don't know what these tax return

12   numbers are created from.  I didn't agree to pay cost of the

13   business, nor did I agree to take profits or losses.  So they

14   do not appear on my tax return, and I've only seen one year

15   of those returns and I can't remember the circumstances.

16   Q.   You were the managing partner at the time.

17   A.   That is correct.

18   Q.   When did you become managing partner?

19   A.   When it was initiated.  It was for North Carolina

20   Washburn Law, PLLC.

21   Q.   Why did you become the managing partner if you were

22   only doing one or two closings per month?

23   A.   Because at that time, Washburn Law was only going to

24   be handling the North Carolina closings, which were only one

25   or two closing per month.  We had no idea it was going to

In Re: Washburn Law, PLLC

115

1    turn into a hundred to 200 closing per month.

2        Q.    Did Ms. Munsey close -- handle the closings in South

3    Carolina?

4        A.    Well, I'm not sure how many she personally handled

5    but she was responsible for all oversight of the South

6    Carolina closings, which included a couple of other

7    attorneys.  Jocelyn Gore [sic], John Croft, and some other

8    attorneys that had come and gone over the period of time.  So

9    she was responsible for them all, oversee -- overseeing them.

10   I don't think she personally handled but 10 or 20 percent of

11   them.

12       Q.    How did the firm do its title -- did the firm do

13   title work?

14       A.    We had an abstract company that was tasked with

15   obtaining copies of all recorded instruments in the chain of

16   title, deed, deeds of trust, liens, easements, restrictions,

17   tax records, recorded liens.  They would generate a package

18   of between a hundred and 200 pages.  They would send that

19   document package to one of the -- well, to our office and one

20   of the attorneys would be assigned to review it and prepare a

21   title report based on those documents.

22       Q.    And was that done for both North Carolina and South

23   Carolina?

24       A.    I am sure the same process was followed.  I only

25   reviewed North Carolina title packages, but I'm sure it's the

In Re: Washburn Law, PLLC

116

1   same.

2       Q.   What was the name of the abstract company?

3       A.   Avanze, A-V-A-N-Z-E.  Avanze was the primary

4   provider.  I believe there were some occasions where Avanze

5   had some obstacle or difficulty and it might have been

6   contracted out to an individual attorney in that particular

7   county that would charge significantly more, but sometimes

8   that had to be done.

9       Q.   And is that through -- say, 2016 through the time

10  that the firm closed [INDISCERNIBLE]?

11      A.   I -- I'm not sure when Avanze started because when

12  it first started, I did a couple of the title searches

13  myself.  But it -- 2016 sounds likely.

14      Q.   Okay.  Did you use any other firms for abstracts?

15      A.   It is possible but Avanze is far and away the only

16  name that I know to be able to recall.  I think Avanze was

17  the main source.

18      Q.   How were its services billed?  Were they billed to

19  the client?  Were they billed to the firm?

20      A.   They were billed to the firm.

21      Q.   Okay.

22      A.   And I didn't see those bills but I know that they

23  were maybe monthly and they would be paid out of the general

24  accounting cycle of payments.

25      Q.   So it was part of the overhead of the firm?

In Re: Washburn Law, PLLC

117

1     A.   It was part of the overhead.  In other words, it did
2  not appear as a line item on a specific closing statement.
3     Q.   Okay.  What subsidiaries did Washburn Law ever have,
4  to your knowledge?
5     A.   I've heard of some subsidiaries.  I was never aware
6  of my -- any ownership of a subsidiary that I saw any returns
7  from, minutes from, K-1s from.  So I do believe that there
8  were subsidiaries created.  Now I believe that there were
9  some in South Carolina, Tennessee, North Carolina that I have
10  no knowledge of.  The -- with one exception.  Contract to
11  Close was a company.  I don't believe I was a member of but I
12  do believe that that was doing business under the auspices of
13  Washburn Law, maybe as a percentage owner, but there were
14  other owners.  I didn't arrange that or negotiate that, but I
15  do know that that was a fairly, I thought, active and
16  legitimate business.
17     Q.   And what did it to do, Contract to Close?
18     A.   At closing, a home inspection might report defects
19  in the properties.  A buyer would only close on a property if
20  those defects would be corrected.  That company, Contract to
21  Close, would stand ready to make those repairs and would make
22  an audit and submit an expense proposed for repairs.  And if
23  it was accepted, Contract to Close would arrange to have
24  those repairs done.
25     Q.   Did you -- did Washburn Law or any sub -- subsidiary

In Re: Washburn Law, PLLC

118

1    of Washburn Law provide any broker price opinions to anybody?

2        A.   There was a period of time -- I'm also a licensed

3    North Carolina broker.  And we did offer a -- what's called a

4    BPO service, which was more along the lines of a document

5    gathering.  We would provide copies of documents of related

6    properties of similar nature and character, and provide that

7    information reflecting what other properties are.  And in

8    some cases, when they asked for a full BPO, I would actually

9    review and prepare a broker price opinion signed by me.  But

10   for the most part, I recall that it being a document

11   gathering service.  But I don't think that was under the

12   auspices of any separate entity.

13       Q.   That was under Washburn Law?

14       A.   That was under Washburn Law.

15       Q.   Okay.  Did you as managing partner, or as a partner,

16   authorize the establishment of any subsidiaries for Washburn

17   Law?

18       A.   I don't recall ever doing that.

19       Q.   Let's talk about -- let's talk about how you worked

20   functionally; how you worked with Washburn Law.  Where were

21   the main offices of Washburn Law?

22       A.   My office was in Wilmington, North Carolina.  I

23   worked out of Wilmington.  I did travel to Tryon where -- and

24   the main office was in Tryon, North Carolina.

25       Q.   Okay.

In Re: Washburn Law, PLLC

119

1      A.   Stephanie and Jack lived just across the border in
2    South Carolina.  I would go to Tryon once a month,
3    approximately once a month, meet with Jack, Stephanie, and
4    others from the office, go over various things, look at
5    reconciliation reports, talk about staffing issues.  I'd
6    spend an hour or two and maybe then go to lunch and the come
7    back to Wilmington.  So my -- and that was usually on a
8    Sunday.  I would spend my days going to my office in
9    Wilmington and any communication was by phone or email.
10     Q.   So did you have regular telephone conversations with
11   people from the Tryon office?
12     A.   I had regular telephone conversation with people in
13   Tryon.  We also had two regular staff meetings every weekday.
14   There was one I did not participate in.  That was at eight
15   o'clock.  That was for just administrative staff.  And then
16   we had one at 8:45.  And it's my understanding that Stephanie
17   kind of orchestrated that meeting.  And then one at 8:45,
18   which was all the attorneys, and I would try to attend that
19   meeting.  It was fairly much orchestrated by Jack or
20   Stephanie, introducing the topics.  But that was daily.  And
21   I would make at least four out of five of those every week.
22   I might miss one.  Any one of us could have missed one for
23   some closing or something.
24     Q.   Did you have signatory authority over any bank
25   accounts at Washburn Law?

In Re: Washburn Law, PLLC

120

1    A.   Well, I did.  When we opened Washburn Law, I went to

2    Tryon.  I walked into First Citizens Bank and was introduced

3    to a couple of people.  We signed some trust account

4    signature cards and authorization agreements, and put that in

5    effect, and I had that authority.  I never really accessed

6    the accounts.  I didn't feel I needed to.  So I did think

7    that I always had that authority even though I didn't have a

8    need or an opportunity, I thought, to exercise that

9    particular role.

10        But at the very end, I discovered -- I don't know

11   how much you need to delve into this right now or if you're

12   going to do it later, but I'll just go ahead and say.  There

13   was a transaction in the -- November of 2022 that appeared to

14   be in excess of what's in the account.  And I contacted the

15   bank and I got proof that there was a wire transfer of that

16   amount.  And the bank said this wire authorization form that

17   you provided appeared to have been altered.  And I had gotten

18   it from Tryon.  And at that moment, I said, well, this is a

19   problem.  Freeze the account and freeze every account.

20   Something's wrong.

21        And Donna Morris -- I had to go through a series of

22   people to get there.  Donna Morris investigating with First

23   Citizens Bank said, well, you don't have the authority to do

24   that.  And that was the first I had heard and I said, well, I

25   have authorization agreements.  I have copies of them.  She

In Re: Washburn Law, PLLC

121

1   said, yes, but around three or four years ago, you filed an

2   amendment removing you as a signatory, which I had never

3   signed.  But that was the answer to the question.  I did not

4   have signatory authority, but I did think that I had from the

5   opening of that account.

6       Q.   So were you responsible for reviewing -- you know

7   the State Bar requires --

8       A.   Absolutely.

9       Q.   -- periodic bank reconciliation --

10      A.   Absolutely.

11      Q.   -- of your trust account.  And they're three-way

12  reconciliations, right?

13      A.   I know.  And I --

14      Q.   Were you responsible for those for Washburn Law?

15      A.   I did have the responsibility of reviewing the

16  reconciliation reports.  Yes.

17      Q.   And did you fulfill that responsibility?

18      A.   Well, whether or not it was sufficient remains to be

19  determined.  But I would go to Tryon at the end of a month.

20  They would be laid out on a conference table.  I'd come in

21  usually on a Sunday afternoon.  At the earlier years of

22  Washburn Law, I would meet with Jack Munsey and Lee Zuber.

23  But later on, Lee got it done and just left it with Jack and

24  I would go over it, give it a review.  I would have -- if I

25  had a question or two, I might call Lee and say, Lee, do you

In Re: Washburn Law, PLLC

122

1   have a record of this or that check.  And then we'd confirm.

2   Those reports appeared to balance to me and I would sign

3   them.  And then we'd talk about other business and go to

4   dinner and I'd go back to Wilmington.

5       Q.   So did you do that regularly?

6       A.   I did that regularly but not always in Tryon.

7   Sometimes Jack would be in Wilmington for some firm-related

8   business or to meet with an employee or something, and he

9   would bring a reconciliation with him.  There were times when

10  we met at a realtor's office in Fayetteville that we were

11  working with and he would bring a report with him.  So I

12  sometimes signed and -- not in Tryon, but the same process.

13      Q.   So to your knowledge, the reconciliation reports

14  were regularly done and you regularly reviewed them?

15      A.   I did believe that that was the case.  And I -- a

16  couple of times would ask, are all the reports in, or are

17  they in order?  Yes, they're all here and they're all in

18  order.

19      Q.   Who prepared the reconciliation reports for

20  Washburn?

21      A.   Our bookkeeper was Lee Zuber and that's who we

22  relied on to get them done.  I say that but we had a State

23  Bar request for an audit in the middle of 2022 and the last

24  month that was provided was August.  And after that, the next

25  one that would have been due would be September.  September

In Re: Washburn Law, PLLC

123

1   should have been completed by the end of October.  And by the

2   end of October, I never got it.  And I said -- and I had five

3   or ten emails, where is this September report.  And I went

4   all the way through -- and it wasn't there by the end of

5   October.  So during November, I was firing emails off about

6   we need that one and now we need October, too.  And I never

7   got it.  I sort of got radio silence about where that was.

8   And then I discovered this whole episode at the end of

9   November.                    So I didn't have one and I

10  knew I didn't have that one, which contributed to my urgency

11  when I discovered this problem at the end of November.

12      Q.   This problem being the diversion of funds from the

13  trust account?

14      A.   The check --- right.  The wire transfer report that

15  was not actual.

16      Q.   Okay.  So -- and did you -- were you -- I may be

17  using the wrong word.  Were you reprimanded by the State Bar

18  in 2017 regarding bank account reconcile -- trust account

19  reconciliations?

20      A.   Yes.  And I would like to comment that that was --

21  probably contributed to some of my, I would say, confidence

22  that reports were being done.  The reports when we were asked

23  in 2017, were triggered by some 13-dollar check on the

24  general account.  But the State Bar asked for an audit.  And

25  I was not confident at that time with the work that was being

In Re: Washburn Law, PLLC

124

1    generated out of the accounting department.  So I asked for a

2    SoftPro, independent, paid-for audit, which they did six or

3    eight months' worth of duplicating the work that had been

4    provided by Lee Zuber.  And they came up with the exact same

5    numbers that Lee had.  So even though I didn't necessarily

6    initially have that confidence in Lee's reports, SoftPro

7    confirmed that they were accurate.

8         And I received a reprimand because that SoftPro work

9    caused a delay in getting the reports in.  And so I think the

10   report read not producing them timely, which was true.  But I

11   felt it was better to have them done with an independent

12   accounting firm that was reputable and --

13   Q.   Did anyone else prepare a reconciliation report for

14   Washburn Law that you recall?

15   A.   Not that I recall.  I have heard something about a

16   company called Boston Financial, but I don't think they did

17   reconciliation reports, and I'm not really sure what Boston

18   Financial's role was.  It was always in -- it was always

19   internal.

20   Q.   Did -- who prepared the tax returns for Washburn

21   Law?

22   A.   I'm not sure.  I think you named a name of somebody,

23   that was the first I heard, who prepared them.  I just --

24   Q.   I'm sorry.

25   A.   -- assumed Stephanie did that.

In Re: Washburn Law, PLLC

125

1    Q.    That's my question.   Who from Washburn Law arranged

2    for the preparation of tax returns?

3    A.    I can only assume it was Stephanie and Jack.   I'm

4    pretty sure Lee Zuber did not prepare the tax returns.   But I

5    think it would be Stephanie and Jack arranged for the

6    preparation of tax returns.   I heard something about Austin

7    or something.   I don't know.

8    Q.    Was Stephanie involved in the accounting matters for

9    Washburn Law?

10   A.    I didn't think she was involved in any of the

11   accounting.   No.   I thought that Jack Munsey oversaw all the

12   financial aspects of operating the business.   He is a

13   business-trained person.

14   Q.    What was his title?

15   A.    CEO.   Sometimes we had to do a non-attorney office

16   manager.   We put that in his title a couple times because I

17   think some people got the impression that he was an attorney.

18   We wanted to make sure that that was clear.   His wife was the

19   attorney.

20   Q.    Let me refer your -- let me ask about closings, how

21   closing happened.   So you used SoftPro for a while.   You used

22   Qualia for a while.   And I assume the parties would sit down

23   at a closing table and sign a -- it used to be called a

24   closing statement.   Now it's called a disclosure statement.

25   What's that?

In Re: Washburn Law, PLLC

126

1    A.   Office settlement statement is what it's called now.

2    Q.   Okay.  So office settlement statement.  And that

3  would direct where the monies where the monies would go from

4  the closing.  Is that correct?

5    A.   That's correct.  That is the key document in a real

6  estate transaction.

7    Q.   That was signed by the client and signed by the --

8  well, you represented generally buyers or borrowers, right?

9    A.   The offer is required to be signed by the buyer, the

10  seller, and a closing attorney.

11    Q.   Okay.

12    A.   Or the representative at the table.

13    Q.   Okay.  And that directs where the money goes.  Who

14  was responsible for making the disbursements after the

15  closing?

16    A.   Candice Morrow was -- if you gave her a title -- the

17  disbursement agent.  Candice would be the one that would get

18  the receipts and disbursements, or the incoming and outgoing

19  part of the settlement statement.  And once she got

20  confirmation that documents -- that title had been updated

21  and documents had been recorded, she was instructed to make

22  the disbursements as established on that settlement --

23    Q.   How --

24    A.   -- disbursement statement.

25    Q.   How would she make wires happen?

In Re: Washburn Law, PLLC

127

1    A.   Well, I think she would set up -- and this I don't

2  know internally in Tryon exactly who walked across the hall

3  or who pushed what buttons.  But I think Candice would go in

4  and set it up, email me in, get the destination and routing,

5  but somebody else with the wiring authority would have to go

6  in and put in their code and push the button.  So she would

7  have it all set up and either Jack or Stephanie or Lee or

8  somebody would push the button and submit that.

9    Q.   So is --

10   A.   But I'm speculating on exactly how that would work.

11   Q.   So it was a two-step process.  Is that right?

12   A.   It's my understanding that she would do the --

13 somebody would set it up to be ready and somebody else would

14 submit that wire.

15   Q.   Did you ever submit wires?

16   A.   I did not submit wires.

17   Q.   Who had authority to submit the wires?

18   A.   Well, apparently not me.  Because I thought that I

19 always -- I never did it but I always thought that I had it

20 from the opening in 2014.  But somewhere along '17 or '18 --

21 I suppose Donna Morris would know because she told me I was

22 removed.  So I think Lee Zuber had authority, and possibly

23 Stephanie, and possibly Jack Munsey but he may have just

24 coordinated it.  I don't know.

25   Q.   Okay.  So when -- I don't want you to speculate.  I

In Re: Washburn Law, PLLC

128

1    want you to tell the court what you recall about Jack Munsey

2    or Stephanie Munsey ever authorizing the wire to be sent.

3        A.  Well, I can't state that I know they authorized or

4    didn't authorize it because I don't know who submitted the

5    actual wire transfer.  I believe it was always set up by

6    Candice and maybe Heather would do some set up because she

7    overall all of the paralegals and could do any task.  But who

8    actually pushed the button and submitted those wires, I -- I

9    am only able to speculate.

10       Q.  Do you know whether or not Candice or Heather had

11   the access to press that button to authorize the wire?

12       A.  I do not know.

13       Q.  Okay.  Let me turn your attention to what I've

14   marked -- we're in the black book -- as Exhibit Number 3.

15       A.  South Carolina articles of organization.

16       Q.  And for the company called All American A, LLC.

17       A.  All American A, LLC.

18       Q.  And I would bring to your attention it was -- the

19   date of it is -- that's a true and correct copy, but it says

20   it was dated December 8th, 2014.  Were you aware of the

21   existence of that company?

22       A.  I was not.

23       Q.  Okay.  Where is -- who lives at -- or who lives or

24   lived at 1841 Fairfield -- Fairview Farms Road?  Do you know?

25       A.  In 2014, Jack Munsey and Stephanie Munsey lived

In Re: Washburn Law, PLLC

129

1   there.

2       Q.   Okay.  I'm going to turn your attention to Exhibit

3   4.  It's another All American A and a change of designated

4   office.  This was filed November of 2018.  And it changes the

5   office to the 840 Wappoo Road in Charleston, South Carolina.

6   Do you know who lived or who did business at that address?

7       A.   I do not.

8       Q.   Did Washburn Law ever have an office there?

9       A.   I don't recall an office at that address.  But it

10  does have a ring of familiarity.  I cannot tell you about

11  that address.

12      Q.   Okay.  Let me turn your attention to Exhibit 5,

13  which purports to be amended restate -- restated operating

14  agreement for All America Abstracts, LLC.  Have you seen this

15  document before?

16      A.   I have not.

17      Q.   On the last page of it -- second to last page, it

18  says Washburn, PLLC in North Carolina.  A limited liability

19  company by Jackson Munsey, Manager.  Was he ever a manager of

20  Washburn Law, PLLC?

21      A.   No, he was not unless Stephanie did some amendment

22  with her ownership percentage saying so.  I was never aware

23  that that took place.

24      Q.   So this was purportedly -- this was made effective

25  20 -- January 1, 2018.  Would you have been a managing member

In Re: Washburn Law, PLLC

130

1   of Washburn Law, PLLC at that time?

2       A.   Yes, I would.

3       Q.   Okay.  Did you authorize this document?

4       A.   I did not.

5       Q.   Did you authorize Mr. Munsey to sign this document?

6       A.   I did not.

7       Q.   Look at Exhibit 8, if you would.  It lists as a

8   member Washburn Law, PLLC and indicates its share of the

9   capital of All American Abstract, LLC is a hundred percent.

10  Were you aware that Washburn Law owned a hundred percent of a

11  company called All American Abstract, LLC?

12      A.   I was not aware, nor was I aware of the company.

13      Q.   Were you aware that -- were you aware of any

14  services provided by a company called All American Abstract,

15  LLC or All American A, LCC to Washburn Law?

16      A.   I was not.

17      Q.   Did it provide any title abstract services to the --

18  to Washburn Law?

19      A.   It may have but not that I am aware of.  I was never

20  handed any title abstract information from this company.

21      Q.   Okay.  Do you know of any reason -- any business

22  reason why funds would be transferred from Washburn Law to

23  All American A, LLC?

24      A.   No, I don't.

25      Q.   Do you know who controlled All American A, LLC?

In Re: Washburn Law, PLLC

131

1    A.  Well, from this document it would purport that

2  Washburn Law was the hundred percent owner and controlled it.

3  But Washburn Law through me as managing partner never engaged

4  in any activity managing All American.

5    Q.  Did Stephanie Munsey do anything to review the trust

6  accounts of Washburn Law?

7    A.  It -- I don't know.  I was under the impression that

8  she was reviewing activity in South Carolina, but that may

9  not be the case.  I don't know.  I don't know what her review

10  consisted of.

11    Q.  Was she managing South Carolina attorneys and

12  employees?

13    A.  She was the oversight manager for all real estate

14  business in South Carolina.

15    Q.  So she did services beyond title abstract and --

16  work and title opinions.  Is that right?

17    A.  I'm not able to say exactly what work Stephanie did.

18  But she was oversight for all the different attorneys' work

19  in South Carolina.  She may not have done the work.  But I

20  don't know.

21    Q.  Let me turn your attention to what's marked as

22  Exhibit 25, which is --

23    A.  Is it in a different book?

24    Q.  White book, yeah.  Have you seen this document

25  before?

In Re: Washburn Law, PLLC

132

1      A.   I have seen this document before as was presented to

2   me in other earlier hearings, but not during the operation of

3   Washburn Law.

4      Q.   So this document was never sent to you?  Is that --

5      A.   I had already concluded before that I had not seen

6   this document during the operation of Washburn Law.

7      Q.   Okay.  Let me turn your attention to Exhibit 26.

8      A.   All right.

9      Q.   Which purports to be a text message from your phone.

10  Do you recall that?

11     A.   This does not appear to be my cell phone screen.

12     Q.   Do -- are the messages, messages that you --

13     A.   I do not recognize these messages.  It may have been

14  an earlier cell phone screen.  I don't recognize the

15  messages.  And it doesn't look like my cell phone screen.  My

16  cell phone screen -- for example, where it says JW at the

17  top, I have a picture identification on my cell phone.

18     Q.   Okay.  This was produced to me by Mr. Ellington, who

19  was here previously.  You know, it may be his cell phone or

20  something else, but I'm more --

21     A.   Okay.

22     Q.   -- interested in the content.  Do you recall that

23  con -- that text conversation that you -- that you

24  purportedly had with Stephane Munsey?

25     A.   And in here it says, I am going to beg you and ask

In Re: Washburn Law, PLLC

133

1   Jack to sort through our difficulties.  I don't want it to

2   end like this.  I do not recall having written that message.

3   I do recall, from time to time, that Jack and Stephanie --

4   difficulties.  But I just can't recall this specific message.

5       Q.   What sort of difficulties did they have?

6       A.   I think Jack engaged in extramarital activities that

7   caused Stephanie anger and resentment.

8       Q.   Okay.  And do you recall in April of 2021 whether or

9   not Stephanie made efforts to leave Washburn Law?

10      A.   I never felt a moment where she was trying to leave

11  Washburn Law.  I did feel a moment where I thought she might

12  be trying to leave Jack.  But I -- a lot of things that took

13  place were not in the same office that I was there.  So I

14  can't tell you what was going on in all those

15  [INDISCERNIBLE].

16      Q.   But you don't recall, looking at Exhibits 25 and 26,

17  any request by her to transfer her interest to you?

18      A.   I don't recall any documentation that was signed

19  agreeing to that.  I might have heard her say once or twice

20  that I'm leaving and that means I'm out.  And I said, well,

21  we'll have to talk about that.  But nothing to the extent of

22  needing documentation prepared and agreed to.

23      Q.   Do you recall any change in her professional duties

24  or approach to her professional duties after April of 2021?

25      A.   I sometimes felt she was not fully attentive to the

In Re: Washburn Law, PLLC

134

1  business.  And so the fact that she may have been more angry

2  about it wouldn't really have changed my perception that she

3  was not fully attentive to the business.  So I can't say I

4  noticed a detectable change.

5       Q.   Did she receive a salary from Washburn Law?  Do you

6  know?

7       A.   I do not know what she received from Washburn Law.

8  And I always stated that she was the owner and whatever she

9  wanted to pay herself or Jack or anybody else was up to her.

10 I expected my salary and the expenses we agreed on.

11      Q.   Okay.  Let me refer your attention to Exhibit 28.

12 So the previous exhibits were April of '21.  This is March of

13 '22.  I'll give you a minute and ask you if you recall this

14 email being sent.

15      A.   I have a recollection of this episode.

16      Q.   And so do you recall receiving this email from

17 Stephanie Munsey?

18      A.   I do recall receiving this email.  Yes.

19      Q.   Let me refer your to -- your attention to Mr.

20 Nordlander's analysis at page 33.

21      A.   Exhibit 33 or page?

22      Q.   Exhibit 33.  Excuse me.

23      A.   All right.

24      Q.   Okay.  So -- and I realize you may not have seen

25 this before.  But you weren't aware of transactions going on

In Re: Washburn Law, PLLC

135

1   with All American A.  Is that right?

2       A.   That is correct.

3       Q.   So you don't know why any of these transfers were

4   made by A Better Bid?  Do you know who that is?

5       A.   A Better Bed?

6       Q.   Bid.

7       A.   Oh, A Better Bid.  No, I do not.

8       Q.   Okay.  And Repair to Close?

9       A.   That is the con -- I think I said Contract to Close.

10  Repair to Close is what it was.  It's the same business.

11  Repair to Close and Contract to Close.

12      Q.   Okay.

13      A.   Why they received money, I don't know what the

14  reason for that disbursement was.

15      Q.   Okay.  Southeast Auto Group.

16      A.   I don't know.

17      Q.   You don't know anyone named Alexis Habner [sic]?

18      A.   I don't know that person.

19      Q.   Did you have a PayPal account that received monies

20  from All America A?

21      A.   I don't -- no, I did not.

22      Q.   And obviously, Mr. Zuber -- Contract to Close.

23  There is a Contract to Close.  Is that separate from Repair

24  to Close?

25      A.   I can't distinguish between Repair to Close and

In Re: Washburn Law, PLLC

136

1    Contract to Close.

2        Q.   Okay.  Mark Fisher Ford.  Is there any reason --

3        A.   I don't know.

4        Q.   Is that a business expense of Washburn Law?

5        A.   No, it is not.

6        Q.   You don't --

7        A.   Not to my knowledge.

8        Q.   Do you why Mr. Munsey would receive cash out of All

9    American A?

10       A.   No, I do not.

11       Q.   Pre-owned Motor Cars.

12       A.   I don't recognize --

13       Q.   We could go on a while.  Let me ask you, any of the

14   automobile businesses, is there any reason they would receive

15   money as a business expense from --

16       A.   None that I'm aware of.

17       Q.   Okay.  Rebecca Frazee.  Do you know --

18       A.   Don't know that.

19       Q.   Walter Hocutt.  Do you know a Walter Praka?

20       A.   I don't know that.

21       Q.   Michael Thacker.

22       A.   I don't know that name.  I know the name Thacker, so

23   I don't want to say I don't know, but I don't recognize that

24   name.

25       Q.   Okay.  Did you receive any money from All American

In Re: Washburn Law, PLLC

137

1   A, to your knowledge?

2       A.   To my knowledge, I never even knew of it until Marty

3   from the State Bar and I discovered their articles in

4   December of 2022.

5       Q.   Okay.  If you look on the third page.  We don't have

6   Mr. Nordlander here anymore.  But about halfway down the

7   page, it says Jonathan Washburn, 3,200 dollars.

8       A.   I don't recall that.  I don't know what -- don't

9   know anything about it.  It doesn't ring a bell.

10      Q.   Did you ever receive monies from Jack Munsey or

11  anyone else from a company other than Washburn Law?

12      A.   Not that I recall.

13           MR. ANGELL:  Your Honor, I have no further questions

14  at this time.

15           THE COURT:  Mr. Behr?

16           MR. BEHR:  No questions, Your Honor.

17           THE COURT:  Mr. Washburn, let me ask you a couple

18  things.

19           THE WITNESS:  Yes.

20           THE COURT:  I think I have five items.  Were you

21  ever law partners with Alan Toll?

22           THE WITNESS:  I was not.

23           THE COURT:  Okay.  How did you know Mr. Toll?

24           THE WITNESS:  Alan went to Carolina.  I went to

25  Carolina.  He was an attorney in Wilmington.  He swam in

In Re: Washburn Law, PLLC

138

1  college.  I swam in college.  We swam together.  His children

2  and my children knew each other.  A couple of times I think

3  he asked me to provide some real estate title information for

4  him, and I think he's done some legal work for me and my

5  clients.

6          THE COURT:  So how -- what was your affiliation with

7  him?  Did you ever have a law firm with him?

8          THE WITNESS:  I did not.

9          THE COURT:  Okay.  So when -- and David Ray.  You

10  know David Ray?

11          THE WITNESS:  I never met David Ray.  That was

12  somebody that Jack Munsey knew, who wanted to be in a firm,

13  and he connected us, and I talked to David Ray by phone.  We

14  never met.  We never gelled.  The plan never worked out.

15  Never met him.

16          THE COURT:  So was there ever a law firm that had

17  you and Alan Toll and David Ray in it?

18          THE WITNESS:  No, Your Honor.  But I am wondering if

19  there's a different David Ray that I think Alan Toll was in a

20  firm with.

21          THE COURT:  Okay.

22          THE WITNESS:  I think I know -- I did know Alan --

23          THE COURT:  Who's the David Ray you know?

24          THE WITNESS:  The David Ray from Wilmington is not

25  the -- I believe it's a different David.  I see now how that

In Re: Washburn Law, PLLC

139

1    came together.  There is a Toll & Ray or was.  I don't think

2    that's the same David Ray.

3              THE COURT:  Where is the David Ray you knew?

4              THE WITNESS:  Burlington, or Greensboro, or in that

5    vicinity.  It would be in my files.  But it wasn't in

6    Wilmington.

7              THE COURT:  Not a Wilmington [INDISCERNIBLE]?

8              THE WITNESS:  No.

9              THE COURT:  So who was the insurance carrier for

10   AAA?  Do you know?

11             THE WITNESS:  You mean that company, the --

12             THE COURT:  Right.  Yeah.

13             THE WITNESS:  AA Abstracts?

14             THE COURT:  Right.

15             THE WITNESS:  I don't know anything.  The only time

16   I ever saw that was when we went to empty the law office in

17   Tryon.  And Jack's office was empty.  And Lee's office was

18   empty.  And on the floor, Heather picked up the document and

19   it was articles of AA Abstracts.  And I said what's that.

20   And she said, well, that's a company that money was sent to.

21   And I handed it to Marty and I said this is something that

22   would be worth looking at.  That's the first time I ever

23   heard of it.

24             THE COURT:  And Avanze -- Avanze, title company.

25             THE WITNESS:  That's a -- I believe a legit company.

In Re: Washburn Law, PLLC

140

1    They did a lot of good work, provided a lot of document --

2    200 a month at 200 pages each of title abstracts.  And I

3    think they were paid properly.

4           THE COURT:  Who actually assured the title with

5    Avanze?  Did they have an underwriter behind them?

6           THE WITNESS:  No.  They didn't do title

7    certification.  They pulled documentation.  They would

8    provide us a list of all the out conveyance indexing, copies

9    of the documents from the index, copies of recorded

10   instruments so that we would have it in a package.  Our

11   attorneys prepared the title report --

12          THE COURT:  Okay.

13          THE WITNESS:  -- based on their documentation.

14          THE COURT:  And which title company or companies did

15   you certify when you were doing the title work down in

16   Wilmington?

17          THE WITNESS:  First National comes to mind.  But

18   actually, when I would prepare title opinion, Your Honor, I

19   would sign the opinion.  I would review the documents,

20   prepare the opinion, sign the opinion, and I would send it to

21   our office in Tryon.  And they would select based on the

22   closing and the lender and the preferences, the title company

23   they wanted to forward that to.  So I really didn't make the

24   decision on who to send title opinions to.

25          THE COURT:  Okay.  And --

In Re: Washburn Law, PLLC

141

1        THE WITNESS:  First National comes -- I'm sorry.

2        THE COURT:  No, no.  Finish.

3        THE WITNESS:  First National comes to mind.

4        THE COURT:  Okay.

5        THE WITNESS:  Don't think that was the only one.

6        THE COURT:  Okay.  So you're currently a licensed

7   real estate broker with the North Carolina Real Estate

8   Commission?

9        THE WITNESS:  I am.  But I submitted my petition to

10  surrender my license to the Bar, which will take effect at

11  the end of this month if it's accepted.  And I'm going to do

12  the same thing with -- just as a matter of dignity.  I'm

13  totally embarrassed by the whole situation and I'm retired

14  anyway.  So I'm going to be relinquishing my broker's license

15  and my attorney's license.

16       THE COURT:  Tell me about your real estate work down

17  in Wilmington.  I guess you handle New Hanover County and

18  Wilmington proper?

19       THE WITNESS:  Well, most attorneys in that area, if

20  they do local real estate work, will do New Hanover, Pender,

21  and Brunswick.

22       THE COURT:  Right.

23       THE WITNESS:  It's a three-county area, and

24  sometimes Duplin.

25       THE COURT:  But what about real estate brokerage

In Re: Washburn Law, PLLC

142

1   sales representing --

2          THE WITNESS:  I only did commercial work and that

3   would involve -- I've done a couple residential.  But my

4   commercial work would involve large tracts of land or try to

5   do a deal on an office building or a shopping center or

6   something like that.  Development tracts, more or less.

7          THE COURT:  Were you with a company?  Or who's the

8   broker-in-charge?

9          THE WITNESS:  I was with a company called Coldwell

10  Banker Commercial or CBC Sea Coast Real -- Sun Coast was the

11  res -- commercial division.  I'm sorry.  So CBC Sun Coast,

12  which started with another company and then a merge -- CBC

13  Sun Coast.

14         THE COURT:  Who's the BIC?

15         THE WITNESS:  Grayson Powell.

16         THE COURT:  Okay.

17         THE WITNESS:  I haven't been with them for ten years

18  because I left -- I'm sorry.  I started doing the legal work

19  while I stayed at CBC Sun Coast.  And after about five years,

20  the law work took so much time, I left CBC Sun Coast.  So I

21  hadn't been with them for five years.

22         THE COURT:  Okay.  When's the last time you

23  represented a party in a real estate transaction as a broker?

24         THE WITNESS:  Last month.

25         THE COURT:  Okay.  Was that a commercial deal?

In Re: Washburn Law, PLLC

143

1                THE WITNESS:  It was a commercial deal.

2                THE COURT:  Were you buyer's agent or seller's

3      agent?

4                THE WITNESS:  In this particular case, it was a

5      seller of a tract of land and then he did a 1031 and bought a

6      couple of tracts of land.

7                THE COURT:  Okay.

8                THE WITNESS:  Now, I didn't do the closing.

9                THE COURT:  Right.

10               THE WITNESS:  I just was the broker.  We had another

11     attorney do the closing.  Right now, my circumstances

12     wouldn't even allow me to certify title because of the

13     ongoing problems.

14               THE COURT:  Okay.  So you were involved with a

15     number of people involving that transaction?

16               THE WITNESS:  That's correct.

17               THE COURT:  Are you just one of many to help get the

18     deal closed?

19               THE WITNESS:  Oh, many people get involved in a

20     commercial transaction.

21               THE COURT:  Okay.  You had testified that Jack or

22     Stephanie -- I don't know which one -- told you, you needed

23     to get a better car and a nicer car.  What did you get?

24               THE WITNESS:  It was a Mercedes S550.

25               THE COURT:  All right.

In Re: Washburn Law, PLLC

144

1        THE WITNESS:  I put the money in as a down payment,
2    20-some-thousand dollars.  I think I read somewhere in Jack's
3    testimony that the firm did and that's not correct.  I put
4    that down.  I got that from a real estate transaction.  The
5    firm agreed to pay my payment.
6        THE COURT:  And so other than the down payment for
7    that car, you didn't pay for any other upkeep or payments?
8        THE WITNESS:  I paid for all the maintenance, and I
9    paid for all the insurance, and I paid for every part of it.
10   They just paid the loan payment.
11       THE COURT:  They paid the loan.  And did you get
12   that down at a dealer in Wilmington?
13       THE WITNESS:  I'm so nervous.  I don't know why I
14   can't remember.  I believe it was in Wilmington.  It might
15   have been in -- I'd have to go back and look.  I think it was
16   at Bob King, which is in Wilmington.
17       THE COURT:  Okay.  So in --prior to evidence, we've
18   heard -- there is a quote that Jack Munsey had made, is that
19   he asked himself the question about the transfers, who
20   benefited from it.  Jonathan benefited from down payment for
21   his house and a few other things.  The law firm benefited
22   from it most.  Money to pay bills, day in, day out bills.  So
23   did you get a down payment for your home from the firm?
24       THE WITNESS:  I did.  I was buying -- it's a home.
25   It was also a recovery house.  I've been in -- I've been

Pace Reporting Service, Inc.  919-859-0000        www.pacereporting.com

In Re: Washburn Law, PLLC

145

1    sober for 21 years.  About ten years ago, I opened a 45-bed

2    recovery house, but during COVID, we just couldn't bring new

3    people in.  So I left there.  I located a house that I could

4    live in and also use for eight beds for recovery.  The down

5    payment was going to be 30,000 dollars and I had arranged to

6    sell a coin set to a friend of mine for 28,000.  But then the

7    contract got delayed and I had to get an extension of

8    contract.  I told Jack about my problem.  He said, well,

9    look, we will advance the 40,000 dollars towards your salary

10   with PPP money.  And I said great.  I -- he said but you

11   can't quit the firm after this because I had been talking

12   about my possible retirement.  I said, well, 2,000 dollars a

13   month towards that 40,000.

14          So I got that money.  That came from the law firm,

15   which he said had the money.  So that's all I knew about

16   that.

17          THE COURT:  So at what point in time were you making

18   the most money and how much was that?  You had mentioned

19   about the, you know, finally -- well, I think the last I

20   heard was a thousand dollars a week or you said 2,000 every

21   two weeks.  I can't remember exactly what it was.  But

22   essentially, it was 52,000 a year.  What more were you

23   getting other than the down payment on the house and the down

24   payment on the car -- not a down payment on the car, but the

25   balance of the car loan?  What else -- amount of money did

In Re: Washburn Law, PLLC

146

1    you receive from Washburn Law annually?

2          THE WITNESS:  The only thing I got from Washburn Law

3    -- in the 2000s, what I netted, I think my gross was 2,500.

4    So it's about 5,000 a month in salary; 1,300 a month for the

5    car payment; 200 a month for the life insurance policy.  So

6    that's how much I got.  And I believe my annual reportable

7    income was 75,000 dollars.  Every year, I might have a couple

8    of real estate commissions come in of 10 or 20,000 dollars.

9    But it's been in that general range for the last five years.

10         THE COURT:  Okay.  Okay.  In lieu of my questions,

11   Mr. Angell and Mr. Behr, do y'all have any questions?  Follow

12   up --

13         MR. ANGELL:  I do.  I'd like to follow up with it.

14   REDIRECT EXAMINATION BY MR. ANGELL:

15     Q.   Mr. Washburn, are you aware of anybody at Washburn

16   Law signing your name to anything or impersonating you?

17     A.   I believe -- I might have mentioned this before.  A

18   long time ago, something happened where I saw that Jack had

19   signed my name on something, a letter to somebody.  I mean

20   2016 or '15.  And I said, Jack, you can't do that.  He said,

21   well, it was just a letter.  I said whatever it is, if you

22   need it signed, let me know and I'll sign it.  So I know that

23   he had done that at that time because I called him out on it.

24   And I don't know if that has happened.  But I know it had

25   happened once.

In Re: Washburn Law, PLLC

147

1    Q.   Is that the only time you heard Mr. Munsey

2    impersonate you in any way?

3    A.   I -- there may have been -- there may have been some

4    other instances that I just can't think of.  But it's my

5    understanding that if he's done it, he's done it furtively

6    without any permission or consent from me.

7         MR. ANGELL:  Your Honor, I move the admission of

8    Exhibits 3 and 4, which are --

9         THE COURT:  Let me get to my -- okay, 3, 4.  I

10   gotcha.

11        MR. ANGELL:  Three and 4 are the --

12        THE COURT:  The articles of incorporation, articles

13   of organization, and the designated agent from South

14   Carolina.

15        MR. ANGELL:  Right.  There's a lot here that he

16   could not authenticate.  Exhibit 28, the email from Stephanie

17   Munsey to DeeDee Pack.

18        THE COURT:  Okay.

19        MR. ANGELL:  I believe he testified Exhibit 39, he

20   had seen a signed copy of that.  And so I ask that that be

21   admitted, as well.

22        THE COURT:  All right.  So you're moving to admit

23   39, 3, 4, and 28.  Is that correct?

24        MR. ANGELL:  That's correct.

25        THE COURT:  Okay.  They are admitted.

In Re: Washburn Law, PLLC

148

1          MR. BEHR:  [INDISCERNIBLE] question, Your Honor.

2          THE COURT:  Yes, sir.

3    CROSS EXAMINATION BY MR. BEHR:

4          Q.   Mr. Washburn, the coin collection that you were

5    unable to sell, do you still maintain that?

6          A.   No.  That -- that's a little more complicated.  It -

7    - I had been giving coins to my daughters every year on their

8    birthday and Christmas.  That particular coin collection did

9    belong to my daughters, but I told them I'd be selling it to

10   buy this property for them.  And I would live in it and

11   manage it for them.  When that deal didn't work out for the

12   coin collection on the earnest money, I sold the coin

13   collection in the middle of last year to pay John Ryan an

14   attorney's fee, who's representing that entity that owns that

15   property.  So -- and I told my daughters, look, it's your

16   coin collection.  I'm selling it.  So that is now gone.  And

17   I -- unfortunately, I had to sell it for a little less than

18   what Jim would have paid for it.

19         Q.   Okay.  So the -- it's your testimony today that the

20   coin collection did not belong to you, that it belonged to

21   your daughters.

22         A.   It didn't belong to me, but it was with their

23   permission that I could have that to sell to buy that

24   property.  So --

25         Q.   Then it -- was there a point in time when the coin

In Re: Washburn Law, PLLC

149

1    collection did belong to you?

2        A.    That particular one, I probably gave that to them in

3    2001 or 2000 --

4        Q.    So many, many years --

5        A.    Many years ago.  I've been -- they were born in 1990

6    and 1991, and I've been giving them coins since 1990 and

7    1991.

8        Q.    Have --

9        A.    Each time I'd complete a set, they'd get the coins.

10       Q.    Have you given your daughters or any other family

11   members or friends any sizeable gifts -- let's say in excess

12   of 500 dollars -- since 2021?

13       A.    I'll say no.  I think the last few coin sets I've

14   given them have been these innovative dollars.  They're

15   called gold dollar innovative coins.  Presidential dollars.

16   And the maximum value of any of those sets -- birthday,

17   Christman, birthday Christmas -- a hundred to 150 dollars,

18   so, no.

19       Q.    Okay.  Nothing [INDISCERNIBLE].

20            MR. BEHR:  No further questions, Your Honor.  Thank

21   you.

22            THE COURT:  Anything else?

23            MR. ANGELL:  Your Honor, I've got no further

24   questions.  I ask that the witness be excused and released.

25            THE COURT:  Okay.  Let me just ask you, Mr.

Pace Reporting Service, Inc.  919-859-0000    www.pacereporting.com

In Re: Washburn Law, PLLC

150

1   Washburn.  I'm just -- I've seen a lot in my life and not

2   only in this job but the job I had before.  And I -- can you

3   just explain to me a little bit about the trust you had or

4   the lack of review?  Just -- I mean, you were, you know, 400

5   miles, 300 miles away from these people who are running an

6   operation under your name and with little or no oversight.

7   Just help me understand because I will not be able to sleep

8   at night unless I understand what was going through your

9   mind.  And if it was a bad time, I understand.  But I have to

10  have some type of explanation from you as to why things went

11  the way they did because you're well educated.  You know,

12  your brother's here.  He's well educated.  You're a hard

13  worker.  I just -- I don't -- I can't put the pieces

14  together.

15          THE WITNESS:  Your Honor, I was at Chapel Hill with

16  Jack Munsey.  I knew him then.  I lost track of him years

17  later, but I found out he had run some sort of successful

18  cell phone business and he moved back to South Carolina,

19  married an attorney.  And he came to Wilmington a few times,

20  spoke to me, and talked about what he was doing.  And at one

21  point, he said my wife's doing a lot of real estate.  We want

22  you to do a closing or two.  And I said I'm busy doing real

23  estate.  I also own and operate a 45-bed halfway house.  I

24  have a lot going on.  And I was doing a bunch of stuff with

25  the church.  I was just really busy.  And I said but I'll do

In Re: Washburn Law, PLLC

151

1    one or two.

2          But I'm -- and this is where I guess this trust

3    went.  But you're running a business.  You keep running that

4    business.  I'm not going to run it.  I'm not going to -- I'll

5    just handle a real estate closing or two.  And so with that

6    premise of hands-off, I guess it just expanded into a larger

7    operation that I never intended to be the manager of a large

8    network or employees and accounts and income.  And it just

9    grew beyond our expectations.

10          THE COURT:  Okay.  Well, thank you for that.

11   Appreciate that.  Anything else?

12          MR. ANGELL:  Your Honor, if I can just add one

13   thing?  Your Honor was asking about his Bar license and one -

14   - and other things.  As Your Honor recalls, I objected to Mr.

15   Washburn's discharge and we reached an agreement with Mr.

16   Washburn.  I -- whereby he's going to waive his discharge, so

17   it's likely he will not -- you know, assuming the court

18   approves that agreement, that he will not get a discharge in

19   this case.

20          THE COURT:  Okay.  All right.  Thank you.  You may

21   step down.

22          THE WITNESS:  Thank you.

23          THE COURT:  Anything further?

24          MR. ANGELL:  Just to confirm he's released, Your

25   Honor?

In Re: Washburn Law, PLLC

                                                                152

1          THE COURT:  Oh, you're released.  Yes, sir.  You can
2     go.  Thank you.
3                    (WITNESS DISMISSED)
4          UNIDENTIFIED SPEAKER:  But may he stay and hear the
5     remainder [INDISCERNIBLE]?
6          THE COURT:  Sure.  Absolutely.  I mean, this is an
7     open courthouse, so you can stay as long as you want.
8          MR. ANGELL:  I'd like to call Mr. Zuber to the
9     stand.
10          THE COURT:  Okay.  Mr. Zuber, come around and be
11     sworn please.  Do you want to take a break?  A quick five-
12     minute break, a ten-minute break?
13          MR. ANGELL:  Sure.
14          THE COURT:  Let's do that.  Let's start fresh.
15          THE CLERK:  All rise.  The United States Bankruptcy
16     Court will be in recess [INDISCERNIBLE].
17                    (RECESS)
18          THE COURT:  Ready?
19          MR. ANGELL:  Thank you, Your Honor.
20          THE COURT:  Okay.
21          MR. ANGELL:  I'd like to call Garland Lee Zuber, Jr.
22     to the stand.
23          THE COURT:  Okay.  Come and be sworn, please, sir.
24               GARLAND LEE ZUBER, JR.,
25               having been first duly sworn,

In Re: Washburn Law, PLLC

153

1                    was examined and testified

2                    as follows:

3    DIRECT EXAMINATION BY MR. ANGELL:

4        Q.    State your name for the record.

5        A.    Garland Lee Zuber.

6        Q.    Mr. Zuber, what is your educational background?

7        A.    BBA from -- in college.

8        Q.    In what area?

9        A.    I had a concentration in accounting.

10       Q.    Okay.  And did you work as an accountant other than

11   at Washburn Law?

12       A.    I did.

13       Q.    Where did you do work as an accountant?

14       A.    It was right after college.  And right after -- I

15   guess early '90s.  I was in public accounting.

16       Q.    Okay.  How long were you in public accounting?

17       A.    Just a couple of years.

18       Q.    When did you first --

19            THE COURT:  Mr. Zuber, can you get close to the

20   microphone so we can pick your --

21            THE WITNESS:  Okay.  Sorry.

22            THE COURT:  Thank you.  You can pull it down a

23   little bit, too.

24            THE WITNESS:  Okay.

25            THE COURT:  Feel free to do that.

In Re: Washburn Law, PLLC

154

1       THE WITNESS:  Yeah.  I'm not quite as tall.

2       THE COURT:  That's great.  Thank you.

3   Q.   When were you first employed at Washburn Law?

4   A.   I believe it was July 2015.

5   Q.   And what was it called at that point?

6   A.   I believe it was Washburn Law.

7   Q.   Do you know who owned it?

8   A.   I really didn't know who owned it.  But -- not

9   really.

10  Q.   What were you employed to do?

11  A.   Accounting and the tax, payroll tax stuff.

12  Q.   Who were you to report to?

13  A.   It was -- there was a person there that was doing

14  accounting that I kind of trained under.  Then she left and

15  the pretty much recorded -- I reported to Jack Munsey.

16  Q.   Okay.  Did you report to Jonathan Washburn?

17  A.   Well, I felt ultimately, I -- I mean, he seemed like

18  [INDISCERNIBLE].  It was the name on the [INDISCERNIBLE].

19  Q.   Did you report to Stephanie Munsey?

20  A.   I felt like I did.  Yes.  I mean, I didn't talk to

21  her as much.

22  Q.   Did you perform bank -- bank reconciliations for the

23  trust accounts for Washburn Law?

24  A.   I did for a while.  Yes.

25  Q.   And from what period to what period did --

In Re: Washburn Law, PLLC

155

1    A.   I don't know the exact dates.  It was after Ariella

2  Carver left.  And then I did reconciliations until -- Boston

3  Financial was supposed to them.  They never really took over

4  completely.  And then SoftPro did them.

5    Q.   So did -- when did SoftPro take over?

6    A.   I don't know exactly when.

7    Q.   2021, 2022?

8    A.   I --the dates -- once -- I didn't want to have much

9  to do with -- I didn't like triple reconciliations.  I'd

10  never done them before.

11    Q.   Did the trust accounts reconcile when you did them?

12    A.   As far as I remember, yes.  I mean, they are

13  supposed to triple balance.  Yeah.

14    Q.   And they would reconcile?

15    A.   The ones I -- that I remember doing, yes.

16    Q.   When did you recon -- when did you stop reconciling

17  the bank accounts?

18    A.   When -- Boston Financial was supposed to take them

19  over.  I tried to tell the guys how to do it.  The guy that

20  was here.  I can't remember his name but he was Indian.  And

21  I don't know that they ever did any of them at that time.

22  And then SoftPro took them over at some point.

23    Q.   So did you attempt to put together bank

24  reconciliation when the State Bar called for them?

25    A.   I --

In Re: Washburn Law, PLLC

156

1    Q.   Did -- sorry.

2    A.   I had --

3    Q.   In the summer of 2022.

4    A.   I compiled the -- got it off of -- I printed them

5    off of Qualia but I made adjustments to make them balance.

6    And then somebody else actually did the reconciliation.

7    Q.   So they wouldn't balance?

8    A.   I don't believe the activity of -- the SoftPro

9    reconciliations were in Qualia.  So it was -- started with

10   that [INDISCERNIBLE] start.  So there was no way they could

11   balance.

12   Q.   Okay.  So these diversions of trust funds, you were

13   able -- were you able to balance the account?  Did you find

14   any diversions of the trust funds when you --

15   A.   I --

16   Q.   -- balanced the --

17   A.   I made it so they could print and that was --

18   there's -- on the 15th of the month, I put in adjustments

19   either way to make them balance so that they would print.

20   They wouldn't print -- nothing would print unless they

21   balanced.

22   Q.   Okay.  When you say you made adjustments, did you

23   make adjustments that -- that coincided with the reality of a

24   transaction or did you --

25   A.   No.

Pace Reporting Service, Inc.  919-859-0000      www.pacereporting.com

In Re: Washburn Law, PLLC

157

1      Q.    -- simply put a plug number in?

2      A.    I plugged numbers.  Sometimes I did it the wrong way

3  and made it -- and have to do it the other way.  And it was

4  that -- it was just a plug number.

5      Q.    And how long did you put in plug numbers?

6      A.    I don't recall the exact -- I did it so that they

7  could be processed.  And whenever the -- they were asked for

8  as far as by the State Bar or whatever.

9      Q.    So did you do that way back in 2015?

10     A.    No.

11     Q.    '16?

12     A.    I don't -- I don't know when I stopped doing them,

13 but no.

14     Q.    So --

15     A.    It was when Qualia was -- came about.

16     Q.    And did you check back with SoftPro to see if there

17 were outstanding checks, et cetera?

18     A.    I did not.

19     Q.    And you just plugged in a number?

20     A.    Yes.

21     Q.    Were you aware of the organization of a company

22 called All American A or All American Abstracts?

23     A.    I was aware of it, yes.

24     Q.    Okay.  And were you aware of transfers of money made

25 to that company?

In Re: Washburn Law, PLLC

158

1    A.   Yes.

2    Q.   How were you aware -- made aware of that?

3    A.   I actually made wire transfers to it.

4    Q.   Okay.  So who told you to wire the money to All

5  American A?

6    A.   It would be Jack or Usha.

7    Q.   Okay.  Is Usha Jack's assistant?

8    A.   Yes.

9    Q.   And did you know why those transfers were being

10  made?

11    A.   To -- I mean, he would -- I didn't know exactly why.

12  No.

13    Q.   Did he tell you to transfer that money from the

14  trust account or from other accounts?

15    A.   That was the one that I had the ability to transfer

16  from was the trust account.

17    Q.   Oh, so if they asked you for money, you had to do it

18  from the trust account?

19    A.   I did.

20    Q.   Is that right?  Who else had the authority -- Mr.

21  Washburn talked about that two-step --

22    A.   Yes.  It was two steps.  And right or wrong, I had

23  the ability -- and I understand his testimony.  I believe it

24  to be true.  But I transferred -- and my credentials were

25  under Jonathan's name, but it wasn't by -- for any reason

In Re: Washburn Law, PLLC

159

1    except that's just the way it worked out.  And Candice could

2    transfer money, too, and she did it under my name.  Which it

3    wasn't -- it wasn't really -- that's just the way it worked

4    out.

5        Q.   So then she had -- so she had authority to do that

6    second step, which is authorized?

7        A.   She did, but normally she didn't.  And I think -- I

8    believe that Heather probably could, too.

9        Q.   Okay.

10       A.   With the same credentials.

11       Q.   And so people were using each other's -- other

12   people's credentials?

13       A.   They were.  And that's -- and I don't know what

14   happened with the First Citizens and Jonathan being taken off

15   anything because I always thought he was on it because it

16   just -- it just would always seemed like he had to be on it.

17       Q.   Were you aware of any services or goods provided by

18   All American A or All American Abstract to --

19       A.   It was a company that --

20       Q.   -- Washburn Law?

21       A.   It was a company that was developed back in the PPO

22   days or -- and there were several of them like that.  That --

23   I can't recall the other names but that one seemed to

24   survive.

25       Q.   What's the PPO days?

In Re: Washburn Law, PLLC

160

1      A.  BPO days.

2      Q.  BPO days.

3      A.   Yeah.

4      Q.   Okay.

5      A.  There's a lot of them.

6      Q.   But you're not aware of any services provided by All

7   American A to Washburn Law?

8      A.   I thought it had something to do with abstracts but

9   I don't know of anything.

10     Q.   Was Stephanie Munsey, to your knowledge, aware of

11  All American Abstract or All American A?

12     A.  I don't know.

13     Q.   Do you know if Jack Munsey had access to the

14  approval process for sending wires?

15     A.   I don't think he had any credentials or used

16  anybody's credentials.  And I don't think Jonathan did

17  either.

18     Q.   You heard Jonathan's testimony -- Mr. Washburn's

19  testimony.  Are there any corrections you would make to his

20  testimony based on your experience?

21     A.   It just -- the whole thing with First Citizens

22  didn't make sense.  But I know he said they took him off.  If

23  he says they took him off, they took him off.  But I was

24  always under the impression that it was his deal to oversee.

25  But it -- evidently, they did.  And like I said, they -- even

In Re: Washburn Law, PLLC

161

1    with the wires, if something happened, they would call me and

2    ask for Jonathan.  And then they wouldn't talk to me when I

3    wasn't Jonathan.

4        Q.   When did you first start initiating wires from the

5    trust account to All American A?

6        A.   I don't know exactly.

7        Q.   Do you have any -- estimate of the time frame?  How

8    many years did that go on?

9        A.   I would think it -- two, two or three.  Two or three

10   years.  I don't know exactly.

11            MR. ANGELL:  I've got no further questions, Your

12   Honor.

13            THE COURT:  Okay.  Mr. Behr?

14   CROSS EXAMINATION BY MR. BEHR:

15       Q.   Just very briefly.  So were all the -- just to

16   confirm -- all the transfers that were made from All American

17   A -- I'm sorry -- from the trust account to All American A

18   were done so at the direction of Jack Munsey?

19       A.   Jack and Usha.

20       Q.   And do you know -- do you have reason to know who

21   would -- whether Usha made those decisions on her own or was

22   she directed to by someone else to direct you to make the

23   transfer?

24       A.   I don't know but I would assume directed.

25       Q.   By whom?

162

```
1      A.   Probably Jack.
2      Q.   Okay.  Did you ever question why you were
3  transferring money from the IOLTA trust account to All
4  American A?
5      A.  We had money coming in from -- no.
6      Q.   Did you have an opportunity to listen to Mr.
7  Nordlander's testimony?  He was the forensic accountant.
8      A.   Yes.
9      Q.   Do you -- and then your -- and what was your role
10  again with Washburn Law?
11      A.   Accounting.
12      Q.   Okay.  So based on your experiences involving
13  accounting with Washburn Law, do you contest any of the
14  findings that Mr. Nordlander testified about today?
15      A.   No.  There was some things that I didn't know about
16  until today.  But I don't question.  I'm sure he looked at it
17  thoroughly.
18      Q.   Okay.  Do you have -- based on your own knowledge,
19  you have no reason to believe that his opinion might not be
20  correct?
21      A.  I have no reason to.
22      Q.   Okay.
23          MR. BEHR:  No further questions, Your Honor.  Thank
24  you.
25          THE COURT:  So let me understand, Mr. Zuber.  Mr.
```

In Re: Washburn Law, PLLC

163

1    Nordlander testified about transfers that were made from the

2    trust account through AAA to you.  Do you dispute any of that

3    testimony?

4           THE WITNESS:  Jack would send me money from time to

5    time.  And I don't -- I didn't really hear that in the

6    testimony.  I wasn't here at that time because of

7    complications.  But if it says -- if it came to me through

8    there, it did, I'm sure.

9           THE COURT:  So tell me about your compensation from

10   the company.  I mean from AAA or from Washburn Law.  Let's

11   say starting in 2020.

12          THE WITNESS:  I was always -- I was paid through

13   Washburn and sometimes from 1492.  Sometimes from --

14   evidently, from All America.  It would -- I don't think I was

15   ever paid out of Contract to Close or Repair to Close.  There

16   was a little bit of confusion about those.  I think they were

17   the same company or morphed into -- it's essentially the

18   same, Contract to Close and Repair to Close.  There were two

19   separate names like that but it ended up being Repair to

20   Close.  I don't believe I was ever paid from Repair to Close.

21   But I didn't really question where the money was -- you know,

22   which company was paying me as long as I got the money.

23          THE COURT:  So out of all the entities, no matter

24   which one it was, what did you receive in 2021 and '22?

25          THE WITNESS:  As far as a number?

In Re: Washburn Law, PLLC

164

1        THE COURT:  Yes, sir.

2        THE WITNESS:  I don't know that number.

3        THE COURT:  Can you make a guess?

4        THE WITNESS:  In the full year of 2020?

5        THE COURT:  Yes, sir.

6        THE WITNESS:  I would guess, you know, around 80

7  something -- 80,000, something in that range, 85, 80 -- maybe

8  90.

9        THE COURT:  Okay.  What about in '21?

10        THE WITNESS:  It would be a similar number.  I don't

11  really know.

12        THE COURT:  '22?

13        THE WITNESS:  I would think it'd be a similar number

14  again.

15        THE COURT:  I'm just curious because there's -- 51?

16  There's an expenditure -- this is Exhibit 33.  Did you want

17  to -- do you want to examine him on that, Mr. Angell?

18        MR. ANGELL:  Certainly, if I can find it.

19        THE COURT:  Exhibit 33.  This is -- it's got a

20  159,000-dollar expenditure next to your name.  I'm just

21  trying to figure out what was that for.  If that was over

22  time, it would be about right with your testimony.  But I

23  want to make sure.

24        MR. ANGELL:  I think Mr. Nordlander testified this

25  was from 2020 through the end of 2022.

In Re: Washburn Law, PLLC

165

1        THE COURT:  Okay.  So that would be -- it make sense
2   to make it all three years.  Okay.  All right.  Never mind.
3   You confirmed what I --
4        THE WITNESS:  Okay.
5        THE COURT:  You confirmed the opposite of what I was
6   going to ask you, so that's fine.  Thank you.  I don't have
7   any other questions.  You know --
8        MR. ANGELL:  I have one.
9   RECROSS EXAMINATION BY MR. BEHR:
10      Q.   Mr. Zuber, were you present for Mr. Ellington's
11  testimony?
12      A.   No.
13      Q.   Okay.  He -- he testified that around the end of
14  2022 that certain email accounts associated with Washburn
15  Law, PLLC had been deleted and accounts had been removed.
16  Were you aware of that at the time?
17      A.   I lost access to any Washburn account when I left.
18      Q.   And when was it -- when did you leave?
19      A.   Whenever the -- I don't know the exact date but
20  early December of 2022.  It was --
21      Q.   Did -- was your loss of access -- was that
22  associated with your departure from the company or the law
23  firm, or was it before then?
24      A.   No.  It was with departure.  I don't know that I
25  tried to log in, but when I -- I didn't have access at some

In Re: Washburn Law, PLLC

166

1   point when I tried.

2       Q.   Did you have any conversations with anyone at

3   Washburn Law about destruction of records or preservation of

4   records around that time?  The end of -- December of 2022.

5       A.   No.

6       Q.   No conversations with Mr. -- Mr. and Ms. Munsey

7   about preservation of records or destructions of records or

8   anything along those lines?

9       A.   I just left my office with the papers that were in

10  it.

11      Q.   Have you had discussions with Mr. or Ms. Munsey

12  since December of 2022?

13      A.   I have.

14      Q.   Have you discussed the issues that are, you know,

15  present in these bankruptcy cases or are you just having, you

16  know, friendly conversations about family and other things?

17      A.   Yeah.  It -- there would be conversation about -- I

18  have -- he stored a lot of things for me, so I have reason to

19  get things from -- he was a friend.  But yes, I mean, things

20  would come up from time to time about this.  Yes.

21      Q.   Has he made any comments -- and he being Mr. Munsey,

22  Mr. Jack Munsey -- about who may be culpable for the losses

23  of Washburn Law to you?

24      A.   Not really.  I don't think so.  No.

25      Q.   Has he acknowledged any fault to you during those

In Re: Washburn Law, PLLC

167

1    conversations?

2        A.   No.

3        Q.   And who do you hold responsible based on your

4    experience with Washburn Law for the financial predicament it

5    finds itself in right now?

6        A.   I don't know that I'd be qualified to answer.

7             MR. BEHR:  No further questions.

8    REDIRECT EXAMINATION BY MR. ANGELL:

9        Q.   So just to be clear, you received specific

10   instructions from Jack Munsey or Usha Thomas to transfer

11   money from the trust account to All American?

12       A.   Yes.

13       Q.   Okay.  Were you in charge of insurance matters for

14   Washburn Law?

15       A.   No.

16       Q.   Did you pay insurance bills?

17       A.   I can't recall any specific insurance bills.  I may

18   have signed some checks to pay insurance, but --

19       Q.   Do you know what insurance policies the company had?

20       A.   I do not.  It's -- most of that, I didn't have much

21   involvement with.

22       Q.   Okay.

23            MR. ANGELL:  I have no further questions, Your

24   Honor.

25            THE COURT:  Okay.  Thank you, Mr. Zuber.  You can

In Re: Washburn Law, PLLC

168

1   step down.  You are dismissed.  Okay.  Anything else?

2                    (WITNESS DISMISSED)

3        MR. ANGELL:  Your Honor, I have Exhibits 29, 30, and

4   31, which are insurance policies, regularly kept records of

5   the company, and I would ask that those be admitted into

6   evidence.

7        THE COURT:  29, 30, and 31?

8        MR. ANGELL:  Yeah.  And I represent that we

9   requested those and received those from the insurance

10  company.  Their declaration -- the declaration --

11       THE COURT:  Debt pages.  Okay.  Okay.  And who's the

12  carrier?  Who's papers are in there?

13       MR. ANGELL:  Hartford is 29.  Hartford, I think

14  that's -- 30, I believe, is a worker's comp policy.  And then

15  the professional liability policy is 31 with StarStone.

16       THE COURT:  Okay.  All right.  Each of those is

17  admitted, 29, 30, and 31.

18       MR. ANGELL:  Thank you, Your Honor.

19       THE COURT:  Okay.  Any other evidence?

20       MR. ANGELL:  No more evidence, Your Honor.  I'm

21  [INDISCERNIBLE].

22       THE COURT:  Okay.  I'm not going to ask for a real

23  summary argument because I think I know where I'm going on

24  it.  I just need to know -- you've reached a deal with Mr.

25  Zuber as far as the injunction.  Is that right?

Pace Reporting Service, Inc.  919-859-0000     www.pacereporting.com

In Re: Washburn Law, PLLC

169

1      MR. ANGELL:  We have.  Yes, Your Honor.  I tendered

2  a consent order that's --

3      THE COURT:  Okay.  And with effect to Mr. Washburn,

4  was he not involved in that one?

5      MR. ANGELL:  Mr. Washburn, no.  He's not involved in

6  this lawsuit.

7      THE COURT:  Not in this one.  Okay.  So you're

8  seeking it against All American A, LLC and Jack Munsey and

9  Stephanie Munsey.  Is that correct?  And also the trust.

10     MR. ANGELL:  Yes.  Yeah.  On the All American A,

11  we've got a default at this point, entry of default.  But

12  yes, I think -- Your Honor, and I want to tell the court that

13  may I go ahead and do a pre-judgement attachment on funds of

14  the Munsey trust and that will be filed tomorrow I

15  anticipate.

16     THE COURT:  Okay.  All right.  Do you need to have

17  that heard pretty quickly?

18     MR. ANGELL:  Yes, Your Honor.

19     THE COURT:  Okay.  I will -- we'll do that very

20  quickly and we may do it ex parte.

21     MR. ANGELL:  Thank you, Your Honor.

22     THE COURT:  Okay.

23     MR. ANGELL:  That would be appropriate.

24     THE COURT:  I am going to -- let me get through the

25  deal.  As far as your findings today, your showing today, the

Pace Reporting Service, Inc.  919-859-0000      www.pacereporting.com

In Re: Washburn Law, PLLC

170

1    court finds that the conditions necessary to the imposition

2    of preliminary injunction have been met.  The trustee has

3    shown that it is clearly likely to prevail on the merits.

4    The dispute raised in the memorandum filed yesterday do not

5    dispute the evidence that the court has heard today.  I find

6    that Mr. Washburn was not in complete control of Washburn

7    Law, as been argued.

8        And the other argument under that first provision,

9    really, just don't -- make a lot of sense to me.  I also find

10   that the trustee and his interest are likely to suffer

11   irreparable harm if this injunction got entered.  The balance

12   of equities tips in the favor absolutely of the trustee

13   because of the circumstances that have arisen in this case.

14   And that there is indeed a public interest in this matter and

15   it -- that weighs in favor of the trustee because of all the

16   people who've been harmed by the actions of what appears to

17   be the Munseys in this case.

18           So I am more than happy to enter that preliminary

19   injunction if you have that available.  I don't know if you

20   uploaded that or not, but I'll get that entered promptly, and

21   be glad to entertain the order of attachment.

22           MR. ANGELL:  Thank you, Your Honor.  I do not have -

23   - I'm sorry.  I do not have the order prepared.  I will

24   prepare the order.

25           THE COURT:  Okay.  All right.  Anything further in

In Re: Washburn Law, PLLC

171

1  this case?  I think we covered the Motion to Dismiss.  I

2  denied that earlier.  And I think that does it for you,

3  doesn't it?

4          MR. ANGELL:  That's it, Your Honor.

5          THE COURT:  Okay.  Thank you for your presentation

6  and your time.  And I appreciate the witnesses' availability

7  today, as well.  Madam Clerk, you may adjourn.

8          THE CLERK:  All rise.  United States Bankruptcy

9  Court is now adjourned.

10                 (End of recording.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

In Re: Washburn Law, PLLC

172

STATE OF NORTH CAROLINA

COUNTY OF WAKE

C E R T I F I C A T E

I, Anya Stallings, do hereby certify that the foregoing Pages 1 through 172 represents a true and accurate transcription of an electronic recording provided to me by HOWARD STALLINGS FROM & HUTSON, to the best of my ability and based on the quality of the recording, that I am not related to any of the parties to this action, that I am not interested in the outcome of this case, and that I am not of counsel nor in the employ of any of the parties to this action.

This the 5th day of April 2024.

*Anya Stallings*
_____
Anya Stallings